**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| MARCH FOR LIFE<br>　　1317 8th St., NW<br>　　Washington, DC 20001<br><br>JEANNE F. MONAHAN<br>　　3202 Martha Custis Drive<br>　　Alexandria, VA 22302<br><br>and BETHANY A. GOODMAN<br>　　124 Rumsey Ct. SE<br>　　Washington, DC 20003<br><br>　　Plaintiffs,<br><br>v.<br><br>SYLVIA M. BURWELL, in her official capacity<br>as Secretary of the United States Department of<br>Health and Human Services; THOMAS E. PEREZ,<br>in his official capacity as Secretary of the United<br>States Department of Labor; JACOB J. LEW, in<br>his official capacity as Secretary of the United<br>States Department of the Treasury; UNITED<br>STATES DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES; UNITED STATES<br>DEPARTMENT OF LABOR; and UNITED<br>STATES DEPARTMENT OF THE<br>TREASURY,<br><br>　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Case No. ___14-1149___ |

---

**VERIFIED COMPLAINT**

Plaintiffs, the March for Life Education and Defense Fund (March for Life), Jeanne F.

Monahan, and Bethany A. Goodman, allege as follows:

**INTRODUCTION**

1.      The federal government is requiring one of the oldest pro-life organizations in the nation and its employees to pay for health coverage of items that can destroy human embryos early in their development. March for Life exists, and its employees work there, precisely to protect, defend, and respect human life at every stage and to enable other like-minded Americans to do the same. The organization and its employees hold as a basic tenet, based on scientific and medical knowledge that human life begins at conception/fertilization. Thus, a human embryo, small and fragile though it may be, is a human life that the March for Life seeks to protect.  The March for Life's founding documents and articles of incorporation list this belief as an underlying principle. In direct contradiction to the March for Life's principles about protecting human life at all stages, Defendants seek, under the Patient Protection and Affordable Care Act ("ACA"), to require the March for Life to provide hormonal birth control items or intrauterine devices, which may prevent or dislodge the implantation of a human embryo after fertilization (hereinafter "abortifacients").

2.       March for Life and its employees object to the requirement that their health insurance plan cover such abortifacients. This coverage contradicts their shared beliefs, and none of the employees want to participate in such coverage.  Defendants created exemptions from their rules for other groups whose employees "likely" oppose contraception, but they refuse to extend those exemptions to March for Life and its employees.

3.      This requirement (hereinafter the "Mandate")[1] is illegal, unconstitutional and unethical.  It is arbitrary and capricious for the government to force a pro-life organization and

_____

[1] The Mandate consists of a conglomerate of authorities, including: "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act," 77 Fed. Reg. 8725–30 (Feb. 15, 2012); the prior interim

its pro-life employees to pay for abortifacient coverage that fundamentally violates their beliefs and ethical objections in principle and in practice. Thus the Mandate violates the Administrative Procedure Act, 5 U.S.C. § 500 et seq. (APA), via 5 U.S.C. § 700 *et seq*. (allowing for judicial review of APA violations). Defendants also violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA"), when they force March for Life's employees, who work there in order to associate with and express their ethical and religious pro-life beliefs, to obtain health insurance including abortifacients. And the rule violates the Plaintiffs' right to Equal Protection under the Fifth Amendment of the U.S. Constitution by refusing them an exemption that Defendants give to similarly situated groups.

4.      Plaintiffs seek declaratory and injunctive relief from the Defendants' violations. The Mandate deprives March for Life's employees of the ability to choose a non-abortifacient health insurance plan and it prohibits March for Life from obtaining and offering such a plan.

**IDENTIFICATION OF PARTIES**

5.      Plaintiff March for Life is a non-profit, non-religious pro-life organization organized under the laws of the District of Columbia.  It is located in Washington, D.C.

---

final rule found at 76 Fed. Reg. 46621–26 (Aug. 3, 2011) which the Feb. 15 rule adopted "without change"; the guidelines by Defendant HHS's Health Resources and Services Administration (HRSA), http://www.hrsa.gov/womensguidelines/, mandating that health plans include no-cost-sharing coverage of "All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" as part of required women's "preventive care"; regulations issued by Defendants in 2010 directing HRSA to develop those guidelines, 75 Fed. Reg. 41726 (July 19, 2010); the statutory authority found in 42 U.S.C. § 300gg-13(a)(4) requiring unspecified preventive health services generally, to the extent Defendants have used it to mandate coverage to which Plaintiffs object; penalties existing throughout the United States Code for noncompliance with these requirements; and other provisions of ACA or its implementing regulations that affect exemptions or other aspects of the Mandate.

6.     Plaintiff Jeanne F. Monahan is the President of March for Life.   She is a nationally recognized pro-life advocate and opponent of abortifacient drugs and devices.   She is a participant in March for Life's health insurance plan.   She resides in Alexandria, Virginia.

7.     Plaintiff Bethany A. Goodman is an employee at March for Life and a participant in March for Life's health insurance plan.   She resides in Washington, D.C.

8.     Defendant Sylvia M. Burwell is the Secretary of the United States Department of Health and Human Services (HHS). In this capacity, she has the responsibility for the operation and management of HHS. Burwell is sued in her official capacity only.

9.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

10.     Defendant Thomas E. Perez is the Secretary of the United States Department of Labor. In this capacity, he has responsibility for the operation and management of the Department of Labor. Perez is sued in his official capacity only.

11.      Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

12.     Defendant Jacob Lew is the Secretary of the Treasury. In this capacity, he has responsibility for the operation and management of the Department. Lew is sued in his official capacity only.

13.      Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

**JURISDICTION AND VENUE**

14.     This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1361, jurisdiction to render declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 & 2202, 42 U.S.C. § 2000bb-1, 5 U.S.C. § 702, and Fed. R. Civ. P. 65, and to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

15.     Venue lies in this district pursuant to 28 U.S.C § 1391(e). Plaintiff March for Life and the United States Defendants are located in this district.

**FACTUAL ALLEGATIONS**

**I.      March for Life's Beliefs.**

16.     March for Life was founded in 1973, following the Supreme Court's landmark decision in *Roe v. Wade,* when a group of pro-life leaders gathered to express concern that the first anniversary of the decision would come and go with no recognition.

17.      The hallmark of March for Life is its annual march on the Supreme Court and United States Capitol, held every year on or around January 22, the anniversary of *Roe v. Wade*. March for Life intends to hold the march every year until *Roe v. Wade* is overturned. The first march was held on January 22, 1974.

18.     March for Life organizes for the purpose of protecting the lives of unborn children, promoting respect for the worth and dignity of all unborn children, and opposing abortion in all its forms.

19.     Life begins at conception, thus a human embryo is a human life that March for Life believes shall be protected and certainly not intentionally terminated.  Therefore, March for Life opposes abortifacients. "The life of each human being shall be preserved and protected from

the human being's biological beginning when the Father's sperm fertilizes the Mother's ovum." (See Exhibit 1 at 2, attached, March for Life Articles of Incorporation art. 3.)

20.     March for Life's commitment to opposing all abortion includes opposing coverage for abortion or abortifacients in their health insurance plan.

21.     Because of this commitment, March for Life only hires employees who oppose all abortion, including abortifacients.

22.     March for Life has three employees who have elected to be covered under its health insurance plan. All three object to participating in a plan that covers abortion-inducing drugs and devices for plan participants. Two of those employees are Plaintiffs Jeanne F. Monahan and Bethany A. Goodman.

23.     March for Life's health insurance plan does not qualify for grandfathered status under the Affordable Care Act because, among other reasons, it did not come into existence until after the Act's relevant passage date in 2010.

24.     March for Life believes that it should provide all of its employees with health insurance as a responsible business practice, as an essential benefit for employees, and so employees will have a pro-life health insurance option.

25.     March for Life's health insurance carrier has indicated it would offer coverage to MFL that omits abortifacients if doing so was legally permissible.

**II.     The March for Life Employees' Religious Beliefs.**

26.     Plaintiffs Jeanne F. Monahan and Bethany A. Goodman, are full-time employees of March for Life. Each employee receives health insurance coverage through March for Life.

27.     Miss Monahan is a Catholic Christian, and Mrs. Goodman is an Evangelical Protestant Christian (hereinafter "employees").

28.     Each of the employees strives to follow their ethical and religious beliefs and the moral teachings of their faith throughout their lives, including within their employment.

29.     Each of the employees believe that all human lives have full human dignity from the moment of conception/fertilization, because at that moment a new and complete organism comes into existence (although at an immature stage) and is a whole, living, distinct, individual member of the human species; in other words, it is an individual human being. Each employee also holds that the destruction of an innocent human life at any stage in development is a grave injustice. Each employee sees abortion as a violation of human rights.

30.     They believe that in order to be true to their religious and ethical conscience, they are called to live out those beliefs in their work and how they live their lives.  Furthermore, March for Life employees believe that to sever their beliefs from practice is to disobey their faith.

31.     Each employee specifically works at the March for Life in order to educate Americans about the dignity of the human person from conception/fertilization and to help protect life in all of its stages.

32.     As a matter of their religious faith and belief, the March for Life employees believe that they are prohibited from using, supporting, or otherwise advocating abortifacients drugs and devices, which may act to end very early human life.

33.     The employees have sincere and deeply held religious and moral beliefs against abortion and abortifacients, and they oppose having insurance coverage for the same for themselves and their families.

34.     Consequently, the March for Life employees object, on the basis of their sincerely held ethical and religious beliefs, to participating in a health insurance plan which provides coverage for abortifacient items for themselves and their family members.

35.     Forcing the March for Life employees to participate in a health insurance plan which provides coverage for abortifacient items places numerous substantial burdens on the religious beliefs and exercise of each individual employee.

### III.   The ACA Statute.

36.     In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Publ. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act" ("ACA").

37.     The ACA regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

38.     One ACA provision mandates that any "group health plan" (including employers offering the plan) or "health insurance issuer offering group or individual health insurance coverage" must provide coverage for certain preventive care services. 42 U.S.C. § 300gg-13(a).

39.     These services include medications, screenings, and counseling given an "A" or "B" rating by the United States Preventive Services Task Force; immunizations recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; and "preventive care and screenings" specific to infants, children, adolescents, and women, as to be "provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(1)-(4).

40.     These services must be covered without "any cost sharing." 42 U.S.C. § 300gg-13(a).

**IV.   Defendants Rush an Abortifacient Mandate through the Regulatory Process.**

41.     On July 19, 2010, HHS published an interim final rule imposing regulations concerning the Affordable Care Act's requirement for coverage of preventive services without cost sharing.  75 Fed. Reg. 41726, 41728 (2010).

42.     After the Interim Final Rule was issued, numerous commenters warned against the potential conscience implications of requiring objecting individuals and organizations to include certain kinds of services—specifically contraception, sterilization, and abortion services—in their health care plans.

43.     HHS directed a private health policy organization, the Institute of Medicine (IOM), to make recommendations regarding which drugs, procedures, and services all health plans should cover as preventive care for women.

44.     In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum. All of these groups advocate for access to contraception and abortion.

45.     Plaintiff Jeanne Monahan attended each of the public IOM meetings. She provided remarks at each meeting during the public comment section. During this portion of the meeting, any groups that had not specifically been invited to present were allowed to speak and express concerns.

46.     Public commenters included a variety of pro-life medical doctors, attorneys, health insurance representatives.  But no group or individual that opposed government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the presenters invited by the IOM.

47.     On July 19, 2011, the IOM published its preventive care guidelines for women, including a recommendation that preventive services include "[a]ll Food and Drug Administration approved contraceptive methods [and] sterilization procedures" and related "patient education and counseling for women with reproductive capacity."  Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, at 102-10 and Recommendation 5.5 (July 19, 2011). In issuing these recommendations, the IOM committee ignored and/or disregarded any technical research that discussed the destruction of life prior to, or in the case of ulipristal, after implantation and how that would impact recommendations. They did not address the large number of public meeting participants who expressed grave concern about the modes of action of these drugs and devices that were destructive rather than preventative. This science and research was simply not considered.

48.     FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices such as IUDs; Plan B (also known as the "morning-after pill"); ulipristal (also known as "ella" or the "week-after pill"); and other drugs, devices, and procedures.

49.     In the category of "FDA-approved contraceptives" included in the Mandate are all hormonal contraceptives, IUDs, and emergency contraception, which March for Life and its employees believe function to prevent the implantation of a human embryo after fertilization in some cases.

50.     The manufacturers of many hormonal contraceptives, IUDs, and emergency contraception methods indicate in the labeling of those items that they can function to prevent implantation of an early embryo.

51.     The FDA approved in this same "contraception" category a drug called "ella" (the so-called "week after" pill), which studies show can function to kill embryos even after they have implanted in the uterus, by a mechanism similar to the abortion drug RU-486.

52.     The Defendants admit that at least Plan B, ella, and IUDs can function in part to cause the demise of the embryo after its fertilization and before its implantation.

53.     The requirement for related "education and counseling" accompanying abortifacients, sterilization, and contraception necessarily covers education and counseling given in favor of covered drugs and devices, even though it might also include other education and counseling.  Moreover, it is inherent in a medical provider's decision to prescribe one of these items that she is taking the position that use of the item is in the patient's best interests, and therefore her education and counseling related to the item will be in favor of its proper usage.

54.     On August 1, 2011, a mere 13 days after IOM issued its recommendations, HRSA issued guidelines adopting them in full. *See* http://www.hrsa.gov/womensguidelines (last visited April 8, 2014).

55.     Non-exempt insurance plans starting after August 1, 2012 were subject to the Mandate.

56.     Any non-exempt employer providing a health insurance plan that omits any abortifacients, contraception, sterilization, or education and counseling for the same, is subject (because of the Mandate) to heavy fines approximating $100 per employee per day.  Such employers are also vulnerable to lawsuits by the Secretary of Labor and by plan participants.

57.     Dropping health insurance coverage for employees would harm an entity's ability to attract and keep good employees, cause the entity to have to increase employee compensation so that they could purchase health insurance themselves, and cause the entity's employees to have no option for obtaining health insurance that omits abortifacients.

58.     The Mandate applies to all plans that March for Life's employees have the option of enrolling in, whether at March for Life, on insurance exchanges, or in the individual market.

**V.     Defendants Refuse to Exempt March for Life while Exempting Similar Groups.**

59.     On the very same day HRSA rubber-stamped the IOM's recommendations, HHS promulgated an additional Interim Final Rule regarding the preventive services mandate.   76 Fed. Reg. 46621 (published Aug. 3, 2011).

60.     This Second Interim Final Rule granted HRSA "*discretion* to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46621, 46623 (emphasis added). The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the religious tenets of the organization"; and (4) "is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626 (emphasis added).

61.     The statutory citations in the fourth prong of this test refers to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order." 26 U.S.C.A. § 6033.

62.     HRSA exercised its discretion to grant an exemption for religious employers via a footnote on its website listing the Women's Preventive Services Guidelines. The footnote states

that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers." *See* http://www.hrsa.gov/womensguidelines (last visited April 8, 2014).

63.    Defendants excluded March for Life from this exemption because it is not religious and is not a church, even though it does in fact employ only people who share its views against abortion and abortifacients.

64.    Like the original Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or opportunity for public comment.

65.    Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance. 76 Fed. Reg. at 46624.

66.    Upon information and belief, after the Second Interim Final Rule was put into effect, over 100,000 comments were submitted opposing the narrow scope of the "religious employer" exemption and protesting the contraception mandate's gross infringement on the rights of religious individuals and organizations. Among the many commenters, Jeanne Monahan submitted comments to HHS in the capacity of her previous employer. See Family Research Council, "Comments on Women's Preventive Services Mandate," Sept. 30, 2011 available at http://downloads.frc.org/EF/EF11I58.pdf (last visited June 23, 2014).

67.    The public outcry for a broader religious employer exemption continued for many months.   On January 20, 2012, HHS issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law." *See* Jan. 20, 2012 Statement by

13

U.S. Department of Health and Human Services Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited April 8, 2014).

68.     On February 10, 2012, HHS formally announced a "safe harbor" for non-exempt nonprofit religious organizations that objected to covering free contraceptive and abortifacient services.

69.     Under the safe harbor, HHS agreed it would not take any enforcement action against an eligible organization during the safe harbor, which would remain in effect until the first plan year beginning after August 1, 2013.

70.     Defendants excluded March for Life from the safe-harbor because it is not religious.

71.     Despite the safe harbor and HHS's accompanying promises, on February 10, 2012, HHS announced a final rule "finalizing, without change," the contraception and abortifacient mandate and narrow religious employer exemption. 77 Fed. Reg. 8725-01 (published Feb. 15, 2012).

72.     On March 21, 2012, HHS issued an Advance Notice of Proposed Rulemaking (ANPRM), presenting "questions and ideas" to "help shape" a discussion of how to "maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations. 77 Fed. Reg. 16501, 16503 (2012).

73.     The ANPRM conceded that forcing religious organizations to "contract, arrange, or pay for" the objectionable contraceptive and abortifacient services would infringe their "religious liberty interests." *Id.*

74.     "[A]pproximately 200,000 comments" were submitted in response to the ANPRM, 78 Fed. Reg. 8456, 8459, largely reiterating previous comments that the government's

proposals would not resolve conscientious objections, because the objecting religious organizations, by providing a health care plan in the first instance, would still be coerced to arrange for and facilitate access to morally objectionable services. Plaintiff Jeanne Monahan submitted comments to HHS in the formal capacity of her previous employer. See Family Research Council, "Comments on 'Accommodation' for HHS Mandate," June 8, 2012, available at http://downloads.frc.org/EF/EF12F18.pdf (last visited June 23, 2014).

75.      On February 1, 2013, HHS issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM. 78 Fed. Reg. 8456 (published Feb. 6, 2013).

76.      The NPRM proposed two changes to the then-existing regulations. 78 Fed. Reg. 8456, 8458-59.

77.      First, it proposed revising the religious employer exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and primarily employ and serve only persons of their same faith. 78 Fed. Reg. at 8461.

78.      Under this proposal a "religious employer" would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 8461.

79.      HHS emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. 8456, 8461.

80.      Second, the NPRM reiterated HHS's intention to "accommodate" non-exempt, nonprofit religious organizations by making them "designate" their insurers and third party

administrators to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

81.     Defendants did not include March for Life in either its proposed religious employer definition or its proposed accommodation because March for Life is not religious and is not a church.

82.     In issuing the NPRM, HHS requested comments from the public by April 8, 2013. 78 Fed. Reg. 8457.

83.     "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. 39870, 39871, with religious organizations again overwhelmingly decrying the proposed accommodation as a gross violation of their religious liberty because it would conscript their health care plans as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

84.     On April 8, 2013, the same day the notice-and-comment period ended, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

85.     In her remarks, Secretary Sebelius stated:

We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.

*See* The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, *available at* http://theforum.sph

.harvard.edu/events/conversation-kathleen-sebelius (Episode 9 at 2:25) (last visited April 8, 2014) (emphases added).

**VI.    The Final Mandate Excludes March for Life from the Exemption.**

86.    On June 28, 2013, Defendants issued a final rule, which ignores the objections repeatedly raised by conscientious objectors and continues to co-opt employers into the government's scheme of coercing free access to contraceptive and abortifacient services. 78 Fed. Reg. 39870.

87.    The final rule contains the discretionary "religious employer" exemption, which exempts formal churches and their integrated auxiliaries and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39874.

88.    Defendants declared that this exemption covers only churches and their integrated auxiliaries because "Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." *Id.*

89.    Defendants excluded March for Life from this definition even though it in fact employs only people sharing its opposition to abortifacients.

90.    The Mandate also creates a separate "accommodation" for certain non-exempt religious organizations. 78 Fed. Reg. at 39874. A religious organization is eligible for the "accommodation" if it: (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a

17

religious organization"; and (4) "self-certifies that it satisfies the first three criteria." *Id*. The self-certification serves to trigger an organization's insurer or third-party administrator's duties to provide the required items under the Mandate without cost-sharing to the employees of eligible organizations.

91.     March for Life does not qualify for the accommodation because it is not religious.

92.     Amidst the various comment periods and hundreds of thousands of comments between 2011 and the final Mandate rule, several comments were submitted suggesting that the Mandate should exempt pro-life groups such as March for Life alongside churches, but Defendants did not exempt such pro-life groups, and did not offer adequate reasons for declining to do so.

**VII.  The Mandate's Impact on Plaintiffs.**

93.     Under the Mandate, March for Life faces the untenable choices of transgressing its pro-life commitment and its commitment to its pro-life employees by offering abortifacients in its health plan, or violating the law and suffering under the Mandate's penalties, or revoking its employees' health plan and sending them into a market where all plans offer abortifacients and many offer abortion at later stages of pregnancy.

94.     March for Life's employees, under the Mandate, face similarly untenable choices between participating in a health plan that provides abortifacient coverage for themselves and their families against their religious and moral beliefs, buying such a plan from the open market which will include abortifacients or might also include surgical abortion.

95.     Dropping its insurance plan would place March for Life at a severe competitive disadvantage in its efforts to recruit and retain employees.

96.     The Mandate forces March for Life to deliberately provide health insurance that provides free access to abortifacients drugs.

97.     The Mandate and the ACA require the employees of March for Life to accept health insurance coverage for abortifacient items, regardless of the fact that none of the employees desire the coverage.

98.     In plans required to cover abortifacients by the Mandate, the Mandate allows no employee to opt out of receiving that coverage even if they do not want the coverage, and even if the employer, plan and issuer would be willing to allow the employees to opt out, as here.

99.     The Mandate forces March for Life to facilitate government-dictated education and counseling concerning abortion that directly conflicts with its organizational views regarding the sanctity of human life.

100.     Facilitating this government-dictated speech directly undermines the express speech and messages concerning the sanctity of life that March for Life seeks to convey.

101.     Coercing March for Life to provide abortifacient coverage in its health insurance plan advances no compelling or even rational interest, because not only March for Life but its employees oppose the coverage.

102.     There are numerous alternative mechanisms through which the government could provide access to abortifacients, and March for Life's employees do not even want that access.

103.     The government provides exemptions for religious employers on the explicit rationale that they are "likely" to employ people who do not want contraceptive coverage, but it denies that same exemption to March for Life when it in fact and as a matter of policy definitely only employs people who do not want abortifacient coverage.

104.    The government also exempts grandfathered plans from the Mandate, encompassing tens of millions of women, 42 U.S.C. § 18011; 75 Fed. Reg. 41,726, 41,731 (2010). Employers who follow HHS guidelines have a "right" to use grandfathered plans indefinitely. *Id.*

105.    In the ACA, Congress chose to impose a variety of requirements on grandfathered health plans, but decided that this Mandate was not important enough to impose to the purported benefit of tens of millions of women.

106.    The Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose religious and moral beliefs such as those held by the March for Life and its employees regarding marriage, family, and life.

107.    On October 5, 2011, six days after the comment period for the original interim final rule ended, Secretary Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America.  She told the assembled crowd that "we are in a war."

108.    She further criticized individuals and entities whose beliefs differed from those held by her and others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much."

109.    On July 16, 2013, Secretary Sebelius further compared opponents of the Affordable Care Act generally to "people who opposed civil rights legislation in the 1960s," stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation." *See* http://www.hhs.gov/secretary/about/speeches/sp20130716.html (last visited April 8, 2014).

110.    Consequently, on information and belief, the purpose of the Final Mandate is to discriminate against organizations and individuals that oppose contraception and abortion.

111.    The Mandate subjects Plaintiffs to irreparable harm to their statutory and constitutional rights, and Plaintiffs will continue to suffer such harm absent injunctive and declaratory relief.

112.    Plaintiffs have no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**
**Violation of the Fifth Amendment to the United States Constitution**
**Equal Protection**

113.    Plaintiffs reallege all matters set forth in paragraphs 1–112 and incorporate them herein.

114.    The Due Process Clause of the Fifth Amendment requires that government actors treat equally all persons similarly-situated.

115.    This requirement of equal treatment applies to organizations as well as to individuals.

116.    Through the Mandate's "religious employer" exemption, Defendants have exempted certain religious organizations that object to complying with the contraceptive mandate based on the dictates of their conscience.

117.    Defendants limited that religious employer exemption to churches, religious orders and integrated auxiliaries thereof on the explicit rationale that such entities "are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39874.

118.    Defendants refused to exempt non-religious organizations such as March for Life.

119.    March for Life in fact only employs currently, and only hires as a matter of policy, employees who share March for Life's opposition to abortion, abortifacients, and coverage of the same in their health insurance plans.

120.    By extending exemptions to churches etc. but failing to extend it to March for Life, Defendants have treated March for Life differently than similarly-situated groups.

121.    This differential treatment is not rationally related to a legitimate governmental interest, furthers no compelling governmental interest, and is not narrowly tailored to any compelling governmental interest.

122.    The Mandate thus violates March for Life's rights secured to it by the Fifth Amendment to the United States Constitution.

123.    Absent injunctive and declaratory relief against application and enforcement of the Mandate, March for Life will suffer irreparable harm.

## SECOND CLAIM OF RELIEF
### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb

124.    Plaintiffs reallege all matters set forth in paragraphs 1–112 and incorporate them herein.

125.    The March for Life employee Plaintiffs including Ms. Monahan and Mrs. Goodman ("March for Life employees") sincerely hold religious beliefs against using, supporting, or otherwise advocating the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families. Their beliefs also require them to maintain their health and wellness, along with that of their families, in order to obey God's command of honoring him with their physical bodies, and health insurance is an integral part of doing that.

22

126.    The March for Life employees' compliance with those beliefs is a religious exercise within the meaning of the Religious Freedom Restoration Act.

127.    The Mandate imposes a substantial burden on the March for Life employees' religious exercise and coerces them to change or violate their religious beliefs.

128.    The Mandate fundamentally changes the compensation package that can be offered to the individuals employees, or that they can purchase as health insurance for their families.  The Mandate requires that, if the employees accept March for Life's insurance plan, or buy one for their families, it must provide coverage for abortifacients. This pressures the employees to decline health insurance as compensation, and to deprive themselves and their families of health insurance coverage. At the same time, the individual mandate imposes penalties on the employees and their family members if they do not have insurance.

129.    The Mandate exerts pressure to change the employees' behavior of maintaining health insurance in accordance with their religious beliefs and toward not having health insurance, since all plans they could buy must include coverage for abortifacients. The Mandate makes it impossible for the March for Life employees to find a health insurance plan that would comport with their sincerely held religious beliefs.

130.    The Mandate conditions a significant benefit, namely health insurance, on the March for Life employees' accepting health insurance that covers abortifacients. The Mandate therefore pressures the employees to forfeit benefits otherwise available, or to violate their sincerely held religious beliefs.

131.    The Mandate chills the March for Life employees' religious exercise within the meaning of RFRA.

132.    The Mandate serves no compelling governmental interest and is not narrowly tailored to further any compelling government interest.

133.    The Mandate or other significant provisions of the ACA do not apply to, inter alia, (1) the enormous number of health insurance plans that enjoy "grandfathered" status, (2) and churches and their integrated auxiliaries, on the explicit rationale that their employees are "likely" to oppose contraception and/or abortifacients. Both exceptions conclusively demonstrate the lack of a compelling interest in imposing the Mandate on March for Life and its employees.

134.    The government cannot serve any legitimate government interest by forcing people to accept insurance with abortifacient coverage when they do not want abortifacient coverage.

135.    Compelling the March for Life plan and employees to carry health insurance which provides access to such drugs and services is not the least restrictive means of advancing any interest the Defendants might have.

136.    The Mandate violates RFRA as applied to March for Life's employees.

**THIRD CLAIM FOR RELIEF**
**Violation of the First Amendment to the United States Constitution**
**Free Exercise of Religion**

137.    Plaintiffs reallege all matters set forth in paragraphs 1–112 and incorporate them herein.

138.    The March for Life employee Plaintiffs including Ms. Monahan and Mrs. Goodman ("March for Life employees") sincerely hold religious beliefs against using, supporting, or otherwise advocating the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families. Their beliefs also require them to maintain their health and wellness, along with that of their families, in order to obey

God's command of honoring him with their physical bodies, and health insurance is an integral part of doing that.

139.   The March for Life employees' compliance with those beliefs is a religious exercise within the meaning of the Free Exercise of Religion Clause of the First Amendment.

140.   The Mandate imposes a burden, and a substantial burden, on the March for Life employees' religious exercise and coerces them to change or violate their religious beliefs.

141.   The Mandate fundamentally changes the compensation package that can be offered to the individuals employees, or that they can purchase as health insurance for their families.  The Mandate requires that, if the employees accept March for Life's insurance plan, or buy one for their families, it must provide coverage for abortifacients. This pressures the employees to decline health insurance as compensation, and to deprive themselves and their families of health insurance coverage. At the same time, the individual mandate imposes penalties on the employees and their family members if they do not have insurance.

142.   The Mandate exerts pressure to change the employees' behavior of maintaining health insurance in accordance with their religious beliefs and toward not having health insurance, since all plans they could buy must include coverage for abortifacients. The Mandate makes it impossible for the March for Life employees to find a health insurance plan that would comport with their sincerely held religious beliefs.

143.   The Mandate conditions a significant benefit, namely health insurance, on the March for Life employees' accepting health insurance that covers abortifacients. The Mandate therefore pressures the employees to forfeit benefits otherwise available, or to violate their sincerely held religious beliefs.

144.    The Mandate chills the March for Life employees' religious exercise within the meaning of the Free Exercise of Religion Clause of the First Amendment.

145.    The Mandate is not neutral and is not generally applicable.

146.    The Mandate or other significant provisions of the ACA do not apply to, inter alia, (1) the enormous number of health insurance plans that enjoy "grandfathered" status, (2) and churches and their integrated auxiliaries, on the explicit rationale that their employees are "likely" to oppose contraception. Both exceptions conclusively demonstrating the lack of neutrality, general applicability, and a compelling interest in imposing the Mandate on March for Life and its employees.

147.    The Mandate serves no compelling governmental interest and is not narrowly tailored to further any compelling government interest.

148.    The government cannot serve any legitimate government interest by forcing people to accept insurance with abortifacient coverage when they do not want abortifacient coverage.

149.    Despite being informed in detail of the religious objections of groups and people like Plaintiffs, Defendants designed the Mandate and the exemption therefrom in a way that continues to impose the Mandate on them, while not imposing it on some other similarly situated persons.

150.    Compelling the March for Life plan and employees to carry health insurance which provides access to abortifacient drugs and services is not the least restrictive means of advancing any interest the Defendants might have.

151.    The Mandate violates March for Life's employees' rights under the Free Exercise of Religion Clause of the First Amendment of the United States Constitution.

## FOURTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act

152.    Plaintiffs reallege all matters set forth in paragraphs 1–112 and incorporate them herein.

153.    The Administrative Procedure Act ("APA") requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law" or "contrary to [a] constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A) & (B).

154.    As set for above, the Mandate violates RFRA and the Fifth Amendment to the U.S. Constitution.

155.    Defendants did not adequately consider or respond to comments they received indicating that groups like March for Life should be exempt from the Mandate.

156.    The Mandate is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it exempts churches which are merely "likely" to have employees who oppose contraception and/or abortifacients, but refuses to exempt March for Life, which is explicitly an anti-abortion organization that only hires anti-abortifacient employees.

157.    The Mandate is arbitrary and capricious under the APA because no rational government interest is served by forcing people to accept abortifacient coverage as a condition of having health insurance when those people morally or religiously oppose abortifacient coverage.

158.    The Mandate is also contrary to the provision of the ACA that states that "nothing in this title"—i.e., title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." Section 1303(b)(1)(A).

159.    The Mandate is also contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008), which provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

160.    The Mandate also violates the provisions of the Church Amendment, 42 U.S.C. § 300a-7(d), which provides that "No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions."

161.    The Mandate is contrary to existing law and is in violation of the APA under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    That this Court enter a judgment declaring the Mandate and its application to March for Life and its employees is a violation of their rights protected by RFRA, the APA and the Fifth Amendment to the United States Constitution;

B.    That this Court enter a preliminary and permanent injunction prohibiting Defendants from continuing to apply the Mandate to Plaintiffs and their insurers, and other pro-

life groups similarly situated but not before the Court, in a way that requires March for Life or its employees to provide or participate in health insurance that contains coverage for abortifacients, or that penalizes March for Life or its employees or their insurers for not offering abortifacient coverage in Plaintiffs' health insurance plan;

   C. That this court award Plaintiffs nominal damages, and court costs and reasonable attorney's fees as provided by the Equal Access to Justice Act and RFRA (as provided in 42 U.S.C. § 1988);

   D. That this Court grant such other and further relief as to which Plaintiffs may be entitled.

   Respectfully submitted this 8th day of July, 2014.

*Attorneys for Plaintiffs***:**

  _s/ Matthew S. Bowman_   

| | |
|---|---|
| DAVID A. CORTMAN | STEVEN H. ADEN |
|   (DC Bar No. 478748) |   (DC Bar No. 46777) |
| ALLIANCE DEFENDING FREEDOM | MATTHEW S. BOWMAN |
| 1000 Hurricane Shoals Road NE |   (DC Bar No. 993261) |
| Suite D-1100 | ALLIANCE DEFENDING FREEDOM |
| Lawrenceville, GA 30043 | 801 G Street, NW, Suite 509 |
| (770) 339-0774 | Washington, D.C.  20001 |
| (770) 339-6744 (facsimile) | (202) 393-8690 |
| dcortman@alliancedefendingfreedom.org | (202) 347-3622 (facsimile) |
| | saden@alliancedefendingfreedom.org |
| ELISSA GRAVES* | mbowman@alliancedefendingfreedom.org |
| ALLIANCE DEFENDING FREEDOM | |
| 15100 N 90th Street | |
| Scottsdale, AZ 85260-2901 | |
| (480) 444-0020 | |
| (480) 444-0028 (facsimile) | |
| egraves@alliancedefendingfreedom.org | |

*Pro hac vice application forthcoming*

**VERIFICATION OF COMPLAINT**

**PURSUANT TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 7, 2014

_____*s/ Jeanne F. Monahan*_____
JEANNE F. MONAHAN


_____*s/ Bethany A. Goodman*_____
BETHANY A. GOODMAN