**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| MARCH FOR LIFE; JEANNE F. MONAHAN; and BETHANY A. GOODMAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:14-cv-1149-RJL |
| KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services; THOMAS E. PEREZ, in his official capacity as Secretary of the United States Department of Labor; JACOB J. LEW, in his official capacity as Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES DEPARTMENT OF THE TREASURY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

**MOTION FOR PRELIMINARY INJUNCTION AND CONSOLIDATED**
**TRIAL ON THE MERITS, AND MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Fed. R. Civ. P. 54, 65 & 65(a)(2), and LCvR 65.1, the above named plaintiffs hereby move for a preliminary injunction and a consolidated trial on the merits awarding them permanent declaratory and injunctive relief on their claims, for the reasons set forth below in the memorandum of law.

Plaintiffs need relief from this Court because they are being forced to provide insurance coverage of abortifacient drugs and devices in violation of their moral convictions and their constitutional and statutory rights. This case raises essentially pure matters of law in which the only evidentiary items needed are the already verified allegations in Plaintiffs' complaint

pertaining to the nature of their beliefs, and Plaintiffs do not anticipate a dispute pertaining to those items. Other cases challenging this Mandate, while presenting distinct issues, nevertheless have involved no material evidentiary disputes. The relevant statute and the government's regulations at issue speak for themselves.

Plaintiffs therefore request a hearing pursuant to LCvR 65.1(d) to present oral argument on this motion. Plaintiffs do not anticipate that the hearing will be evidentiary but, if the Court wishes, the Plaintiffs would be available to supplement the record. To prevent any burden on the Court, Plaintiffs would agree to scheduling the hearing beyond the strict 21-day timeframe indicated in LCvR 65.1.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................v

INTRODUCTION ..........................................................................................................1

FACTUAL BACKGROUND ..........................................................................................1

    A.    Congress decides that a contraception mandate is not important enough to impose, and that preventive services coverage need not be universal. ...................1

    B.    Government agencies impose the contraception Mandate anyway. ........................2

    C.    The government exempts some entities if the employees "primarily" object to contraception, but refuses to exempt entities like March for Life. ..........................2

    D.    The government again exempts religious entities because their employees "likely" object, but refuses to include March for Life in the exemption. ................3

    E.    The government finalizes its exemption of church entities, but not March for Life, because employees of the former "likely" object to contraception. ...............4

    F.    March for Life and its employees oppose abortifacients. ........................................6

ARGUMENT ...................................................................................................................8

    I.    Plaintiffs Are Likely to Succeed on the Merits...........................................................8

        A.    The Mandate violates the Fifth Amendment guarantee of Equal Protection........8

        B.    The Mandate is capricious under the Administrative Procedure Act. ...............10

        C.    The Mandate violates the Religious Freedom Restoration Act rights of the employee Plaintiffs. .........................................................................................12

            1.    The religious exercise at issue. ...................................................................12

            2.    The Mandate substantially burdens the employee Plaintiffs' beliefs. ..........13

            3.    The Mandate cannot satisfy strict scrutiny. ..................................................14

                a.    The Mandate does not serve a compelling interest................................14

                b.    The Mandate is not the least restrictive means of furthering the government's alleged interests.................................................................16

D.  The Mandate violates the Free Exercise rights of the employee Plaintiffs.........17

1.  The Mandate is selective, not generally applicable. ....................................17

2.  The Mandate is not neutral towards religion. ...............................................18

E.  The Mandate violates the APA because it is not "in accordance with law".......19

II.  March For Life Will Suffer Irreparable Harm Absent Injunctive Relief..................20

III. The Balance of Equities Tips in March For Life's Favor .........................................21

IV. An Injunction Is in the Public Interest .....................................................................21

V.  Plaintiffs Are Entitled To Final Judgment On The Merits ......................................21

CONCLUSION..................................................................................................................22

# TABLE OF AUTHORITIES

*Cases*

ACLU v. Ashcroft,
    322 F.3d 240 (3d Cir. 2003) ..................................................................21

Blackhawk v. Pennsylvania,
    381 F.3d 202 (3d Cir. 2004) .............................................................18–19

\* Brandon v. District of Columbia Bd. of Parole,
    823 F.2d 644 (D.C. Cir. 1987) ..............................................................8

Brown v. Borough of Mahaffey,
    35 F.3d 846 (3d Cir. 1994).....................................................................19

\* Burwell v. Hobby Lobby Stores, Inc.,
    134 S. Ct. 2751 (2014)......................................................2, 12–13, 16

\* Center for Inquiry, Inc. v. Marion Circuit Court Clerk,
    2014 WL 3397217 (7th Cir. July 14, 2014)...........................................10

\* Church of the Lukumi Babalu Aye v. City of Hialeah,
    508 U.S. 520 (1993)...............................................................15, 17–19

\* Citizens to Pres. Overton Park., Inc. v. Volpe,
    401 U.S. 402 (1971)...............................................................................11

City of Boerne v. Flores,
    521 U.S. 507 (1997)...............................................................................14

Cleburne v. Cleburne Living Ctr.,
    473 U.S. 432 (1985) ................................................................................8

County of Los Angeles v. Shalala,
    192 F.3d 1005 (D.C. Cir. 1999) ...........................................................11

Davenport v. Int'l Bhd. of Teamsters,
    166 F.3d 356 (D.C. Cir. 1999) ..............................................................8

Davis v. Pension Benefit Guar. Corp.,
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................8

Employment Div. Dep't of Human Res. of Or. v. Smith,
    494 U.S. 872 (1990) ........................................................................17–18

*Environmental Defense Fund, Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) ........................................................................10–11

*Foster v. Mabus*,
    895 F. Supp. 2d 135 (D.D.C. 2012) ...............................................................10–11

*Fowler v. Rhode Island*,
    345 U.S. 67 (1953) .................................................................................................18

\* *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999) ..........................................................................17–18

\* *Frontiero v. Richardson*,
    411 U.S. 677 (1973) ................................................................................................8

\* *Gilardi v. U.S. Dept. of Health and Human Servs.*,
    733 F.3d 1208 (D.C. Cir. 2013) ....................................................................14–16

*Gonzales v. O Centro Espirita Beneficente União do Vegetal*,
    546 U.S. 418 (2006) .............................................................................................15

*Halbig v. Burwell*,
    2014 WL 3579745 (D.C. Cir. July 22, 2014) .......................................................19

*Hartmann v. Stone*,
    68 F.3d 973 (6th Cir. 1995) ..................................................................................19

*Kingman Park Civil Ass'n v. Gray*,
    956 F. Supp. 2d 230 (D.D.C. 2013) .......................................................................8

*Little Sisters of the Poor v. Burwell*,
    No. 1:13-cv-02611 (D. Colo.).................................................................................6

*Midrash Sephardi, Inc. v. Town of Surfside*,
    366 F.3d 1214 (11th Cir. 2004) ....................................................................17–18

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ...........................................................................20

\* *Muwekma Ohlone Tribe v. Salazar*,
    708 F.3d 209 (D.C. Cir. 2013) ..............................................................................11

*Mylan Pharms. Inc. v.  Shalal*a,
    81 F. Supp. 2d 30 (D.D.C. 2000) .........................................................................21

*Noble v. U.S. Parole Comm'n,*
    194 F.3d 152 (D.C. Cir. 1999) ............................................................8

*O Centro Espirita Beneficente União do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) .....................................................20–21

*Reaching Souls Int'l., Inc., v. Burwell,*
    No. 5:13-cv-01092-D (W.D. Okla.)..............................................6

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ................................................................13–14

*Tenafly Eruv Ass'n v. Borough of Tenafly,*
    309 F.3d 144 (3rd Cir. 2002) .............................................................18

\* *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.,*
    450 U.S. 707 (1981) ................................................................12–14

*Tyndale House Publishers, Inc. v. Sebelius,*
    904 F. Supp. 2d 106 (D.D.C. 2012) .......................................20

*Welsh v. United States,*
    398 U.S. 333 (1970) ................................................................10

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972).....................................................................15

*Constitutional Provisions and Statutes*

\* U.S. Const. 5th Am..................................................................8–10

Consolidated Appropriations Act of 2012, Public Law 112-74, § 507
    (Dec. 23, 2011) ................................................................19–20

Health Care and Education Reconciliation Act, Pub. L. No. 111-152
    (March 30, 2010) ..........................................................................1

Patient Protection and Affordable Care Act, Pub. L. No. 111-148
    (March 30, 2010) ..........................................................................1

\* 5 U.S.C. § 706.................................................................10–11, 19

26 U.S.C. § 4980D.................................................................6

29 U.S.C. § 1132.................................................................6

42 U.S.C. § 300a-7 ................................................................................................20

42 U.S.C. § 300gg-13 ...................................................................................... *passim*

 \* 42 U.S.C. § 2000bb-1 ...................................................................................12–16

42 U.S.C. § 2000bb-2 ............................................................................................12

42 U.S.C. § 18011 ...................................................................................................2

42 U.S.C. § 18023 .................................................................................................19

Fed. R. Civ. P. 54 ............................................................................................ i, 22

Fed. R. Civ. P. 65 ................................................................................ i–ii, 21–22


*Regulations*

45 C.F.R. § 147.130 ................................................................................................2

45 C.F.R. § 147.131 ................................................................................................2

75 Fed. Reg. 34,540 (2010) ....................................................................................2

75 Fed. Reg. 41,726 (July 19, 2010) (First Regulation) .......................................2

76 Fed. Reg. 46,621 (Aug. 3, 2011) (Second Regulation) ....................................2

 \* 77 Fed. Reg. 8,725 (Feb. 14, 2012) (Third Regulation) .............................3, 9, 11

77 Fed. Reg. 16,501 (Mar. 21, 2012) (Fourth Regulation) ...................................4

78 Fed. Reg. 8,456 (Feb. 6, 2013) (Fifth Regulation) .......................................4, 9

 \* 78 Fed. Reg. 39,870 (July 2, 2013) (Sixth Regulation) ...............................4–5, 9

79 Fed. Reg. 51,092 (Aug. 27, 2014) (Seventh Regulation) .................................5

 \* 79 Fed. Reg. 51,118 (Aug. 27, 2014) (Eighth Regulation) .....................5–6, 9, 11

*Other Authorities*

Dorland's Illustrated Medical Dictionary 31st Ed. (2007) ...................................................19

HHS, *Guidance on the Temporary Enforcement Safe Harbor* (updated June 28, 2013),
    *available at* http://www.cms.gov/CCIIO/Resources/Regulations-and-
    Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf
    (last visited August 29, 2014) .....................................................................................3

HRSA, *Women's Preventive Services Guidelines* (Aug. 1, 2011)........................................2

Mosby's Medical Dictionary 7th Ed. (2006) ......................................................................19

Statement by U.S. Department of Health and Human Services
    Secretary Kathleen Sebelius (Jan. 20, 2012), *available at*
    http://www.hhs.gov/news/press/2012pres/01/20120120a.html
    (last visited Aug. 29, 2014).........................................................................................3

Stedman's Medical Dictionary 28th Ed. (2006) .................................................................19

## INTRODUCTION

Plaintiffs March for Life, Jeanne Monahan, and Bethany Goodman seek preliminary and permanent declaratory and injunctive relief and final judgment on the merits against a series of regulations (the "Mandate") that force them under the Affordable Care Act to provide and receive health insurance coverage for abortifacient drugs, devices, and related education in counseling, in contravention of their moral beliefs and their constitutional and statutory rights.

The government has offered numerous exemptions and other arrangements to people and entities that object to the Mandate—and to many who don't object—but it has refused to offer any of those arrangements to March for Life or its employees.  The Mandate advances none of the government's interests as imposed on Plaintiffs, and coverage of such items causes March for Life and its employees to act contrary to the very reason of March for Life's existence. The Mandate is both unconstitutional and illegal in these circumstances and must be enjoined.

## FACTUAL BACKGROUND

In March 2010, Congress passed and President Obama signed into law the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (March 30, 2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152 (March 30, 2010), together known as the ACA. The ACA regulates the national health insurance market by, *inter alia*, directly regulating "group health plans" and "health insurance issuers."

### A. Congress decides a that contraception mandate is not important enough to impose, and that preventive services coverage need not be universal.

The ACA requires that some health plans provide coverage for "preventive services," including "preventive care" "with respect to women." 42 U.S.C. § 300gg-13(a) & (a)(4). The ACA did not specify what preventive care for women included, but indicated that the Health Resources and Services Administration (HRSA), within defendant Department of Health and Human Services (HHS), would promulgate guidelines listing such items. *Id*. at § 300gg-13(a)(4).

Congress decided, however, that whatever items ended up being defined as "preventive services," many plans need not cover them. The ACA requires nearly all plans to abide by

1

multiple rules benefitting patients, such as the requirement that plans cover dependents until age 26; but the ACA specifically declares that the preventive service mandate need not be followed for "grandfathered" health plans. *See* 42 U.S.C. § 18011(3)–(4).  Defendant agencies themselves, implementing this statute, declared that the preventive services mandate was not "particularly significant." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014) (quoting 75 Fed. Reg. 34,540 (2010)). Consequently, by the voluntary choice of Congress and the Defendants, the preventive services mandate "presently does not apply to tens of millions of people." *Id.* at 2764 (quoting *Hobby Lobby Stores, Inc. v. Burwell*, 723 F.3d 1114, 1143 (10th Cir. 2013)).

**B.    Government agencies impose the contraception Mandate anyway.**

In 2010, Defendants published an interim final rule under the ACA (First Regulation), confirming that HRSA would publish guidelines on August 1, 2011. 75 Fed. Reg. 41,726 (July 19, 2010). On August 1, 2011, HRSA issued guidelines providing that women's preventive care would include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." HRSA, *Women's Preventive Services Guidelines* (Aug. 1, 2011).  Among these items are included hormonal oral and implantable contraceptives, IUDs, and products categorized as emergency contraception, all of which the Plaintiffs believe can prevent the implantation of a newly conceived human embryo. Verified Complaint ("VC") ¶¶ 49–52.

**C. The government exempts some entities if the employees "primarily" object to contraception, but refuses to exempt entities like March for Life.**

On the same day that HRSA issued guidelines, the government Defendant agencies promulgated a second interim final rule (Second Regulation) to exempt some entities that object to providing contraceptive coverage. 76 Fed. Reg. 46,621 (Aug. 3, 2011); *see also* 45 C.F.R. § 147.130(a)(1)(iv)(A)-(B). This Second Regulation granted HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46,621, 46,623. The term "religious employer" referred, in general, to churches, church congregations and religious orders.  *See id* at 46,626; 45 C.F.R. § 147.131(a) (final exemption).

2

The Mandate and exemption were enshrined in a Third Regulation issued in February 2012. 77 Fed. Reg. 8,725 (Feb. 14, 2012). In this finalization, Defendants explained that their goal in imposing the Mandate itself was to "provid[e] contraceptive coverage without cost-sharing to individuals who want it," so as to prevent "unintended" pregnancy. *Id.* at 8,727. Defendants also declared that they were choosing to exempt any church related organization from the contraception Mandate if it "primarily employs persons who share the religious tenets of the organization," because "the employees of employers availing themselves of the exemption would be less likely to use contraceptives even if contraceptives were covered under their health plans." *Id.* at 8,728.  The exemption did not include non-religious entities like March for Life, even though they are non-profit pro-life entities that only hire employees who oppose certain items included in the Mandate. *See* VC ¶¶ 21, 26–35.

On January 20, 2012, HHS also issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with this new law." *See* Jan. 20, 2012 Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited Aug. 29, 2014). On February 10, 2012, HHS issued a "temporary enforcement safe harbor" for non-exempt nonprofit religious organizations that objected to the mandated coverage, advising that it would not enforce the Mandate for one additional year against such organizations, and that enforcement would not begin until an organization's plan year beginning after 2013. HHS, *Guidance on the Temporary Enforcement Safe Harbor* (updated June 28, 2013), *available at* http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf (last visited August 29, 2014).

### D. The government again exempts religious entities because their employees "likely" object, but refuses to include March for Life in the exemption.

In March 2012, Defendants issued an Advance Notice of Proposed Rulemaking (the "Fourth Regulation") presenting "questions and ideas" to "help shape" a discussion of how to

"maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations. 77 Fed. Reg. 16,501, 16,503 (Mar. 21, 2012). HHS noted "approximately 200,000 comments" submitted in response to the Fourth Regulation. 78 Fed. Reg. 8,456, 8,459 (Feb. 6, 2013).

In February 2013, Defendants followed up on the Fourth Regulation by issuing a Notice of Proposed Rulemaking (Fifth Regulation). *Id.* In the Fifth Regulation, the government proposed to simplify the religious employer exemption to exempt all churches, integrated auxiliaries, religious orders and church congregations. *Id.* at 8,461. Defendants again explained that they were proposing to exempt these entities, but not others, because "participants and beneficiaries in group health plans" of other entities "may be less likely than participants and beneficiaries in group health plans established or maintained" by churches "to share such religious objections" against contraception and its coverage. *Id.* Nevertheless, the Fifth Regulation did not propose to include March for Life and similar entities, even if March for Life's employees all, by definition, share March for Life's objections to certain contraceptives as abortifacients. *See* VC ¶¶ 21, 26–35.

The Fifth Regulation also proposed to "accommodate" non-exempt religious organizations by allowing their plans not to cover the Mandated items, but requiring the entities to submit a form causing their insurers and third party administrators to provide "separate" payments to their plan participants for the same objectionable items. 78 Fed. Reg. at 8,463. This accommodation was not proposed to be available to non-religious non-profit organizations.

### E. The government finalizes its exemption of church entities, but not March for Life, because employees of the former "likely" object to contraception.

In the summer of 2013, Defendants finalized their rule a second time by issuing a Sixth Regulation. 78 Fed. Reg. 39,870 (July 2, 2013).  Under the Sixth Regulation, the religious employer exemption was defined as previously proposed to include churches, integrated auxiliaries, religious orders, and church congregations. *Id.* at 39,874 Defendants once again

explained that the reason they were choosing to exempt these entities was because their employees were "likely" to share an objection to certain contraceptive items:

> Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.

*Id.* Yet Defendants again omitted groups like March for Life from this exemption—even though by definition all of its employees are not merely "likely," but actually do, object to certain contraceptives as abortifacient. Additionally, the Sixth Regulation finalized the "accommodation" process, offering it to religious non-profit organizations that are not churches, but not to non-religious non-profit organizations such as March for Life. *See id.* at 39,892–93.

Most recently, the Defendants issued their seventh and eighth versions of regulations on the Mandate. 79 Fed. Reg. 51,092 (Aug. 27, 2014) (Seventh Regulation); 79 Fed. Reg. 51,118 (Aug. 27, 2014) (Eighth Regulation). In the Seventh Regulation, Defendants issued interim final rules (meaning they will have to "finalize" it a third time in the future) expanding the "accommodation" for non-profit religious organizations by allowing them to submit a letter to HHS instead of a form to their insurer as part of the accommodation. This Seventh Regulation does not extend to non-religious pro-life non-profit organizations such as March for Life. It does, however, observe that the government has chosen not to impose any obligation on the health plan administrator of non-church non-profit entity that happens to be enrolled in certain religious health plans that are exempt from ERISA. 79 Fed. Reg. at 51,095 n.8. Although these plans are somewhat confusingly referred to as "church plans," *id.*, many entities in them are not in fact exempt churches, but are instead religious non-churches that are not exempt from the Mandate, and for which the government would otherwise require an offer of contraceptive payments to all their employees. But the government has chosen not to require contraceptive coverage for any of the persons covered in such plans because they fall into this ERISA category, even if their employers are not churches and therefore do not fall into the category of being directly exempt

from the Mandate. There are hundreds of entities in such plans. *See Little Sisters of the Poor v. Burwell*, No. 1:13-cv-02611 (D. Colo.), Complaint ¶ 18, doc. # 1 (filed Sept. 24, 2013) (plan covers "more than 200 non-exempt Catholic employers"); *Reaching Souls Int'l., Inc., v. Burwell*, No. 5:13-cv-01092-D (W.D. Okla.), Complaint ¶ 39, doc. # 1 (filed Oct. 11, 2013) (plan covers "hundreds" of employers).

In the Eighth Regulation, Defendants explained that the Mandate's purpose is to advance "women's health and equality" by means of women using the covered items. 79 Fed. Reg. at 51,123. They also issued proposed rules whereby the accommodation would be extended to include even for-profit corporations who object. 79 Fed. Reg. at 51,122. Yet the government is still not proposing to include non-religious non-profit organizations such as March for Life.

If an employer provides a non-exempt, non-grandfathered health plan without abortifacients, doing so triggers massive monetary penalties and subjects an entity to lawsuits by the Defendant Department of Labor. 26 U.S.C. § 4980D; 29 U.S.C. § 1132. By virtue of the Mandate, all plans that the employees of March for Life could enter in state insurance exchanges or in the individual market would cover abortifacients for themselves and their dependants in violation of their beliefs. VC ¶¶ 93–94.  If March for Life's employees attempted not to have health insurance, it would detrimentally impact the health of themselves and their dependents, and may subject them to penalties under the ACA. VC ¶¶ 128–29.

### F.  March for Life and its employees oppose abortifacients.

March for Life is a pro-life, non-religious non-profit advocacy organization that has existed for over 40 years precisely to oppose the destruction of human life at any stage before birth, including by abortifacient methods that may act after the union of a sperm and ovum. VC ¶¶ 16–25 & Exh. 1. March for Life therefore has a moral objection to offering health insurance that covers abortifacient items and counseling in favor of the same (and March for Life believes that any hormonal drug or device within the Mandate is an abortifacient). VC ¶¶ 20, 48–52. March for Life's employees share these beliefs; in fact March for Life only hires and maintains employees who affirm such beliefs. VC ¶¶ 21, 26–35, 119, 156.   Plaintiffs Monahan and

Goodman base their beliefs on religious precepts in addition to morality. VC ¶ 32. March for Life's health insurance carrier has indicated it would offer health coverage to March for Life that omits abortifacients if doing so was legally permissible. VC ¶ 25.

But under the Mandate, March for Life faces the untenable choice of transgressing its pro-life commitment and the beliefs of its employees by: (a) offering abortifacients in its health plan, (b) attempting to offer a health plan without abortifacients in violation of the Mandate, thus incurring the Mandate's penalties, or (c) revoking its employees' health plan and sending them into a market where all plans offer them and their dependents abortifacients and many offer surgical abortion. VC ¶ 93. The Mandate thus forces March for Life to deliberately provide abortifacients and supportive education and counseling in the health insurance it offers to its employees. VC ¶ 96–98.  Facilitating this government-dictated speech directly undermines the express speech and messages supporting the sanctity of human life that March for Life exists to convey. VC ¶ 99. Dropping its insurance plan would also place March for Life at a severe competitive disadvantage in its efforts to recruit and retain employees. VC ¶ 95.

March for Life's employees face a similarly untenable choice. They must participate in a health plan, either from March for Life or somewhere else, that provides abortifacient coverage for themselves and their families against their religious beliefs. Or they must deprive themselves and their families of the benefits of health insurance, also violating their religious beliefs and facing penalties from the ACA's individual mandate. VC ¶ 94. The Mandate and the ACA require the employees of March for Life to accept health insurance coverage for abortifacient items, regardless of the fact that none of the employees desire the coverage. VC ¶ 97.

Yet, as discussed above, the Defendants in this case have repeatedly exempted entities from this Mandate entirely on the express rationale that those entities' employees "likely" share the entities' beliefs against contraception. And Defendants have exempted many millions of others from the Mandate for purely administrative reasons such as the grandfathering exception. But Defendants refuse to exempt March for Life, whose employees are not only "likely" but by definition do share and advocate its anti-abortifacient views. This irrational refusal violates the

rights of March for Life and of Plaintiffs, and thus inflicts irreparable harm absent this Court's issuance of injunctive relief and final judgment in Plaintiffs' favor. VC ¶ 111.

## ARGUMENT

In considering whether to grant a preliminary injunction, the Court balances "(1) the movant's showing of a substantial likelihood of success on the merits, (2) irreparable harm to the movant, (3) substantial harm to the non-movant, and (4) public interest." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). "Historically, these four factors have been evaluated on a 'sliding scale' in this Circuit, such that a stronger showing on one factor could make up for a weaker showing on another." *Kingman Park Civil Ass'n v. Gray*, 956 F. Supp. 2d 230, 241 (D.D.C. 2013) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999), but pointing out some doubt about the sliding scale approach). As explained in detail below, Plaintiffs meet these requirements.

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A.  The Mandate violates the Fifth Amendment guarantee of Equal Protection.

The Mandate violates the Fifth Amendment guarantee of Equal Protection because it treats March for Life differently than non-profit groups having their same objection to the Mandate, in a way that cannot rationally be described as advancing the government's interests.

Under the Equal Protection doctrine, the government cannot make a distinction that "bears no rational relationship to a legitimate governmental interest." *See Frontiero v. Richardson*, 411 U.S. 677, 683 (1973). In order to avoid violating the Fifth Amendment guarantee of equal protection, the government must "demonstrate that its reasons for treating an individual differently bear some rational relationship to a legitimate state purpose." *Brandon v. District of Columbia Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987) (internal citations omitted). Equal protection requires that "that government not treat similarly situated individuals differently without a rational basis." *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (emphasis omitted) (*citing Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

In support of its interests, the government repeatedly declared that the purpose of the Mandate is to offer contraceptive coverage to women who "want it," so as to prevent "unintended" pregnancies (not to prevent intended pregnancies). 77 Fed. Reg. at 8,727. Thus Defendants reiterated that they chose to exempt churches, integrated auxiliaries, religious orders and congregations of churches because Defendants deemed (without citing evidence) that the employees of these entities are "likely" or "more likely" than other groups to agree with the organization's beliefs against contraception, and therefore likely to not want or use the coverage anyway. *Id.* at 8,728; 78 Fed. Reg. at 8,461; 78 Fed. Reg. 39,874. The Mandate's purpose is to advance "women's health and equality" by means of women *voluntarily* using items to which they have access under the Mandate. 79 Fed. Reg. at 51,123.

But March for Life, by definition, is an entity whose employees not only agree with its anti-abortifacient views, but work there precisely to advocate those views. VC ¶¶ 21, 26–35, 48–52, 119, 156.  March for Life only hires employees who oppose abortifacients, don't want them, don't want coverage for them, and will not use the items. *Id.* Therefore the government's interests in providing contraception access to women who want it, and yielding benefits from women who use it, are not advanced by imposing the Mandate on March for Life. It is therefore irrational for the government to refuse to exempt March for Life from the Mandate when it exempts other entities that are merely "likely" to have anti-contraception employees.

The government found its interests perfectly consistent with exempting churches on the explicit rationale that their employees are "likely" or "more likely" than other groups to oppose contraception and therefore not use the coverage. 77 Fed. Reg. at 8,728; 78 Fed. Reg. at 8,461; 78 Fed. Reg. at 39,874. But here, March for Life is one of the oldest pro-life non-profit organizations in the nation; it exists to oppose abortifacients; it only hires people opposed to them; and its employees don't want abortifacient coverage. VC ¶¶ 21, 26–35, 48–52, 119, 156. No government interest is rationally advanced by imposing a Mandate on an entity and people who not only don't want it and won't use it, but who are organized to oppose it.

The government's stated rationale for exempting churches applies with more force in March for Life's case, not less. The government's regulations essentially concede that it has no interest in imposing the Mandate when the employees are merely *likely* to oppose the coverage. But March for Life's employees are 100% certain to oppose abortifacient coverage. VC ¶¶ 1, 31.

The government cannot treat March for Life less favorably than church organizations in this respect simply because they are a "non-religious ethical group[]." *See Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*, 2014 WL 3397217, at *4 (7th Cir. July 14, 2014). In *Center for Inquiry*, the Seventh Circuit held it violated Equal Protection where a state offered the benefit of marriage solemnization to religious persons but not atheist humanists, though in that respect their interests were indistinguishable. *Id.* at *5. The court held that the government cannot "favor religions over non-theistic groups that have moral stances that are equivalent to theistic ones except for non-belief in God or unwillingness to call themselves religions." *Id.* at *3; *cf. Welsh v. United States*, 398 U.S. 333, 340 (1970) (holding that an individual who "deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience" was equally entitled to a religious conscientious objector exemption under that statute). Just as "[i]t is irrational to allow humanists to solemnize marriages if, and only if, they falsely declare that they are a 'religion,'" *Ctr. for Inquiry*, 2014 WL 3397217 at *5, it is irrational to allow March for Life an exemption from this Mandate if and only if it claims to be religious and becomes a church. Because the government explicitly exempted churches due to their employees' "likely" beliefs opposing abortifacients, the government must also exempt March for Life due to its and its employees certain beliefs opposing abortifacients.

### B. The Mandate is capricious under the Administrative Procedure Act.

Applying the Mandate to March for Life—an organization and employee group that doesn't want abortifacient coverage—is arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A).

"Review of agency actions under the 'arbitrary and capricious' standard is 'highly deferential' *Foster v. Mabus*, 895 F. Supp. 2d 135, 143 (D.D.C. 2012) (citing *Environmental*

*Defense Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981)). However, the D.C. Circuit applies "a similar analysis [to rational basis analysis under the Equal Protection doctrine] under the APA. Agency action is arbitrary and capricious if 'the agency offers insufficient reasons for treating similar situations differently.'" *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 137–38 (D.C. Cir. 2013) (*quoting Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)). In assessing an agency decision, the Court reviews whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park., Inc. v. Volpe*, 401 U.S. 402, 416 (1971). If Plaintiffs should be exempt, the Court "shall . . . compel agency action unlawfully withheld." 5 U.S.C. § 706(a).

For the same reasons explained above why it is irrational to impose the Mandate on an organization and its employees who don't want it and who by definition exist to oppose it, the Mandate cannot pass "rational basis" review under the APA and must be deemed arbitrary and capricious. The government's stated purpose behind the Mandate is to offer contraceptive coverage to women who "want it," so as to prevent "unintended" pregnancies, 77 Fed. Reg. at 8,727, so as to advance "women's health and equality" by means of women voluntarily using the items, 79 Fed. Reg. at 51,123.[1]  But March for Life, its employees, and any employees it would hire, do not want abortifacients or coverage for them, and they will not use it—in fact they feel so strongly about that point that they *work at March for Life*. VC ¶¶ 21, 26–35, 48–52, 119, 156.

It is arbitrary and capricious for the government to require a pro-life organization and its pro-life female plan participants to receive and participate in coverage that they consider morally abhorrent, when the stated purpose of the requirement is to offer it to women who want it, and when "health" and "women's equality" will not result since the women won't use the items. Imposing the Mandate on Plaintiffs actually undermines the general purpose in the ACA to expand health coverage, because it perversely incentivizes Plaintiffs to not have health coverage.

---

[1] Notably, the government does not *and could not* claim that the Mandate serves an interest of giving contraception to women who do *not* want it, or an interest in preventing *intended* pregnancies. No such interest has been identified, because it would be offensive and coercive. And since the Mandate doesn't force women to use the items, it doesn't advance such an interest.

**C. The Mandate violates the Religious Freedom Restoration Act rights of the employee Plaintiffs.**

The Religious Freedom Restoration Act (RFRA) provides that the "[g]overnment shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1 (2012). Such a burden is only permissible if the government proves that it: "(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." *Id.*

The initial inquiry under RFRA requires the court to (1) "identify the religious belief in th[e] case," (2) "determine whether th[e] belief is sincere," and (3) "turn to the question of whether the government places substantial pressure on the religious believer." *Hobby Lobby,* 723 F.3d at 1140. If there is such substantial pressure, the government will then bear the burden of demonstrating that the challenged action meets strict scrutiny. *Id.*; 42 U.S.C § 2000bb-1.

**1. The religious exercise at issue.**

RFRA defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). Whether an act or practice is rooted in religious belief, and thus entitled to protection, does not "turn upon a judicial perception of the particular belief or practice in question." *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981). Nor does the Court assess whether a religious objection is "acceptable, logical, consistent, or comprehensible." *Id.* at 714–15. In the cases challenging the Mandate here at issue, the Court has stated that organizations opposing the Mandate "sincerely believe that providing the insurance coverage demanded by the HHS regulations lies on the forbidden side of the line, and it is not for us to say that their religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 134 S. Ct. at 2779.

Here, the employee Plaintiffs believe, as a matter of religious conviction as well as moral beliefs, that a human being's life begins at fertilization/conception; that certain contraceptives are abortifacient to such beings before and possibly after their implantation in the womb; and that they therefore object to using or participating in coverage of such items. VC ¶¶ 29–34.

12

### 2. The Mandate substantially burdens the employee Plaintiffs' beliefs.

The Mandate substantially burdens the religious beliefs of the employee Plaintiffs by compelling them to participate in health plans that provide abortifacient coverage for themselves and their dependents. A substantial burden exists where a law places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718. In determining whether or not a burden is substantial, courts must focus on the religious belief itself, and not whether the burden is too "attenuated." *See Hobby Lobby*, 134 S. Ct. at 2777. The Plaintiffs believe that maintaining "the coverage demanded by the HHS regulations is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them" to maintain the coverage. *See id.* at 2778. "This belief implicates a difficult and important question of religion and moral philosophy. . . . Arrogating the authority to provide a national answer to this . . . question, HHS . . . in effect tell[s] the plaintiffs that their beliefs are flawed. For good reason, we have repeatedly refused to take such a step." *Id.* (internal citations omitted).

Here, the individual employees' sincere religious beliefs oppose participating in health insurance plans that cover abortifacients. This belief is substantially burdened because they are directly required to violate it and to participate in an insurance plan, from March for Life or from other sources, that cover abortifacients. If they were to drop coverage, that "option" too would substantially pressure them to violate their beliefs because health insurance is important to a family's health, which is the premise of the ACA. Plaintiffs also believe that it is part of God's command to take care their health, and the health of their dependents, which includes having health insurance. VC ¶ 125. But the Mandate pits that belief against their belief against abortifacient coverage. The Mandate also fundamentally changes the compensation package of the Plaintiff employees, which would otherwise omit abortifacient coverage. Therefore the Mandate pressures the individual employees to forfeit benefits otherwise available—the ability to have health insurance in the United States of America—or to violate their beliefs.

This is a definitional substantial burden as set forth by the Supreme Court in not only *Hobby Lobby* but also *Sherbert v. Verner*, 374 U.S. 398 (1963). *Sherbert* involved a plaintiff who

13

was not required to work on the Sabbath, but was merely denied unemployment benefits for refusing such work, and the Court deemed this an "unmistakable" substantial pressure on the plaintiff to abandon that observance. *Id.* at 404 (reasoning that the law "force[d] [plaintiff] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand," and that "the pressure on her to forego that practice is unmistakable"); *see also Thomas*, 450 U.S. at 717–18 (finding burden on religious exercise "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith. . . thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs"). *Sherbert* and *Thomas* therefore declared that even "indirect" pressure was a substantial burden. *See Thomas*, 450 U.S. at 718 (explaining "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial").

### 3.   The Mandate cannot satisfy strict scrutiny.

#### a.   The Mandate does not serve a compelling interest.

Because the Mandate substantially burdens Plaintiffs' religious exercise, the government must justify the Mandate under strict scrutiny, the "most demanding test known to constitutional law." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997); *see also* 42 U.S.C. § 2000bb-1(b). It cannot do so here. "Unless the government demonstrates a compelling governmental interest, and uses the least restrictive means of furthering that interest, the [contraceptive] mandate *must* be set aside." *Gilardi v. U.S. Dept. of Health and Human Servs.*, 733 F.3d 1208, 1219 (D.C. Cir. 2013), *vacated on other grounds*, 134 S. Ct. 2902 (2014). *Gilardi* held that the Mandate violated RFRA, that it did not serve a compelling interest, and that it was not the least restrictive means of furthering a compelling interest. 733 F.3d at 1219–22.

As discussed above with regard to the Equal Protection and APA claims, application of the Mandate to these particular employees cannot serve even a rational government interest. The employees not only don't want the coverage but on principle they won't use it. Therefore none of the government's alleged "health" or "equality" benefits that happen when women use these

14

items can result here. The government's interest must be served for the "particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 430–31 (2006). It is impossible for the Mandate to serve a compelling interest as applied to the Plaintiffs, because the Plaintiffs will not derive or cause any benefits from the objectionable items.

While "public health" has been a compelling interest in a variety of contexts, here "[t]he nebulousness of the government's interest, however prevents [the court] from engaging in the type of exacting scrutiny warranted here." *Gilardi*, 733. F.3d at 1220. Even if March for Life's employees wanted abortifacient coverage, "the reasons underpinning that [access] are tenuous at best." *Id*. If courts are to "assess whether an exemption for the [plaintiffs] would pose an impediment to a governmental objective," the court "must first be able to discern what that objective *is*." *Id*. (internal citations omitted) (emphasis in original).

Furthermore, "the mandate is self-defeating. When a government regulation 'fail[s] to prohibit nonreligious conduct that endangers [its asserted] interests in a similar or greater degree' than the regulated conduct, it is underinclusive by design." *Id*. at 1222 (citing *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543 (1993)). Underinclusiveness, such as in exempting churches, in exempting tens of millions of women in grandfathered plans, and in choosing not to impose obligations on employers in non-ERISA "church plans," "raises serious questions about the efficacy and asserted interests served by the regulation." *Id*. "[T]he mandate is unquestionably underinclusive." *Id*.

To the extent that the government might argue that its interest can be advanced because the daughters of March for Life employees might want to use abortifacients even if their parents object, a similar alleged benefit existed for the child in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), but it could not be used to impose compulsory education against the parents' beliefs. Moreover, by exempting churches, the government is content to let daughters of church employees not receive this Mandate, even though their parents are merely "likely" to oppose contraception.

**b. The Mandate is not the least restrictive means of furthering the government's alleged interests.**

The Mandate independently fails RFRA because it is not the least restrictive means of furthering any interest. In *Hobby Lobby*, which dealt with a for-profit corporation's challenge to the Mandate, the Supreme Court held that "HHS has not showed that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion . . . ." 134 S. Ct. at 2780. The Court noted that "[t]he most straightforward way of [achieving its alleged interests] would be for the government to assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health insurance policies due to their employers' religious objections." *Id*. at 2780.[2] "This would certainly be less restrictive of the plaintiffs' religious liberty, and HHS has not shown, see § 2000bb-1-(b)(2), that this is not a viable alternative." *Id*.

Likewise in *Gilardi*, the court explained that, in the least restrictive means analysis, the Mandate "suffers from two flaws that cannot be overcome." 733 F.3d at 1222. First, "there are viable alternatives . . . that would achieve the substantive goals of the Mandate while being sufficiently accommodative of religious exercise." *Id*. (discussing alternatives such as the government offering its own payments for contraception). The government "has made no such case" to defeat the viability of these alternatives; for all we know, a broader religious exemption would have so little impact on so small a group of employees that the argument cannot be made." *Id*. Because feasible less restrictive alternatives are available, the Mandate fails strict scrutiny.

---

[2] The ruling in *Hobby Lobby* is not limited to the four contraceptive methods there were at issue in that case, but it applies to the scope of any objection to the contraceptive Mandate, consistent with RFRA's protections. *See* 134 S. Ct. at 2759 (explaining that "[t]here are other ways in which Congress of HHS could equally ensure than every woman has cost-free access to the particular contraceptives at issue here and, indeed, *to all FDA-approved contraceptives*") (emphasis added). Even though in *Hobby Lobby* the religious objection was to only four methods of contraception, the Court broadly held that "[t]he contraceptive mandate, as applied to closely-held corporations, violates RFRA." *Id*. at 2785. The Plaintiffs' objection here extends to all hormonal contraceptives an IUDs, though not to barrier methods. Under the standard set by RFRA and affirmed in *Hobby Lobby*, the protections extend to Plaintiffs' objections.

### D.  The Mandate violates the Free Exercise rights of the employee Plaintiffs.

The Mandate similarly violates the Free Exercise Clause of the First Amendment because it is neither religiously neutral nor generally applicable. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. As discussed above, the employee Plaintiffs exercise religion in their objection to the Mandate. *Smith* established that burdens on religiously-motivated conduct are subject to strict scrutiny under the Free Exercise Clause when a regulation lacks neutrality or general applicability. *Employment Div. Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990). Both are missing here.

### 1.  The Mandate is selective, not generally applicable.

Unlike *Smith*, which involved an "across-the-board criminal prohibition on a particular form of conduct," 494 U.S. at 884, the Mandate here falls far short of general applicability. The ACA creates a vast system of categorical exemptions that frees thousands of employers from the Mandate's scope. As discussed above, these include the grandfathering exception, exemptions for churches, and non-penalties for non-profits in "church plans," among others. Such "categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Lukumi*, 508 U.S. at 542. Under Supreme Court precedent "the government violates Free Exercise rights when it selectively imposes burdens on religious conduct." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232 (11th Cir. 2004) (citing *Lukumi*, 508 U.S. 520).  "Categorical" exclusions exacerbate concerns regarding religious discrimination. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364–65 (3d Cir. 1999); *see also Lukumi*, 508 U.S. at 543 (noting a lack of general applicability when a regulation "fail[s] to prohibit nonreligious conduct that endangers [the government's] interests in a similar or greater degree"). The government cannot refuse to extend a system of exemptions "to cases of 'religious hardship' without compelling reason." *Id.* at 537 (quotation omitted); *Smith*, 494 U.S. at 884 (quotation omitted).

### 2.   The Mandate is not neutral towards religion.

The Mandate is not neutral because it distinguishes among religious objectors, as well as between secular and religious objectors. A neutral law "does not target religiously motivated conduct either on its face or as applied in practice." *Blackhawk v. Pennsylvania,* 381 F.3d 202, 209 (3d Cir. 2004); *see also Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953) (holding that the city violated the Free Exercise Clause by enforcing an ordinance banning meetings in park against Jehovah's Witnesses but exempting other religious groups); *Midrash Sephardi*, 366 F.3d at 1232-33 (holding that a city zoning ordinance prohibiting churches and synagogues in seven of the eight zoning districts was neither neutral nor generally applicable where city "treat[ed] religious assemblies differently than secular assemblies by excluding religious assemblies from the business district."). The "government cannot discriminate between religiously motivated conduct and comparable secularly motivated conduct in a manner that devalues religious reasons for acting." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 169 (3rd Cir. 2002). "The Free Exercise Clause's mandate of neutrality toward religion prohibits government from deciding that secular motivations are more important than religious motivations." *Id.* at 165.

Refusing to exempt March for Life, and consequently its employees, from the Mandate in the face of numerous exceptions "devalues [their employees'] religious reasons" for objecting to assisting in the destruction of embryonic life. *See Lukumi*, 508 U.S. at 537. Providing secular exemptions as for grandfathered plans "while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi*." *Fraternal Order of Police*, 170 F.3d at 365; *see also Fowler*, 345 U.S. at 69 (noting the dangers inherent in "the state preferring some religious groups over this one"). Likewise the government decided that some religious employees can be exempt—because they work for churches and are "likely" agree with the church's opposition to contraception. But it refused to give March for Life's employees a similar exemption, and therefore its rule is not neutral towards religion.

Finally, it is noteworthy that under the Free Exercise Clause, the employee Plaintiffs need not show that the Mandate imposes a "substantial" burden on their free exercise rights: strict

scrutiny applies to any non-generally applicable or non-neutral law. *See Lukumi*, 508 U.S. at 546; *Blackhawk*, 381 F.3d at 209; *accord Hartmann v. Stone*, 68 F.3d 973, 979 n.3 (6th Cir. 1995), and *Brown v. Borough of Mahaffey*, 35 F.3d 846, 849 (3d Cir. 1994).

As discussed previously, the government cannot meet strict scrutiny, and the Mandate must fail under the Free Exercise Clause.

### E.  The Mandate violates the APA because it is not "in accordance with law."

The Mandate also violates the Administrative Procedure Act because it is not "in accordance with law," and it is "contrary to constitutional right." 5 U.S.C. § 706(2)(A) & (B). *See also Halbig v. Burwell*, 2014 WL 3579745 (D.C. Cir. July 22, 2014) (vacating an ACA rule that is not in accordance with law).  First, as explained above, imposing the Mandate on March for Life violates its rights under the Equal Protection doctrine of the Fifth Amendment.

Further, the ACA that states that nothing in Title I of the ACA, which includes the provision governing "preventive services," "shall be construed to require a qualified health plan to provide coverage of [abortion] services…as part of its essential health benefits for any plan year." 42 U.S.C. § 18023. The Mandate requires coverage of certain "FDA-approved contraceptives" which act as abortifacients, in that they cause the demise of human embryos after conception and before and/or after implantation in the uterus. Destroying a human embryo that is in a woman's body constitutes an action that is abortifacient, that destroys a new human life, and that terminates a pregnancy.[3]

The Mandate is similarly illegal for violating the Weldon Amendment, *see e.g.,* Consolidated Appropriations Act of 2012, Public Law 112-74, § 507(d)(1), 125 Stat 786, 1111 (Dec. 23, 2011), which provides that none of the funds made available in the Act for

---

[3] *See* Dorland's Illustrated Medical Dictionary 31st Ed. (2007) ("Pregnancy" is "The condition of having a developing embryo or fetus in the body, after union of an ovum and spermatozoon.); Mosby's Medical Dictionary 7th Ed. (2006) ("Pregnancy" is "The gestational process, comprising the growth and development within a woman of a new individual from conception through the embryonic and fetal periods to birth."; "Conception" is "1. the beginning of pregnancy, usually taken to be the instant that a spermatozoon enters an ovum and forms a viable zygote 2. the act or process of fertilization."); Stedman's Medical Dictionary 28th Ed. (2006) ("Pregnancy" is "The state of a female after conception and until the termination of the gestation."; "Conception" is "Fertilization of oocyte by a sperm").

appropriations for Defendants Department of Labor and Health and Human Services "may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Here March for Life's health insurance plan is subject to the Mandate's penalties if it does not provide coverage of abortions at the earliest stages of pregnancy.

The Mandate also violates the provisions of the Church Amendment, which provides that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d). The Mandate requires the employee Plaintiffs to participate in and fund health plans which they find objectionable on the basis of sincerely-held religious beliefs. This is impermissible under the APA.

## II.    MARCH FOR LIFE WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

"It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal quotation marks and citation omitted). "By extension, the same is true of rights afforded under RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment." *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012) (citing *O Centro Espirita Beneficente União do Vegetal v. Ashcroft*, 389 F.3d 973, 995 (10th Cir. 2004), *aff'd*, 546 U.S. 418 (2006)). Here, coercing Plaintiff March for Life to provide coverage for abortifacient contraceptives while exempting similarly situated groups violates March for Life's Equal Protection and APA rights and therefore unquestionably constitutes irreparable harm. Similarly, forcing the employee Plaintiffs to choose between violating their religious beliefs by accepting health care coverage

which provides abortifacients or abandoning part of their compensation package, their health insurance, in order to follow the precepts of their religious beliefs will cause irreparable harm.

### III.     THE BALANCE OF EQUITIES TIPS IN MARCH FOR LIFE'S FAVOR.

Plaintiffs' hardships if the injunction is not granted far outweigh the Defendants' if the injunction is granted. The Defendants will suffer little, if any, harm if the injunction is issued. As discussed above, the employees of Plaintiff March for Life do not want abortifacient contraceptive coverage even if it were provided to them, and the government has no interest in providing it to such people.  The government's alleged interests in public health and gender equality by the use of contraception cannot be advanced among a population of people who ideologically oppose abortifacients. Furthermore, Defendants cannot demonstrate that exempting one organization will harm them where the government has voluntarily exempted millions of other people. The government also has other means available to it to provide for its alleged interests. If the injunction is not granted, the Plaintiffs will suffer irreparable harm to their constitutional and statutory rights. Thus, the balance of equities weighs in favor of Plaintiffs.

### IV.     AN INJUNCTION IS IN THE PUBLIC INTEREST.

An injunction is in the public interest. The government cannot claim any interest in a law violative of the Constitution and federal statutory law. Indeed, "neither the government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003). With regard to the employee Plaintiffs' RFRA claims, "[i]t is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers." *Mylan Pharms. Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000). In addition, "pursuant to RFRA, there is a strong public interest in the free exercise of religion." *O Centro,* 389 F.3d at 1010.

### V.     PLAINTIFFS ARE ENTITLTED TO FINAL JUDGMENT ON THE MERITS.

Plaintiffs ask the Court to consolidate the preliminary injunction hearing and trial on the merits. Fed. R. Civ. P. 65(a)(2). The legal issues involved in resolving final judgment and likelihood of success on the merits as addressed above are identical. There are no material factual

disputes. Based on the facts sworn in the Verified Complaint and the legal arguments above, Plaintiffs ask the Court to enter final judgment on the merits pursuant to Rules 54 and 65(a)(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for preliminary injunction and consolidated final judgment on the merits, and enter permanent declaratory and injunctive relief in Plaintiffs' favor on all their claims.

Respectfully submitted this 2nd day of September, 2014.

*Attorneys for Plaintiffs*:

  *s/ Matthew S. Bowman*  ＿ ＿ ＿ ＿ ＿

<table>
<tr><td>David A. Cortman</td><td>Steven H. Aden</td></tr>
<tr><td>  (DC Bar No. 478748)</td><td>  (DC Bar No. 46777)</td></tr>
<tr><td>Alliance Defending Freedom</td><td>Matthew S. Bowman</td></tr>
<tr><td>1000 Hurricane Shoals Road NE</td><td>  (DC Bar No. 993261)</td></tr>
<tr><td>Suite D-1100</td><td>Alliance Defending Freedom</td></tr>
<tr><td>Lawrenceville, GA 30043</td><td>801 G Street, NW, Suite 509</td></tr>
<tr><td>(770) 339-0774</td><td>Washington, D.C.  20001</td></tr>
<tr><td>(770) 339-6744 (facsimile)</td><td>(202) 393-8690</td></tr>
<tr><td>dcortman@alliancedefendingfreedom.org</td><td>(202) 347-3622 (facsimile)</td></tr>
<tr><td></td><td>saden@alliancedefendingfreedom.org</td></tr>
<tr><td>Elissa Graves</td><td>mbowman@alliancedefendingfreedom.org</td></tr>
<tr><td>  (<em>Pro Hac Vice</em>; AZ Bar No. 030670)</td><td></td></tr>
<tr><td>Alliance Defending Freedom</td><td></td></tr>
<tr><td>15100 N 90th Street</td><td></td></tr>
<tr><td>Scottsdale, AZ 85260-2901</td><td></td></tr>
<tr><td>(480) 444-0020</td><td></td></tr>
<tr><td>(480) 444-0028 (facsimile)</td><td></td></tr>
<tr><td>egraves@alliancedefendingfreedom.org</td><td></td></tr>
</table>