**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARCH FOR LIFE, *et al.*, | |
| Plaintiffs, | |
| v. | No. 14-cv-1149 |
| SYLVIA M. BURWELL, in her official capacity as Secretary of the Department of Health and Human Services, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFANDANTS' MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

STANDARD OF REVIEW .................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

    I.    MARCH FOR LIFE'S EQUAL PROTECTION CLAIM FAILS ................................ 11

    II.   PLAINTIFFS' ADMINISTRATIVE PROCEDURE ACT CLAIMS FAIL ................ 18

        A.  The contraceptive coverage requirement is neither arbitrary nor capricious ......... 18

        B.  The contraceptive coverage requirement does not violate restrictions relating
            to abortion ....................................................................................................... 18

    III.  THE EMPLOYEE PLAINTIFFS LACK STANDING ............................................... 22

    IV.  THE EMPLOYEE PLAINTIFFS' RELIGIOUS FREEDOM RESTORATION
        ACT CLAIM FAILS ............................................................................................... 28

        A.  The contraceptive coverage requirement does not impose a substantial burden
            on the employee plaintiffs' religious exercise ....................................................... 28

        B.  Providing the employee plaintiffs an exemption to the contraceptive coverage
            requirement would undermine the government's compelling interests in a
            workable insurance system .................................................................................. 30

        C.  The contraceptive coverage requirement is the least restrictive means of
            furthering the government's compelling interests .................................................. 36

    V.   THE EMPLOYEE PLAINTIFFS' FREE EXERCISE CLAIM FAILS ...................... 38

        A.  The contraceptive coverage requirement is a neutral law of general applicability 38

        B.  In any event, the contraceptive coverage requirement serves compelling
            governmental interests in public health and gender equality ................................. 40

    VI.  PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM, AND AN
        INJUNCTION WOULD INJURE THE GOVERNMENT AND THE PUBLIC ......... 42

CONCLUSION ................................................................................................................... 44

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abdullah v. Obama*,

   753 F.3d 193 (D.C. Cir. 2014)................................................................................. 43

*Am. Family Ass'n, Inc. v. FCC*,

   365 F.3d 1156 (D.C. Cir. 2004)............................................................................... 40

*Ashcroft v. Iqbal*,

   556 U.S. 662 (2009) ................................................................................................. 11

*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*,

   397 U.S. 150 (1970) ................................................................................................. 19

*Barnhart v. Walton*,

   535 U.S. 212 (2002) ................................................................................................. 21

*Bhd. of R.R. Signalmen v. Surface Transp. Bd.*,

   638 F.3d 807 (D.C. Cir. 2011).................................................................................. 21

*Braunfeld v. Brown*,

   366 U.S. 599 (1961) ................................................................................................. 29

*Browning v. Clinton*,

   292 F.3d 235 (D.C. Cir. 2002).................................................................................. 11

*Buchwald v. Univ. of N.M. Sch. of Med.*,

   159 F.3d 487 (10th Cir. 1998) ................................................................................. 41

*Burwell v. Hobby Lobby Stores, Inc.*,

   134 S. Ct. 2751 (2014)............................................................. 9, 29, 31, 37, 41

*Catholic Charities of Sacramento, Inc. v. Superior Court*,

   85 P.3d 67 (Cal. 2004).............................................................................................. 42

*Catholic Diocese of Nashville v. Sebelius*,

   No. 3:13-cv-1303, 2013 WL 6834375 (M.D. Tenn., Dec. 26, 2013)........................ 38

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

   508 U.S. 520 (1993) .............................................................................. 36, 38, 39, 40

*City of Boerne v. Flores*,

   521 U.S. 507 (1997) ............................................................................................ 33

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*,

   15 F. Supp. 2d 1(D.D.C. 1997).......................................................................... 10

*Cornish v. Dudas*,

   540 F. Supp. 2d 61 (D.D.C. 2008)...................................................................... 44

\* *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,

   483 U.S. 327 (1987) ...................................................................................... *passim*

*Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*,

   758 F.3d 869 (7th Cir. 2014) ........................................................................ 13, 14

*Cutter v. Wilkinson*,

   544 U.S. 709, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)............................ 12, 16

*DaimlerChrysler Corp. v. Cuno*,

   547 U.S. 332, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006)................................... 22

*Dorfmann v. Boozer*,

   414 F.2d 1168 (D.C. Cir. 1969)........................................................................ 10

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,

   -- F. Supp. 2d --, 2014 WL 521544 (D.D.C. 2014) ............................................ 10

*Empt. Div., Dep't of Human Res. of Oregon v. Smith*,

   494 U.S. 872 (1990) .......................................................................................... 38

*Eternal World Television Network, Inc. v. Burwell*,

   -- F. Supp. 2d --, 2014 WL 2739347 (S.D. Ala. 2014)......................................... 38

*FCC v. Beach Commc'ns, Inc.*,

   508 U.S. 307 (1993) .................................................................................. 14, 16, 17

iv

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.*,

    528 U.S. 167 (2000) ................................................................................................. 26

*Fund for Animals v. Frizzell*,

    530 F.2d 982 (D.C. Cir. 1975) .................................................................................. 43

*Geneva Coll. v. Sebelius*,

    929 F. Supp. 2d 402 (W.D. Pa. 2013) ....................................................................... 38

*Gilardi v. U.S. Dep't of Health & Human Servs.*,

    134 S. Ct. 2902 (2014) .............................................................................................. 31

*Gilardi v. U.S. Dep't of Health & Human Servs.*,

    733 F.3d 1208 (D.C. Cir. 2013) ................................................................................ 31

*Goehring v. Brophy*,

    94 F.3d 1294 (9th Cir. 1996) .............................................................................. 33, 34

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,

    546 U.S. 418 (2006) ............................................................................................ 32, 40

*Gordon v. Holder*,

    721 F.3d 638 (D.C. Cir. 2013) ........................................................................... 16, 17

*Graham v. Comm'r*,

    822 F.2d 844 (9th Cir. 1987) .................................................................................... 34

*Gray v. Romeo*,

    697 F. Supp. 580 (D.R.I. 1988) ................................................................................ 19

*Greene v. Dalton*,

    164 F.3d 671 (D.C. Cir. 1999) .................................................................................. 25

*Grote v. Sebelius*,

    708 F.3d 850 (7th Cir. 2013) .................................................................................... 31

*Heller v. Doe*,

    509 U.S. 312 (1993) ........................................................................................... 16, 17

*Henderson v. Kennedy*,

    253 F.3d 12 (D.C. Cir. 2001) .................................................................................... 29

*Hernandez v. Comm'r*,

    490 U.S. 680 (1989) .................................................................................................. 32

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,

    480 U.S. 136 (1987) .................................................................................................. 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,

    132 S. Ct. 694 (2012) ................................................................................................ 17

*Jean-Baptiste v. Dist. of Columbia*,

    958 F. Supp. 2d 37 (D.D.C. 2013) ............................................................................ 44

*Jenkins v. Comm'r*,

    483 F.3d 90 (2d Cir. 2007) ....................................................................................... 32

*Kaemmerling v. Lappin*,

    553 F.3d 669 (D.C. Cir. 2008) ........................................................................... 29, 30

*Kinder v. Geithner*,

    695 F.3d 772 (8th Cir. 2012) .................................................................................... 27

*Klamath Water Users Ass'n v. FERC*,

    534 F.3d 735 (D.C. Cir. 2008) ........................................................................... 23, 28

*Korte v. Sebelius*,

    735 F.3d 654 (7th Cir. 2013) .................................................................................... 17

*Larson v. Valente*,

    456 U.S. 228 (1982) .................................................................................................. 13

*Legatus v. Sebelius*,

    901 F. Supp. 2d 980 (E.D. Mich. 2012) .................................................................. 35

*Lemon v. Kurtzman*,

    403 U.S. 602 (1971) .................................................................................................. 15

*Liberty Univ., Inc. v. Lew,*

    733 F.3d 72 (4th Cir. 2013) ............................................................................. 20, 21

*Locke v. Davey,*

    540 U.S. 712 (2004) ............................................................................................ 16

*Los Angeles Cnty. v. Davis,*

    440 U.S. 625 (1979) ............................................................................................ 31

*Lujan v. Defenders of Wildlife,*

    504 U.S. 555 (1992) .................................................................... 23, 24, 25, 26, 28

*Lurie v. Mid-Atl. Permanente Med. Grp., P.C.,*

    729 F. Supp. 2d 304 (D.D.C. 2010) .................................................................... 25

*Lynch v. Donnelly,*

    465 U.S. 668 (1984) ............................................................................................ 15

*Mead v. Holder,*

    766 F. Supp. 2d 16 (D.D.C. 2011) ................................................................. 30, 41

* *Mich. Catholic Conference v. Burwell,*

    755 F.3d 372 (6th Cir. 2014) ....................................................................... *passim*

*Mich. Catholic Conference v. Sebelius,*

    989 F. Supp. 2d 577 (W.D. Mich. 2013) ....................................................... 21, 38

*Mills v. Dist. of Columbia,*

    571 F.3d 1304 (D.C. Cir. 2009) .......................................................................... 43

*Monsanto Co. v. Geertson Seed Farms,*

    561 U.S. 139 (2010) ............................................................................................ 22

*Muwekma Ohlone Tribe v. Salazar,*

    708 F.3d 209 (D.C. Cir. 2013) ............................................................................ 18

*Mylan Pharm., Inc. v. Shalala,*

    81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................ 43

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*

    132 S. Ct. 2566 (2012).............................................................................................. 27

*Nat'l Motor Freight Traffic Ass'n, Inc. v. ICC,*

    590 F.2d 1180 (D.C. Cir. 1978)............................................................................... 18

*Nat'l Shooting Sports Found., Inc. v. Jones,*

    716 F.3d 200 (D.C. Cir. 2013).................................................................................. 22

*\* Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*

    366 F.3d 930 (D.C. Cir. 2004)........................................................................... 23, 28

*Neal v. Kelly,*

    963 F.2d 453 (D.C. Cir. 1992).................................................................................. 25

*Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.,*

    435 F.3d 326 (D.C. Cir. 2006).................................................................................. 44

*Noble v. U.S. Parole Comm'n,*

    194 F.3d 152 (D.C. Cir. 1999).................................................................................. 18

*Nordlinger v. Hahn,*

    505 U.S. 1 (1992) ..................................................................................................... 18

*Olsen v. Comm'r,*

    709 F.2d 278 (4th Cir. 1983) .................................................................................... 34

*Olsen v. DEA,*

    878 F.2d 1458 (D.C. Cir. 1989)............................................................................... 12

*Olsen v. Mukasey,*

    541 F.3d 827 (8th Cir. 2008) .................................................................................... 39

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.,*

    901 F. Supp. 2d 54 (D.D.C. 2012)...................................................................... 10, 43

*Pers. Adm'r of Massachusetts v. Feeney,*

    442 U.S. 256 (1979) ................................................................................................. 18

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,

    -- F. Supp. 2d --, 2013 WL 6672400 (D.D.C. 2013) ......................................................... 38, 40

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,

    489 F.3d 1267 (D.C. Cir. 2007)............................................................................................ 27

*Reno v. Am. Civil Liberties Union*,

    521 U.S. 844 (1997) ............................................................................................................ 37

*Richenberg v. Perry*,

    73 F.3d 172 (8th Cir. 1995) ................................................................................................ 44

*Roberts v. U.S. Jaycees*,

    468 U.S. 609 (1984) ...................................................................................................... 41, 42

*Roman Catholic Archbishop of Atlanta v. Sebelius*,

    No. 1:12-cv-3489, 2014 WL 1256373 (N.D. Ga., May 30, 2014) .......................................... 38

*Roman Catholic Archbishop of Wash. v. Sebelius*,

    -- F. Supp. 2d --, 2013 WL 6729515 (D.D.C. 2013) ......................................................... 38, 39

*S. Ridge Baptist Church v. Indus. Comm'n of Ohio*,

    911 F.2d 1203 (6th Cir. 1990) ............................................................................................ 35

*Sharpe Holdings v. HHS*,

    No. 2:12-cv-92, 2012 WL 6738489 (E.D. Mo., Dec. 31, 2012) ............................................ 38

*Sissel v. U.S. Dep't of Health & Human Servs.*,

    -- F.3d --, 2014 WL 3714701, at *2 (D.C. Cir. 2014) .......................................................... 11

*Steel Co. v. Citizens for a Better Env't*,

    523 U.S. 83 (1998) ........................................................................................................ 11, 22

*Steffan v. Perry*,

    41 F.3d 677 (D.C. Cir. 1994) (en banc).............................................................................. 14, 17

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,

    450 U.S. 707 (1981) ............................................................................................................ 29

*Tough Traveler, Ltd. v. Outbound Products*,

    60 F.3d 964 (2d Cir. 1995) ................................................................... 43

* *United States v. Lee*,

    455 U.S. 252 (1982) ............................................... 30, 32, 33, 34, 35

*United States v. Schmucker*,

    815 F.2d 413 (6th Cir. 1987) ................................................................ 36

*United States v. Wilgus*,

    638 F.3d 1274 (10th Cir. 2011) .......................................................... 36

*Univ. of Notre Dame v. Sebelius*,

    743 F.3d 547 (7th Cir. 2014) ........................................................... 9, 15

*Univ. of Notre Dame v. Sebelius*,

    988 F. Supp. 2d 912 (N.D. Ind. 2013) ................................................ 38

*Utah v. Evans*,

    536 U.S. 452 (2002) ......................................................................... 24, 28

*Vance v. Bradley*,

    440 U.S. 93, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979) ............................ 16

*Va. Soc'y for Human Life, Inc. v. FEC*,

    263 F.3d 379 (4th Cir. 2001) ................................................................ 44

*Walz v. Tax Comm'n*,

    397 U.S. 664 (1970) ......................................................................... 12, 15

*Warth v. Seldin*,

    422 U.S. 490 (1975) ............................................................................ 28

*Welsh v. United States*,

    398 U.S. 333 (1970) ............................................................................ 14

*Wheaton Coll. v. Sebelius*,

    703 F.3d 551 (D.C. Cir. 2012) (per curiam).......................................... 7

\* *Wieland v. U.S. Dep't of Health & Human Servs.*,

  978 F. Supp. 2d 1008 (E.D. Mo. 2013) ..................................................................... 2, 23, 27, 28

*Winter v. Natural Res. Def. Council, Inc.*,

  555 U.S. 7 (2008) ................................................................................................................ 10

## Statutes and Legislative Materials

26 U.S.C. § 512 .......................................................................................................................... 15

26 U.S.C. § 3309 ........................................................................................................................ 15

26 U.S.C. § 6033 .............................................................................................................. 6, 8, 13, 15

29 U.S.C. § 1003 ........................................................................................................................ 35

42 U.S.C. § 300 .......................................................................................................................... 22

42 U.S.C. § 300a-6 ..................................................................................................................... 22

42 U.S.C. § 300a-7 ..................................................................................................................... 19

42 U.S.C. § 300gg-13 ......................................................................................................... *passim*

42 U.S.C. § 2000bb ..................................................................................................................... 23

42 U.S.C. § 2000bb-1 ............................................................................................................. 28, 40

42 U.S.C. § 2000e-1 ............................................................................................................... 12, 13

42 U.S.C. § 5000A ...................................................................................................................... 27

42 U.S.C. § 18011 ....................................................................................................................... 34

42 U.S.C. § 18021 ....................................................................................................................... 19

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010).............. 2

Ind. Code Ann. § 31-11-6-1 ........................................................................................................ 13

139 Cong. Rec. S14350-01 (daily ed. Oct.26, 1993) ................................................................... 29

155 Cong. Rec. 29,070 (2009) ..................................................................................................... 42

155 Cong. Rec. S12265-02 (daily ed. Dec. 3, 2009) ................................................................... 42

H.R. Rep. No. 111-443 (2010) ..................................................................................................... 37

**Rules, Regulations, and Administrative Materials**

Fed. R. Civ. P. 12 ................................................................................................ 11

Fed. R. Civ. P. 56 ................................................................................. 11, 24, 25

26 C.F.R. § 54.9815-2713 ................................................................................. 35

29 C.F.R. § 54.9815-2713 ................................................................................. 35

29 C.F.R. § 54.9815-2713A ............................................................................... 36

45 C.F.R. § 46.202 ............................................................................................. 22

45 C.F.R. § 147.130 ............................................................................................. 5

45 C.F.R. § 147.131 ........................................................................ 8, 13, 17, 35

45 C.F.R. § 147.140 ........................................................................................... 34

45 C.F.R. § 156.50 ............................................................................................. 36

75 Fed. Reg. 41,726 (July 19, 2010) ................................................................ 30

76 Fed. Reg. 46,621 (Aug. 3, 2011) ................................................... 5, 6, 7, 14

77 Fed. Reg. 8,725 (Feb. 15, 2012) .................................................... 6, 7, 14

77 Fed. Reg. 16,501 (Mar. 21, 2012) ................................................................. 7

78 Fed. Reg. 8,456 (Feb. 6, 2013) ................................................................ 7, 9

78 Fed. Reg. 39,869 (July 2, 2013) .......................................................... *passim*

79 Fed. Reg. 51,092 (Aug. 27, 2014) ............................................................ 9, 35

Health Resources and Services Administration, Women's Preventive Services: Required Health
Plan Coverage Guidelines .................................................................. 4, 5, 6, 20

Memorandum from the Acting Dep. Asst. Sec. for Population Affairs, Dep't of Health & Human
Servs., to Regional Health Admin'rs (Apr. 23, 1997) ................................... 22

**Other Authorities**

INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (2011).. *passim*

HealthCare.gov, Affordable Care Act Rules on Expanding Access to Preventive Services for
Women (August 1, 2011) .................................................................................. 20

Liberty Counsel, *Compulsory Vaccinations Threaten Religious Freedom* ................................. 32

U.S. Preventive Services Task Force A & B Recommendations ................................................... 3

**INTRODUCTION**

The Affordable Care Act and its implementing regulations generally require group health plans to provide coverage without cost-sharing for certain preventive services. Among these are immunizations; cholesterol screening; depression screening; tobacco use counseling and interventions; and, subject to religious exemptions and accommodations, all FDA-approved contraceptive services for women with reproductive capacity as prescribed by health care providers.

Plaintiff March for Life is an avowedly non-religious employer. For *non-religious* reasons, March for Life opposes the use of certain contraceptives and objects to purchasing a group health plan that offers coverage for those contraceptives. Plaintiffs Jeanne Monahan and Bethany Goodman are two of March for Life's employees. For *religious* reasons, the employee plaintiffs oppose the use of certain contraceptives and object to participating in or purchasing health insurance that offers coverage for those contraceptives.

March for Life challenges the regulatory exemption from the contraceptive coverage requirement for religious employers (houses of worship and their integrated auxiliaries) because it does not extend to non-religious employers. But March for Life cannot satisfy its heavy burden, under the Fifth Amendment's Equal Protection guarantee and the Administrative Procedure Act, to demonstrate that the religious employer exemption is not rationally related to a legitimate government purpose. March for Life's arguments are foreclosed by *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, where the Supreme Court upheld Title VII's exemption for religious employers against an Equal Protection challenge indistinguishable from that raised here. 483 U.S. 327, 338-39 (1987). March for Life's claim—that the religious employer "exemption [must] come[] packaged with benefits to secular entities," *id.* at 338—is not advanced by its focus on statements in the rulemaking that are not relevant to its arguments. The limits of the religious employer exemption are consistent with the government's "proper purpose of lifting a regulation" that might "burden[] the exercise of religion" by religious institutions. *Id.*

The employee plaintiffs purport to challenge the contraceptive coverage requirement itself but lack standing to do so. The requirement does not apply to the employee plaintiffs and they have not established that their alleged injury is redressable. The only court to have confronted similar claims has dismissed them for lack of subject matter jurisdiction. *Wieland v. U.S. Dep't of Health & Human Servs.*, 978 F. Supp. 2d 1008, 1014-16 (E.D. Mo. 2013).

Even if the employee plaintiffs had standing, their claims would fail on the merits. Under the Religious Freedom Restoration Act, only substantial burdens on a person's religious exercise trigger the compelling interest requirement, and it is not a substantial burden on a person's religion to have a health insurance plan that includes coverage of services that she or her family members will not use. Even if it were, the government's interest in having a workable insurance system that covers a wide range of preventive services is undoubtedly compelling. Insurance markets could not function if health plans had to be tailored to the specific needs and desires of each individual plan participant and beneficiary. The scheme that plaintiffs envision would all but lead to the end of group health coverage, which relies on common coverage for a set of insured individuals.

The employee plaintiffs' Free Exercise claim is also devoid of merit. The contraceptive coverage requirement is a neutral law of general applicability that does not target religious exercise for disfavored treatment. Nearly every court to have addressed identical Free Exercise claims, where brought by employers with standing to sue, has rejected them.

For the reasons stated below, defendants respectfully request that the Court deny plaintiffs' motion for preliminary injunction, and grant defendants' motion to dismiss or, in the alternative, for summary judgment.

## BACKGROUND

Congress has long regulated employer-sponsored group health plans. In 2010, the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119, established certain additional minimum standards for group health plans as well as health insurance issuers that offer coverage in the group and individual health insurance markets. Before the ACA, many

Americans did not receive the preventive health care they needed to stay healthy, avoid or delay the onset of disease, lead productive lives, and reduce health care costs. Due largely to cost, Americans used preventive services at about half the recommended rate. *See* INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 19-20, 109 (2011) (IOM REP.), AR at 317-18, 407.[1] Section 1001 of the ACA—which includes the preventive services coverage provision relevant here, 42 U.S.C. § 300gg-13—seeks to cure this problem by making preventive care accessible and affordable for many more Americans.

Specifically, the Act requires non-grandfathered group health plans, and health insurance issuers offering non-grandfathered health insurance coverage, to cover four categories of recommended preventive-health services without cost-sharing—that is, without requiring plan participants and beneficiaries to make copayments or pay deductibles or coinsurance. *Id.* The four categories of preventive health services are: items or services that have an "A" or "B" rating from the U.S. Preventive Services Task Force, *id.* § 300gg-13(a)(1); immunizations recommended by the Advisory Committee on Immunization Practices, *id.* § 300gg-13(a)(2); preventive care and screenings for infants, children, and adolescents as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA) (a component of the Department of Health and Human Services (HHS)), *id.* § 300gg-13(a)(3); and additional preventive care and screenings for women as provided for in comprehensive guidelines supported by HRSA, *id.* § 300gg-13(a)(4).[2]

---

[1] Where appropriate, defendants have provided parallel citations to the administrative record (AR).

[2] The requirements articulated in 42 U.S.C. § 300gg-13 thus encompass immunizations, cholesterol screening, blood pressure screening, mammography, cervical cancer screening, screening and counseling for sexually transmitted infections, domestic violence counseling, depression screening, obesity screening and counseling, diet counseling, hearing loss screening for newborns, autism screening for children, developmental screening for children, alcohol misuse counseling, tobacco use counseling and interventions, well-woman visits, breastfeeding support and supplies, and many other preventive services. *See, e.g.*, U.S. Preventive Services Task Force A & B Recommendations, *available at* http://goo.gl/FP2GxS.

Because there were no existing HRSA guidelines relating to preventive care and screening for women, HHS requested that the Institute of Medicine (IOM) develop recommendations to implement the requirement to provide coverage, without cost-sharing, of preventive services for women. IOM REP. at 2, AR at 300.[3] After conducting an extensive science-based review, experts, "including specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines," developed a list of services "shown to improve well-being, and/or decrease the likelihood or delay the onset of a targeted disease or condition." *See id.* at 2-3, AR at 300-01. IOM recommended that HRSA guidelines include, among other things, well-woman visits, breastfeeding support, domestic violence screening, and, as relevant here, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *Id.* at 10-12, AR at 308-10. FDA-approved contraceptive methods include diaphragms, oral contraceptive pills, emergency contraceptives (such as Plan B and Ella), and intrauterine devices (IUDs). *See id.* at 105, AR at 403. IOM determined that coverage, without cost-sharing, for these services is necessary to increase access to such services, and thereby reduce unintended pregnancies (and the negative health outcomes that disproportionately accompany unintended pregnancies) and promote healthy birth spacing. *See id.* at 102-03, AR at 400-01. At least twenty-eight states have laws requiring health insurance policies that cover prescription drugs to also provide coverage for FDA-approved contraceptives. *See* Guttmacher Institute, State Policies in Brief: Insurance Coverage of Contraceptives (June 2013), AR at 1023-26.

On August 1, 2011, HRSA adopted guidelines consistent with IOM's recommendations subject to an exemption for certain religious employers, *see* HRSA, Women's Preventive

---

[3] IOM, which was established by the National Academy of Sciences in 1970, is funded by Congress to provide expert advice to the federal government on matters of public health. IOM REP. at iv, AR at 289.

Services: Required Health Plan Coverage Guidelines (HRSA Guidelines), AR at 283-84,[4] that was authorized by regulations issued that same day, *see* 76 Fed. Reg. 46,621 (published Aug. 3, 2011) (the 2011 amended interim final regulations), AR at 218-25. In the 2011 amended interim final regulations, the Departments explained that they had "received considerable feedback regarding which preventive services for women should be considered for coverage" under the ACA, and that, "while [m]ost commenters . . . recommended that HRSA Guidelines include contraceptive services for all women and that this requirement be binding on all group health plans and health insurance issuers with no religious exemption[,] . . . several commenters asserted that requiring group health plans sponsored by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom." 76 Fed. Reg. at 46,623, AR at 220. The Departments concluded that it would be "appropriate that HRSA," in issuing its Guidelines, consider "the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate." *Id.* The Departments further specified their intention that HRSA "respect[] the unique relationship between a house of worship and its employees," and noted that exempting religious employers "would be consistent with the polices of [s]tates that require contraceptive services coverage, the majority of which simultaneously provide for a religious accommodation." *Id.*

Accordingly, the Departments provided HRSA with "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned," in order "to reasonably balance the extension of any coverage of contraceptive services under the HRSA

---

[4] The HRSA Guidelines include coverage of "all [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" as prescribed by a health care provider. HRSA Guidelines, AR at 284. The relevant regulations adopted by the three Departments implementing this portion of the ACA (HHS, Labor, and Treasury) require coverage of, among other preventive services, the contraceptive services recommended in the HRSA Guidelines. 45 C.F.R. § 147.130(a)(1)(iv) (HHS); 29 C.F.R. § 2590.715-2713(a)(1)(iv) (Labor); 26 C.F.R. § 54.9815-2713(a)(1)(iv) (Treasury) (referred to collectively as the contraceptive coverage requirement).

Guidelines to as many women as possible, while respecting the unique relationship between certain religious employers and their employees." *Id.*[5] HRSA exercised this discretion in issuing its Guidelines, which exempted from the contraceptive coverage requirement "[g]roup health plans sponsored by certain religious employers, and group health insurance coverage in connection with such plans." HRSA Guidelines, AR at 284 (defining "religious employer" according to the definition provided in the 2011 amended interim final regulations, *see supra* n. 5).

In February 2012, the government adopted in final regulations the definition of "religious employer" contained in the 2011 amended interim final regulations, *see supra* n.5, while also creating a temporary enforcement safe harbor for non-grandfathered group health plans sponsored by certain nonprofit organizations with religious objections to contraceptive coverage (and any associated group health insurance coverage), *see* 77 Fed. Reg. 8,725, 8,726-27 (Feb. 15, 2012) (the 2012 final rules), AR at 213-14. The Departments announced, in response to religious objections raised by some commenters, that during the temporary enforcement safe harbor they

---

[5] To qualify for the religious employer exemption contained in the 2011 amended interim final regulations, an employer had to meet the following criteria:

(1) The inculcation of religious values is the purpose of the organization;
(2) the organization primarily employs persons who share the religious tenets of the organization;
(3) the organization serves primarily persons who share the religious tenets of the organization; and
(4) the organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

76 Fed. Reg. at 46,623, AR at 220. The Departments noted that these criteria were "based on existing definitions [of 'religious employer'] used by most [s]tates that exempt certain religious employers from having to comply with [s]tate law requirements to cover contraceptive services." *Id.* The Departments further noted that "[b]ecause HRSA's discretion to establish an exemption applies only to group health plans sponsored by certain religious employers and group health insurance offered in connection with such plans, health insurance issuers in the individual health insurance market would not be covered under any such exemption." *Id.* at 46,623-24, AR at 220-21.

would develop "'changes to these final regulations that would meet two goals'—providing contraceptive coverage without cost-sharing to covered individuals and accommodating the religious objections of [additional] non-profit organizations." *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (per curiam) (quoting 77 Fed. Reg. at 8,727); *see* 77 Fed. Reg. 16,501 (Mar. 21, 2012) (Advance Notice of Proposed Rulemaking (ANPRM)), AR at 186-93; 78 Fed. Reg. 8,456 (Feb. 6, 2013) (Notice of Proposed Rulemaking (NPRM)), AR at 165-85. The regulations challenged here represent the culmination of that process. *See* 78 Fed. Reg. 39,869 (July 2, 2013) (the 2013 final rules).

During the rulemaking process, certain commenters argued that the definition of a "religious employer" that was originally proposed, *see supra* n.5, was too narrow, in that it would not exempt all those organizations with religious objections to contraceptives; others argued that the originally proposed definition was appropriate; and still others argued that the Departments should eliminate the religious employer exemption entirely. 78 Fed. Reg. at 8,459, AR at 168. In the NPRM, the Departments proposed amendments to "the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different faiths." *Id.* at 8,460, AR at 169. The Departments reaffirmed that the definition of "religious employer" was "intended to focus the religious employer exemption on 'the unique relationship between a house of worship and its employees,'" *id.* at 8,461, AR at 170 (quoting 76 Fed. Reg. at 46,623), and not to "exclude group health plans of religious entities that would qualify for the exemption but for the fact that, for example, they provide charitable social services to persons of different religious faiths or employ persons of different religious faiths when running a parochial school," *id.* The Departments therefore proposed a revised definition of "religious employer" that would eliminate "any question as to whether group health plans of houses of worship that provide educational, charitable, or social services to their communities qualify for the exemption," and welcomed comments as to whether the revised definition "would unduly expand the universe of employer

7

plans that would qualify for the exemption and whether additional or different language is needed to clarify the scope of the exemption." *Id.*

Accordingly, as proposed in the NPRM, the 2013 final rules simplify the definition of the exempted "religious employers" that was originally proposed by eliminating the first three criteria and clarifying the fourth criterion. Under the 2013 final rules, a "religious employer" is defined as a nonprofit organization described in the Internal Revenue Code provisions that refer to churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. 45 C.F.R. § 147.131(a) (cross-referencing 26 U.S.C. §§ 6033(a)(3)(A)(i) and (iii)). The Departments explained:

> As indicated in the preamble to the [NPRM], the simplified and clarified definition of religious employer does not expand the universe of religious employers that qualify for the exemption beyond that which was intended . . ., but only eliminates any perceived potential disincentive for religious employers to provide educational, charitable, and social services to their communities. The Departments believe that the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement.

78 Fed. Reg. at 39,874 (citation omitted), AR at 6. In articulating why the religious employer exemption does not undermine the government's compelling interests, the Departments noted that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." *Id.*[6]

---

[6] The 2013 final rules also establish accommodations with respect to the contraceptive coverage requirement for group health plans established or maintained by additional religious nonprofits (referred to as "eligible organizations"). 78 Fed. Reg. at 39,875-80, AR at 7-12; 45 C.F.R. § 147.131(b). An "eligible organization" is a nonprofit that opposes providing coverage for some or all contraceptive services on account of religious objections, that holds itself out as a religious organization, and that self-certifies its eligibility for an accommodation. *Id.*; *see also* 78 Fed. Reg. at 39,874-75, AR at 6-7. Under the accommodations, eligible organizations are not required "to contract, arrange, pay, or refer for contraceptive coverage," but "plan participants and

The contraceptive coverage requirement generally applies to group health plans and health insurance issuers for plan years beginning on or after August 1, 2012, except that: (i) the amendment to the religious employer exemption applies to plan years beginning on or after August 1, 2013; and, as noted above, (ii) eligible organizations could qualify for a temporary enforcement safe harbor until their plan years beginning on or after January 1, 2014, when the accommodations became available. 78 Fed. Reg. at 39,870-72, AR at 2-4.

---

beneficiaries" in eligible organizations' health plans "will still benefit from separate payments for contraceptive services without cost sharing or other charge." *Id.* at 39,874, AR at 6.

    Plaintiff March for Life has averred that it "does not qualify for [an] accommodation because it is not religious," Compl. ¶ 91; has challenged only the scope of the exemption for religious employers, not that of the accommodations available to eligible organizations, *see id.* ¶¶ 116-22, 154-57; Pls.' Mot. at 8-11; and has not stated whether it would avail itself of an accommodation if it deemed itself eligible for one. Therefore, the accommodations are not relevant to plaintiffs' claims. Nonetheless, for a description of the accommodations, *see, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759, 2782 (2014); *Michigan Catholic Conference v. Burwell*, 755 F.3d 372, 385-87 (6th Cir. 2014), *reh'g en banc denied*, Nos. 13-2723, 13-6640 (Sept. 16, 2014); and *University of Notre Dame v. Sebelius*, 743 F.3d 547, 550-51 (7th Cir. 2014), *reh'g en banc denied*, No. 13-3853 (May 7, 2014); *see also* 79 Fed. Reg. 51,092 (Aug. 27, 2014) (interim final regulations augmenting the accommodations by providing an alternative method for eligible organizations to provide notice of their religious objections). Briefly, as the Departments described in the NPRM, under the accommodations participants and beneficiaries in eligible organizations' group health plans receive coverage for contraceptives without cost-sharing, while eligible organizations are "insulat[ed] . . . from contracting, arranging, paying, or referring for such coverage." 78 Fed. Reg. at 8,462, AR at 171. In the NPRM the Departments also explained the differing rationales behind the exemption for religious employers and the accommodations for eligible organizations, stating—consistent with the text from the 2013 final rules quoted above—that the "proposed accommodations, as opposed to the exemption that is provided to religious employers, are warranted given that participants and beneficiaries in group health plans established or maintained by eligible organizations . . . may be less likely than participants and beneficiaries in group health plans established or maintained by religious employers to share [the] religious objections of the eligible organizations." *Id.* at 8,461-62, AR at 170-71. The Departments emphasized that the definition of "eligible organization" that they proposed in the NPRM, and that they adopted in the 2013 final rules, was "intended to allow health coverage established or maintained or arranged by nonprofit religious organizations . . . with religious objections to contraceptive coverage to qualify for an accommodation," and "strike[s] an appropriate balance because it . . . limit[s] any accommodation to nonprofit organizations that hold themselves out as religious." *Id.* at 8,462, AR at 171.

**STANDARD OF REVIEW**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

Here, plaintiffs "face an additional hurdle when proving their entitlement" to a preliminary injunction. *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 56 (D.D.C. 2012) (quotation omitted). Plaintiffs indicate that their health insurance plan currently offers coverage for the contraceptives to which they object. *See* Pls.' Mot. at i; Compl. ¶¶ 23, 25.[7] Plaintiffs request injunctive relief that, they allege, would permit them to seek a health insurance plan that omits coverage for such contraceptives. *Id.* at 28-29. Therefore, because the relief plaintiffs seek "would alter, not preserve, the status quo," a "somewhat higher standard" applies, *Paleteria La Michoacana*, 901 F. Supp. 2d at 56 (quotation omitted): plaintiffs "'must . . . show[] clearly that [they are] entitled to relief or that extreme or very serious damage will result from the denial of the injunction.'" *Elec. Privacy Info. Ctr. v. Dep't of Justice*, -- F. Supp. 2d --, 2014 WL 521544, at *5 (D.D.C. 2014) (quoting *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998)).[8]

---

[7] Plaintiffs do not allege that their plan started covering contraceptives in response to the contraceptive coverage requirement. *Cf.* Compl. ¶ 23 (stating only that "March for Life's health insurance plan . . . did not come into existence until . . . 2010").

[8] Although the "[D.C.] Circuit has neither adopted nor rejected a heightened burden as a doctrinal matter, . . . it is common practice among members of this court to proceed with extreme caution when the injunction would alter the status quo." *Paleteria La Michoacana*, 901 F. Supp. 2d at 56 n.1; *see, e.g.*, *Elec. Privacy Info. Ctr.*, 2014 WL 521544, at *5 ("[I]n this jurisdiction, it is . . . well established that '[t]he power to issue a preliminary injunction, especially a mandatory

Simultaneously with opposing plaintiffs' motion for preliminary injunction, defendants move to dismiss plaintiffs' complaint in its entirety for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Under Rule 12(b)(6), "[t]he court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, . . . but is not required to accept the plaintiff's legal conclusions as correct." *Sissel v. U.S. Dep't of Health & Human Servs.*, -- F.3d --, 2014 WL 3714701, at *2 (D.C. Cir. 2014) (citations omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants also move to dismiss the second and third claims for relief stated in plaintiffs' complaint—the two claims raised by the employee plaintiffs only—under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. The party invoking federal jurisdiction bears the burden of establishing its existence, and the Court must determine whether it has jurisdiction before addressing the merits of a claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 104 (1998).

To the extent that the Court must consider the administrative record in addition to the face of plaintiffs' complaint, defendants move, in the alternative, for summary judgment pursuant to Rule 56. Defendants are entitled to summary judgment where the administrative record demonstrates that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

## I.     MARCH FOR LIFE'S EQUAL PROTECTION CLAIM FAILS

Plaintiff March for Life alleges that the contraceptive coverage requirement's exemption for religious employers is unconstitutional because it does not encompass non-religious entities. But what the Supreme Court has stated in the Establishment Clause context applies with equal

---

one, should be sparingly exercised.'" (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969))).

force here: "Where . . . government acts with the proper purpose of lifting a regulation" that might interfere with religious organizations' "exercise of religion," there is "*no reason* to require that the exemption comes packaged with benefits to secular entities." *Amos*, 483 U.S. at 338 (emphasis added); *Cutter v. Wilkinson*, 544 U.S. 709, 724 (2005) (same); *see Olsen v. DEA*, 878 F.2d 1458, 1463 n.5 (D.C. Cir. 1989) ("In cases [challenging the scope of a religious exemption], [E]stablishment [C]lause and equal protection analyses converge." (citing *Walz v. Tax Comm'n*, 397 U.S. 664, 694 (1970) (opinion of Harlan, J.))). But the government need not resort to arguing by analogy only: *Amos* is dispositive of March for Life's Equal Protection claim. 483 U.S. at 338-39.

In *Amos*, the Supreme Court considered First Amendment and Equal Protection challenges to § 702 of the Civil Rights Act of 1964, which "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." 483 U.S. at 329 (citing 42 U.S.C. § 2000e-1 (Title VII "shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities")). The *Amos* plaintiffs were individuals who had allegedly been fired on account of their religion, and who argued that the § 702 exemption that permitted their church-run nonprofit employers to do so was unconstitutional because the § 702 exemption gives more protections to religious employers than to secular employers. *Id.* at 330-31. First, the Court upheld the § 702 exemption against plaintiffs' Establishment Clause challenge, *id.* at 334-38, applying the *Lemon* test and drawing upon the "long" line of precedent "'recogniz[ing] that the government may'" constitutionally "'accommodate religious practices,'" *id.* at 334 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987)); *see id.* at 335 ("it is a permissible [governmental] purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions").

12

Next, and as particularly relevant here, the Court turned to the argument that the exemption "offend[ed] equal protection principles by . . . drawing distinctions on religious grounds." *Id.* at 338; *see id.* at 338-39. Specifically, the *Amos* plaintiffs argued that the § 702 exemption gave "less protection to the employees of religious employers than to the employees of secular employers," *id.* at 338; the corollary is that the § 702 exemption gives more protection to religious employers than to secular employers, which is precisely the argument that March for Life presses here with regard to the contraceptive coverage requirement's exemption for religious employers. The Supreme Court rejected the *Amos* plaintiffs' Equal Protection claim in broad language that forecloses the materially identical claim put forward by March for Life:

> [W]here a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, . . . [t]he proper inquiry is whether Congress has chosen a rational classification to further a legitimate end. . . . To dispose of [plaintiffs'] [E]qual [P]rotection argument, it suffices to hold—as we now do—that . . . § 702 is rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions.

483 U.S. at 339.

Here, the religious employer exemption "is neutral on its face," *id.*: like the § 702 exemption, which refers broadly to "religious corporation[s]" and other associated entities, 42 U.S.C. § 2000e-1, the religious employer exemption applies to *all* churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order, 45 C.F.R. § 147.131(a) (cross-referencing 26 U.S.C. §§ 6033(a)(3)(A)(i) and (iii)).[9] And like the § 702 exemption, the religious employer exemption is "motivated by a . . .

---

[9] By contrast, the law that the Seventh Circuit struck down in *Center for Inquiry, Inc. v. Marion Circuit Court Clerk* permitted marriages to be solemnized by officials of certain religions but not by those of others. 758 F.3d 869, 871 (7th Cir. 2014) (quoting the challenged law as specifically conferring marriage solemnization rights on, among others, priests, bishops, archbishops, rabbis, "'[t]he Friends Church'" (Quakers), "'German Baptists,'" "'[t]he Bahai faith,'" Mormons, and Muslims (quoting Ind. Code § 31-11-6-1)); *see* Pls.' Mot. at 10. That the challenged law discriminated among religions was crucial to the Seventh Circuit's reasoning. *See Ctr. for Inquiry*, 758 F.3d at 872, 873 (emphasizing the importance of "neutrality"); *see also Larson v. Valente*, 456 U.S. 228, 246 (1982) (stating that, under the Establishment Clause, "law[s] granting

purpose of limiting governmental interference with the exercise of religion" by "religious organizations," *Amos*, 483 U.S. at 339: as the Departments explained repeatedly in the rulemaking, the exemption exists to "respect[] the religious interests of houses of worship and their integrated auxiliaries." 78 Fed. Reg. at 39,874, AR at 6; *see* 76 Fed. Reg. at 46,623, AR at 220 (the religious employer exemption "respects the unique relationship between a house of worship and its employees"); *id.* (the "definition" of "religious employer" is "intended to reasonably balance the extension of any coverage of contraceptive services under the HRSA Guidelines to as many women as possible, while respecting the unique relationship between certain religious employers and their employees"); 78 Fed. Reg. at 8,461, AR at 170 (quoting 76 Fed. Reg. at 46,623).[10]

---

a denominational preference" are subject to "strict scrutiny"). And although the state argued that it could rationally limit marriage solemnization rights to clergy-led religions that treated marriage as a sacrament, *Center for Inquiry*, 758 F.3d at 871, 874, the Seventh Circuit concluded that the state law was not even consistent in that regard, emphasizing that it permitted solemnization by Quakers, "who lack clergy and do not treat marriage as a sacrament," but not by Buddhists, who also "lack . . . clergy [and] do[] not treat marriage as a sacrament," *id*. at 874. March for Life's reliance on *Center for Inquiry* is misplaced: a Seventh Circuit decision considering a statute that arbitrarily conferred positive rights on some religions but not on others has no bearing on this Court's consideration of government regulations that exempt all religious employers from specific obligations in order to "limit[] governmental interference with the exercise of religion," *Amos*, 483 U.S. at 339. *Welsh v. United States*, upon which March for Life also relies, Pls.' Mot. at 10, is no more relevant: that decision explicitly refused to "[p]ass upon the constitutional arguments that [were] raised." 398 U.S. 333, 335 (1970).

[10] March for Life is incorrect when it repeatedly asserts that the government "chose to exempt [religious employers] because . . . the employees of these entities are 'likely' or 'more likely' than other groups to agree with the organization's beliefs against contraception." Pls.' Mot. at 9 (quoting 77 Fed. Reg. at 8,728); *see id.* at 3-5, 10. Rather, as emphasized by the Departments throughout the rulemaking, and as exemplified by the language from the Federal Register quoted above, the religious employer exemption serves the "legitimate purpose" of "limiting governmental interference with the exercise of religion" by religious institutions. *Amos*, 483 U.S. at 339; *see* 78 Fed. Reg. at 39,874; *id.* at 8,461; 76 Fed. Reg. at 46,623. The statements upon which March for Life relies are irrelevant to its Equal Protection challenge to the exemption's scope. If, under rational basis review, governmental "classification[s] . . . 'may be based on rational speculation unsupported by evidence or empirical data,'" *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)), then statements that are not relevant to a plaintiff's challenge cannot possibly undercut the government's rational basis for the challenged classification.

Accordingly, and as plaintiffs concede, *see* Pls.' Mot. at 8-9, rational basis review applies, *Amos*, 483 U.S. at 339, and there can be no question that the purpose served by the religious employer exemption—accommodating religious exercise by religious institutions—is "permissible" and "legitimate," *id.*; *see* U.S. Const. amend. I. The Religion Clauses "prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other." *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971). "[R]eligious employers," therefore, "have long enjoyed advantages (notably tax advantages) over other entities . . . ." *Univ. of Notre Dame*, 743 F.3d at 560 (addressing the religious employer exemption at issue here) (citing 26 U.S.C. §§ 6033(a)(3)(A)(i) and (iii); *Walz*, 397 U.S. at 666).[11] This differential treatment reflects the fact that "religious organizations have an interest in autonomy in ordering their internal affairs." *Amos*, 483 U.S. at 341 (Brennan, J., concurring); *see id.* at 341-42 & n.3 (citing authorities). Indeed, "our history is pervaded by . . . evidence of accommodation of all faiths and all forms of religious expression," and "[t]hrough this accommodation . . . governmental action has followed the best of our traditions." *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984) (quotation and alterations omitted).

Defendants do not assert that the religious employer exemption is required by the Religion Clauses. The exemption does, however, further the values embodied in those clauses by permitting religious employers' group health plans to omit coverage that contravenes the religious employers' religious beliefs, thereby evincing "respect [for] the religious interests of houses of worship and their integrated auxiliaries." 78 Fed. Reg. at 39,874, AR at 6. The exemption reflects the fact that, as the Supreme Court has repeatedly affirmed, "'there is room for play in the joints' between the [Religion] Clauses, . . . some space for [governmental] action

---

[11] *See also, e.g.*, 26 U.S.C. § 512(b)(12) (establishing a specific deduction "[i]n the case of a diocese, province of a religious order, or a convention or association of churches"); *id.* § 3309(b)(1) (establishing an exemption applicable to, *inter alia*, "a church or convention or association of churches" and "an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches").

neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause.'"
*Cutter*, 544 U.S. at 719 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004)). Like other
accommodations of religion that have been upheld by the Supreme Court, the religious employer
exemption "qualifies as a permissible" exercise of the government's discretionary authority to
accommodate religious institutions "that is not barred by the Establishment Clause," *id.* at 720,
or the Fifth Amendment's Equal Protection guarantee, *see Amos*, 483 U.S. at 339.

　　　Nor does the religious employer exemption offend equal protection because it does not
reach non-religious entities like March for Life, even if such entities also object to certain
contraceptives (albeit for non-religious reasons). *See id.* "Whether embodied in the Fourteenth
Amendment or inferred from the Fifth, equal protection  is not a license for courts to judge the
wisdom, fairness, or logic of [governmental] choices." *Beach Commc'ns, Inc.*, 508 U.S. at 313.
"In areas of social . . . policy," courts demand only "plausible reasons" for the government's
decision to draw a classification one way as opposed to another. *Id.* (quotation omitted). Indeed,
the "restraint[] on judicial review" that the rational basis test imposes has "added force where the
[government] must necessarily engage in a process of line-drawing," *id.* at 315 (quotation
omitted), such that "[c]ourts must uphold legislation '[e]ven if the classification involved . . . is
to some extent both underinclusive and overinclusive,'" *Gordon v. Holder*, 721 F.3d 638, 656
(D.C. Cir. 2013) (some alterations in the original) (quoting *Vance v. Bradley*, 440 U.S. 93, 108
(1979)). "A classification does not fail rational-basis review because it is not made with
mathematical nicety or because in practice it results in some inequality." *Heller v. Doe*, 509 U.S.
312, 321 (1993) (quotation omitted).

　　　The scope of the religious employer exemption "bear[s] a strong presumption of
validity," and March for Life has not satisfied its "high burden 'to negative every conceivable
basis'" which might support it. *Gordon*, 721 F.3d at 657 (quoting *Beach Commc'ns*, 508 U.S. at

315).[12] Nor can March for Life do so: it is plainly rational for an exemption intended to "respect the religious interests of houses of worship," 78 Fed. Reg. at 39,874, to be limited to religious organizations, 45 C.F.R. § 147.131(a). The "result" that March for Life desires—an exemption that, by constitutional mandate, would encompass non-religious organizations—"is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706 (2012).

That March for Life chooses to employ only those who hold certain views, Compl. ¶¶ 89, 103, 119; Pls.' Mot. at 6-10, is not relevant to this Court's analysis. As defendants have explained, *see supra* pp. 4-8, 13-14 & nn.5, 6, 10, the boundaries of the religious employer exemption were drawn out of regard for the religious exercise of religious employers themselves. There is a long tradition of exemptions of this kind, which "respect[] the[] autonomy" of houses of worship "to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013) (citing *Hosanna-Tabor*, 132 S. Ct. at 704-06). Regardless, "[d]efining the class of [entities] subject to [the religious employer exemption] inevitably requires that some [entities that] have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is" not "a matter [fit] for . . . judicial[] consideration." *Beach Commc'ns*, 508 U.S. at 315-16 (quotation omitted).

---

[12] While *Gordon* and *Beach Communications* concerned legislative line-drawing, *e.g.*, 508 U.S. at 313, the well-established "presumption of rationality" that these decisions command "extends to administrative regulatory action as well," *see Steffan*, 41 F.3d at 685. And it cannot be questioned that, under rational basis review, "'[t]he burden is on the one attacking the [governmental] arrangement,'" *id.* at 684 (alterations in the original) (quoting *Heller*, 509 U.S. at 320), contrary to plaintiffs' suggestion, *see* Pls.' Mot. at 8 (suggesting that the government bears the burden here).

The Fifth Amendment's Equal Protection guarantee "does not take from the [government] all power of classification," *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 271 (1979), but rather "keeps governmental decisionmakers from treating differently [entities which] are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see Noble v. U.S. Parole Comm'n,* 194 F.3d 152, 154 (D.C. Cir. 1999) (equal protection "does not require that all persons everywhere be treated alike," but instead "imposes the rather more modest requirement that government not treat similarly situated individuals differently without a rational basis"). March for Life "is not religious and is not a church." Compl. ¶¶ 63, 81. In the respect that is relevant to the government's legitimate purpose of accommodating the religious exercise of religious institutions, March for Life is not similarly situated to the entities eligible for the religious employer exemption, and its Equal Protection claim fails. March for Life has not supplied any "reason" why "the [religious employer] exemption" should "come[] packaged with benefits to secular entities." *Amos*, 483 U.S. at 338.

## II.   PLAINTIFFS' ADMINISTRATIVE PROCEDURE ACT CLAIMS FAIL

### A.   The contraceptive coverage requirement is neither arbitrary nor capricious

"[T]he 'arbitrary and capricious' standard requires a reviewing court to defer to an agency's judgment so long as it has a rational basis." *E.g.*, *Nat'l Motor Freight Traffic Ass'n, Inc. v. ICC*, 590 F.2d 1180, 1184 (D.C. Cir. 1978); *accord Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 137-38 (D.C. Cir. 2013). Plaintiffs' arbitrary and capricious claim thus fails for the reasons described above. *See supra* section I. In short, it was neither arbitrary nor capricious for the government to limit to religious employers an exemption from the contraceptive coverage requirement that "respect[s] the religious interests of houses of worship and their integrated auxiliaries." 78 Fed. Reg. at 39,874, AR at 6.

### B.   The contraceptive coverage requirement does not violate restrictions relating to abortion

Plaintiffs contend that the contraceptive coverage requirement violates the Administrative Procedure Act, alleging that it conflicts with three federal statutes dealing with abortion:

§ 1303(b)(1) of the ACA, the Weldon Amendment, and the Church Amendment. Compl. ¶¶ 158-60; Pls.' Mot. at 19-20. Plaintiffs reason that, because the regulations require group health plans to cover certain contraceptives that plaintiffs believe to cause abortions, they require coverage for abortions in violation of federal law.

Certain of plaintiffs' claims should be rejected at the outset because they do not fall within "the zone of interests to be protected or regulated by the [statutory provisions]" to which plaintiffs appeal. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The necessary link between plaintiffs and two of these statutes is missing here. Section 1303(b)(1) of the ACA provides that "nothing in this title . . . shall be construed to require a qualified health plan to provide coverage of [abortion services]," 42 U.S.C. § 18023(b)(1)(A)(i), but plaintiffs are neither a health insurance issuer nor a purchaser of a qualified health plan.[13] Plaintiffs therefore do not fall within the zone of interests to be protected by the statute in question.

Similarly, the Church Amendment protects "individual[s]" from being "required to perform or assist in the performance of any part of a health service program or research activity funded . . . by the Secretary of [HHS] if his performance or assistance . . . would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d). Plaintiff March for Life merely provides a health plan to its employees, and the employee plaintiffs merely choose to participate in that plan; no plaintiffs are required to, and no plaintiffs do in fact, "perform or assist in the performance" of a "health service program or research activity funded . . . under a program administered by the Secretary of [HHS]" within the meaning of the Church Amendment. *See Gray v. Romero*, 697 F. Supp. 580, 590 n.6 (D.R.I. 1988). Nor is plaintiff

---

[13] A "qualified health plan," within the meaning of this provision, is a health plan that has been certified by the health insurance exchange "through which such plan is offered" and that is offered by a health insurance issuer. 42 U.S.C. § 18021(a)(1). Plaintiff March for Life has not alleged that its health insurance plan is a "qualified health plan."

March for Life an "individual" under that provision. Plaintiffs are therefore not within the Church Amendment's zone of interests either.

Even if the Court were to reach the merits of these claims, and with specific regard to plaintiffs' Weldon Amendment claim, plaintiffs' allegation that the regulations require coverage of abortions is incorrect. Defendants are not questioning plaintiffs' beliefs. The relevant point, however, is that the regulations do not require that any health plan cover abortion as a preventive service, or that it cover abortion at all, as "abortion" is defined in federal law. Rather, the regulations require that non-grandfathered, non-exempt, and non-accommodated group health plans cover all FDA-approved "contraceptive methods, sterilization procedures, and patient education and counseling" as prescribed by a health care provider. *See* HRSA Guidelines, AR at 283-84. The government has made clear that the preventive services covered by the regulations do not include abortifacient drugs. HealthCare.gov, Affordable Care Act Rules on Expanding Access to Preventive Services for Women (August 1, 2011), http://goo.gl/Fio8GK (last visited Sept. 23, 2014); *see* IOM REP. at 22 (recognizing that abortion services are outside the scope of permissible recommendations), AR at 320; *see also Liberty Univ. v. Lew*, 733 F.3d 72, 103 n.11 (4th Cir. 2013) ("the Government does not define . . . contraceptives as abortifacients or abortion").

Although plaintiffs are certainly entitled to believe that certain contraceptives are abortifacient, neither the government nor this Court is required to accept that characterization, which is inconsistent with the FDA's scientific assessment and with federal law. Plaintiffs' religious beliefs may define abortion differently than federal law, but as a number of courts have recognized in rejecting claims identical to plaintiffs', statutory interpretation requires that terms be construed as a matter of law and not in accordance with any particular claimant's views or beliefs. The Sixth Circuit, for example, repudiated the notion "that the court should defer to [plaintiffs'] independent interpretation of 'abortion'" because "[t]hat is not how statutory interpretation works," and proceeded to "utilize [the] traditional methods of statutory interpretation to determine" that plaintiffs had failed to establish that "'abortion' in the Weldon

Amendment includes FDA-approved emergency contraceptives." *Mich. Catholic Conf.*, 755 F.3d at 397, *aff'g Mich. Catholic Conf. v. Sebelius*, 989 F. Supp. 2d 577, 593 (W.D. Mich. 2013) ("Plaintiffs believe that FDA-approved emergency contraceptives are 'abortion-inducing products'—as is their right. However, federal law does not define them as such. . . . Accordingly, the regulations are not contrary to law, and Plaintiffs' APA claim fails." (citation omitted)).

Plaintiffs' "contrary to law" claim also fails because the contraceptive coverage requirement reflects a settled understanding of FDA-approved contraceptives that is in accordance with existing federal laws prohibiting federal funding for certain abortions, and because the requirement is consistent with over a decade of regulatory policy and practice. The requirement, therefore, cannot be deemed contrary to any law dealing with abortion. *See Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, 638 F.3d 807, 815 (D.C. Cir. 2011) (giving particular deference to an agency's longstanding interpretation) (citing *Barnhart v. Walton*, 535 U.S. 212, 220 (2002)).

In recommending what contraceptive services should be covered by health plans without cost-sharing, the IOM identified the contraceptives that have been approved by the FDA as safe and effective. *See* IOM Rep. at 10, AR at 308. The list of FDA-approved contraceptives includes certain contraceptives to which plaintiffs object. *See id.* at 105, AR at 403. The basis for the inclusion of such drugs and devices among safe and effective means of contraception dates back to 1997, when the FDA first explained why emergency contraceptives, including Plan B and similar drugs, act as contraceptives rather than abortifacients. Prescription Drug Products; Certain Combined Oral Contraceptives for Use as Postcoital Emergency Contraception, 62 Fed. Reg. 8,610, 8,611 (Feb. 25, 1997) (noting that "emergency contraceptive pills are not effective if the woman is pregnant" and that there is "no evidence that [emergency contraception] will have an adverse effect on an established pregnancy"); 45 C.F.R. § 46.202(f) ("Pregnancy encompasses the period of time from implantation until delivery."); *see Liberty Univ.*, 733 F.3d at 103 n.11 (describing 45 C.F.R. § 46.202(f) as stating a proposition that is "[w]ell-established [in] federal law"). In light of this conclusion by the FDA, HHS informed Title X grantees, which are

required to offer a range of acceptable and effective family planning methods—and may not

offer abortion except under limited circumstances (*e.g.*, rape, incest, or when the life of the

woman would be in danger)—that they "should consider the availability of emergency

contraception the same as any other method which has been established as safe and effective."

Memorandum from the Acting Dep. Ass't Sec. for Population Affairs, Dep't of Health & Human

Servs., to Regional Health Admin'rs (Apr. 23, 1997), *available at* http://goo.gl/2alimh; *see also*

42 U.S.C. §§ 300, 300a-6.

Accordingly, plaintiffs' Administrative Procedure Act claims fail.[14]

## III.   THE EMPLOYEE PLAINTIFFS LACK STANDING

"[A] plaintiff must demonstrate standing for each claim he seeks to press,"

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), as "without jurisdiction the court

cannot proceed at all in any cause," *Steel Co.*, 523 U.S. at 94 (quotation and alterations omitted).

"Standing under Article III of the Constitution requires that an injury be concrete, particularized,

and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable

ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). The employee

plaintiffs alone allege that the contraceptive coverage requirement violates the Religious

---

[14] Plaintiffs also claim, among their complaint's Administrative Procedure Act allegations, that "[d]efendants did not adequately consider or respond to comments they received indicating  that groups like March for Life should be exempt from the" contraceptive coverage requirement. Compl. ¶ 155. Plaintiffs have wisely chosen not to press this claim in their motion, as it has no legal basis and, in any event, is contradicted by record evidence. An "agency need not respond to every comment, or analyze every issue or alternative raised by the comments, no matter how insubstantial." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quotation and alterations omitted). "Rather, an agency must consider only significant and viable and obvious alternatives." *Id.* (quotation omitted). Here, plaintiffs have not identified a single comment submitted to the Departments suggesting that the exemption for *religious* employers should extend to *non-religious* entities. Nor is such an alternative obvious or viable, as made evident by the contradictory terms necessarily used to describe it. Regardless, the preamble to the 2013 final rules contains a detailed discussion both of the comments defendants received and of defendants' responses to those comments. 78 Fed. Reg. at 39,871-88, AR at 3-20. That the regulations may not satisfy the preferences of each and every commenter is not evidence that comments were not considered.

Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* (RFRA); *see* Compl. ¶¶ 124-36 (Second

Claim for Relief), and the Free Exercise Clause, *see id.* ¶¶ 137-51 (Third Claim for Relief).

Because the employee plaintiffs lack standing, the Court must dismiss these claims for lack of

subject matter jurisdiction, as the only other court to have confronted similar claims has done.

*See Wieland*, 978 F. Supp. 2d at 1014-16 (concluding that individuals similarly situated to the

employee plaintiffs who brought RFRA and Free Exercise challenges to the contraceptive

coverage requirement had failed to establish causation and redressability, and therefore that

subject matter jurisdiction over their claims was lacking).

As plaintiffs themselves explain, the contraceptive coverage requirement does not apply

to individuals, but instead applies to "'group health plan[s]'" and "'health insurance issuer[s]

offering group or individual health insurance coverage.'" Compl. ¶ 38 (quoting 42 U.S.C.

§ 300gg-13(a)); *see id.* ¶ 3 & n.1 (citing 42 U.S.C. § 300gg-13(a)(4) and the implementing

regulations). Yet, the employee plaintiffs are not group health plans or health insurance issuers.

They are two of the millions of Americans that obtain health insurance either through their

employer or on the market for individual plans. The requirement they challenge does not regulate

their own conduct, and the relief they seek—a health insurance plan that excludes coverage of

contraceptives—would require action by a health insurance issuer, a third party that is not before

court.

Where "a plaintiff's asserted injury arises from the [g]overnment's regulation of a third

party that is not before the court, it becomes 'substantially more difficult' to establish standing."

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). "Because the necessary elements of

causation and redressability in such a case hinge on the independent choices of the regulated

third party, 'it becomes the burden of the plaintiff to adduce facts showing that those choices

have been or will be made in such manner as to produce causation and permit redressability of

injury.'" *Id.* (quoting *Lujan*, 504 U.S. at 562); *see, e.g., Klamath Water Users Ass'n v. FERC*,

534 F.3d 735, 740 (D.C. Cir. 2008) (Where "relief for the [plaintiff] depends on actions by a

third party not before the court, the [plaintiff] must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Here, the employee plaintiffs have failed to allege—much less to prove, as it is their burden to do before they can obtain final judgment[15]—causation and redressability. The employee plaintiffs' alleged injury is their inability "to participat[e] in a health insurance plan" that accords with their "sincerely held ethical and religious beliefs" by omitting coverage for certain contraceptives. Compl. ¶ 34. Specifically, purchasing "health insurance is an integral part of" the employee plaintiffs' religious beliefs, but "participating in a health insurance plan that covers" certain contraceptives contravenes those beliefs. Compl. ¶¶ 125, 138; *see* Pls.' Mot. at 7 (foregoing "the benefits of health insurance" would "violat[e] [the employee plaintiffs'] religious beliefs"); *id.* at 12 ("as a matter of religious conviction as well as moral beliefs," the employee plaintiffs "object to using or participating in coverage of" "certain contraceptives"). The employee plaintiffs lay blame for their alleged injury on the contraceptive coverage requirement, which they seek to enjoin on grounds that it "burdens [their] religious beliefs . . . by compelling them to participate in health plans that provide" coverage of the contraceptives to which they object "for themselves and their dependents." Pls.' Mot. at 13; *see* Compl. at 28-29. Missing from this formulation, however—and indeed from this case—is a key player: a health insurance issuer willing to provide a plan for the employee plaintiffs that accords with their religious beliefs.

---

[15] Each element of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At summary judgment, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts' . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)). And as relevant here, in light of plaintiffs' request that the court "enter final judgment on the merits" "[b]ased on the facts sworn in the Verified Complaint," Pls.' Mot. at 22, those specific facts "must be supported adequately by . . . evidence," *Lujan*, 504 U.S. at 561 (quotation omitted).

The employee plaintiffs allege that they might obtain health insurance in one of two ways. At present, they "have elected to be covered under [March for Life's group] health insurance plan." Compl. ¶ 22. Alternatively, the employee plaintiffs might "buy[] . . . a plan from the open market" for individual health insurance plans. *Id.* ¶ 94. The contraceptive coverage requirement does mean "that, if the [employee plaintiffs] accept March for Life's insurance plan, or buy one for their families" on the market for individual plans, either plan "must provide coverage" for contraceptives. *Id.* ¶ 128. But it simply does not follow that *absent* the contraceptive coverage requirement, an issuer of group or individual health insurance plans would sell March for Life or the employee plaintiffs, respectively, a plan that would satisfy the employee plaintiffs. In this case, "[t]he existence of [two] of the essential elements of standing"—causation and redressability—"depends on the unfettered choices made by" health insurance issuers, "independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (quotation omitted).

Plaintiffs do aver that "March for Life's health insurance carrier has indicated it would offer coverage *to [March for Life]* that omits" the contraceptives to which plaintiffs object "if doing so was legally permissible." Compl. ¶ 25 (emphasis added). Setting aside whether or not the Court should credit this assertion,[16] it is immaterial as to the *employee plaintiffs*' standing.

---

[16] Although the D.C. Circuit "has established that a verified complaint may be treated as an affidavit for summary judgment purposes," *Lurie v. Mid-Atlantic Permanent Medical Group, P.C.*, 729 F. Supp. 2d 304, 323 (D.D.C. 2010) (citing *Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992)), "[n]evertheless," the Federal Rules of Civil Procedure "dictate[] that" an affidavit used to support a summary judgment motion "'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated,'" *id.* (quoting Fed. R. Civ. P. 56(c)(4)). Here, plaintiffs' assertion that March for Life's insurer indicated to plaintiffs that it was willing to sell March for Life a certain insurance policy, Compl. ¶ 25, is classic hearsay. Nor do plaintiffs "point to specific facts or observations which would support [their] contention or explain the provenance of [their] knowledge." *Lurie*, 729 F. Supp. 2d at 323. As such, the Court should "not consider [paragraph 25] of plaintiffs' verified complaint in evaluating the sufficiency of the evidence." *Id.* (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)). In any event, *plaintiffs'* statement that an

Consider either relevant scenario, construing all of plaintiffs' factual allegations in their favor: first, where plaintiff March for Life succeeds on one of its claims, and second, where plaintiff March for Life's claims fail.

1. Were the Court to order the relief that plaintiff March for Life seeks—an "injunction prohibiting" defendants from applying the contraceptive coverage requirement to plaintiffs "and their insurers," Compl. at 28—then March for Life's insurer would provide March for Life with a group health insurance plan that omits coverage for the contraceptives to which plaintiffs object, *see id.* ¶ 25, and March for Life would offer this plan to the employee plaintiffs, as "March for Life believes that it should provide all of its employees with health insurance," *id.* ¶ 24. Under this scenario, where one of plaintiff March for Life's claims has succeeded and the Court has entered appropriate injunctive relief, the employee plaintiffs' alleged injury—their inability to procure health insurance that accords with their religious beliefs, *see id.* ¶¶ 125, 138—would be eliminated, and the Court would lack subject matter jurisdiction over the employee plaintiffs' (moot) claims, *see, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.*, 528 U.S. 167, 189 (2000) ("the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)" (quotation omitted)).

2. Alternatively, were the Court to find against March for Life on its claims, then March for Life's group health insurance policy would, by law, continue to include the coverage to which the employee plaintiffs object. At that point, the employee plaintiffs would ostensibly

---

insurer "has *indicated it would offer coverage* to [March for Life] that omits [certain contraceptives] if doing so was legally permissible," Compl. ¶ 25 (emphasis added), is hardly the kind of "*fact*[] showing that [such a] choice[] . . . *will be made*" that is necessary "to produce causation and permit redressability of injury," *Lujan*, 504 U.S. at 562 (emphasis added). Consequently, in addition to challenging the employee plaintiffs' standing, defendants may also challenge plaintiff March for Life's standing on redressability grounds if March for Life does not produce suitable evidence—in the form of, for example, a declaration from its insurer—that its insurer would sell it a group health plan tailored to its specific objections if doing so was legally permissible.

decline the coverage offered through March for Life, and their recourse would be to turn to the market for individual policies.[17] Yet, even were the Court to conclude (contrary to defendants' arguments, *see infra* sections IV and V) that the employee plaintiffs' RFRA and Free Exercise claims have merit, and to enjoin enforcement of the contraceptive coverage requirement as to the employee plaintiffs,[18] health insurance issuers "would retain discretion not to offer [the employee plaintiffs] a health plan that excludes" the contraceptives to which they object. *Wieland*, 978 F. Supp. 2d at 1015. And plaintiffs have not even suggested that an issuer in the market for *individuals* would sell them the kind of plan that they desire. (For the reasons discussed below, *see infra* Section IV(B), it is unlikely that any issuer would do so.)

     The employee plaintiffs' complete silence in this regard—especially in light of plaintiffs' assertion regarding what March for Life's group health plan issuer might do—is telling. If "standing to challenge a government policy cannot be founded . . . on *speculation* as to what third parties will do in response to a favorable ruling," *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1274 (D.C. Cir. 2007) (emphasis added), then *silence* surely does not suffice. The employee plaintiffs have failed to "demonstrate" that the invalidation of the contraceptive coverage requirement "would create 'a significant increase in

---

[17] Any claims regarding the potential consequences of hypothetical decisions by the employee plaintiffs to decline to maintain health insurance are not before this Court. The employee plaintiffs allege that foregoing health insurance would violate their religious beliefs, Compl. ¶¶ 125, 138; Pls.' Mot. at 7, and they do not challenge the provision of the ACA "requir[ing] most Americans to maintain 'minimum essential' health insurance coverage," *Nat'l Fed'n of Indep. Business v. Sebelius*, 132 S. Ct. 2566, 2580 (2012) (citing 42 U.S.C. § 5000A). Nor would the employee plaintiffs have standing to do so. The employee plaintiffs both have minimum essential coverage, Compl. ¶ 22 (stating that the employee plaintiffs receive health insurance from their employer); *see* 42 U.S.C. § 5000A(f) (defining "minimum essential coverage" under an "eligible employer-sponsored plan" to include coverage under any employer-sponsored plan, with limited exceptions not relevant here), and individuals with minimum essential coverage lack standing to challenge § 5000A, *see Kinder v. Geithner*, 695 F.3d 772, 778 (8th Cir. 2012).

[18] How the Court would do so is a mystery. The contraceptive coverage requirement applies to "group health plan[s] and . . . health insurance issuer[s]." 42 U.S.C. § 300gg-13(a). As the employee plaintiffs are neither of these, what effect would an order enjoining defendants from enforcing the requirement against them have on their alleged injury?

the likelihood that [they] would obtain'" health insurance plans that accord with their religious beliefs. *Klamath Water*, 534 F.3d at 740 (quoting *Evans*, 536 U.S. at 464). Accordingly, this Court must dismiss their claims for lack of subject matter jurisdiction. *Id.*[19]

\* \* \*

No matter how this Court decides plaintiff March for Life's claims, the employee plaintiffs lack standing. If March for Life wins, the employee plaintiffs' claims are moot, and if March for Life loses, the employee plaintiffs cannot demonstrate causation and redressability. In either scenario, the Court lacks subject matter jurisdiction over the RFRA and Free Exercise claims stated in plaintiffs' complaint.

Regardless, the employee plaintiffs' claims fail on the merits for the reasons stated below.

## IV.   THE EMPLOYEE PLAINTIFFS' RELIGIOUS FREEDOM RESTORATION ACT CLAIM FAILS

Under RFRA, the federal government "shall not substantially burden a person's exercise of religion" unless that burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1.

### A.   The contraceptive coverage requirement does not impose a substantial burden on the employee plaintiffs' religious exercise

The contraceptive coverage requirement does not substantially burden the employee plaintiffs' religious exercise because it does not apply to the employee plaintiffs at all. As

---

[19] Unless properly substantiated (by, for example, an appropriate declaration from an insurer offering individual plans), any future claim by the employee plaintiffs that, "in the event [this] Court issues an injunction" against the contraceptive coverage requirement, insurers in the individual market "*would* offer [them] a health plan which does not include the coverage which [the employee plaintiffs] find objectionable," is too "speculative" to suffice. *Wieland*, 978 F. Supp. 2d at 1015 (emphasis added) (citing *Lujan*, 504 U.S. at 562; *Warth v. Seldin*, 422 U.S. 490, 504 (1975)); *see Nat'l Wrestling*, 366 F.3d at 938 ("In several cases, the Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries." (collecting cases)).

described above, the preventive services coverage provision applies to group health plans and health insurance issuers, 42 U.S.C. § 300gg-13(a), and the employee plaintiffs are neither. Thus, unlike the employer plaintiffs in *Hobby Lobby*, for example, the employee plaintiffs need not "provid[e] health insurance that covers" contraceptives to which they object. 134 S. Ct. at 2775. The employee plaintiffs' RFRA claim should be dismissed for this reason alone.

The fact that employers and health insurance issuers are required to provide coverage for contraceptives is not a substantial burden on the *employee* plaintiffs' exercise of religion. No one is required to use her health coverage for services that she does not want, and it is not a burden on a person's religion to participate in a group health plan that covers services that she will not use.

"[O]nly *substantial* burdens on the exercise of religion trigger the compelling interest requirement." *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (emphasis added).[20] "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (citing *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). "An inconsequential or *de minimis* burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." *Id.*; *see also Braunfeld v. Brown*, 366 U.S. 599, 606 (1961) (plurality opinion) ("To strike down, without the most careful scrutiny, legislation which imposes only an indirect burden on the exercise of religion, *i.e.*, legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature.").

---

[20] Whereas the initial version of RFRA prohibited the government from imposing any "burden" on free exercise, Congress added the word "substantially" "to make it clear that the compelling interest standards set forth in the act" apply "only to Government actions [that] place a substantial burden on the exercise of" religion. 139 Cong. Rec. S14350-01, S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy); *see id.* (statement of Sen. Hatch).

Defendants do not dispute that the employee plaintiffs' desire not to participate in a health insurance plan that covers contraceptives is a sincere religious belief. But because the alleged burden on the employee plaintiffs' exercise of religion results from obligations that the contraceptive coverage requirement imposes on other entities, it is not cognizable under RFRA. Under the contraceptive coverage requirement, the provision and use of contraceptive services are "entirely activities of [third parties], in which [the employee plaintiffs] play[] no role." *Kaemmerling*, 553 F.3d at 679. "Although the [third party]'s activities . . . may offend [the employee plaintiffs'] religious beliefs, they cannot be said to hamper [their] religious exercise." *Id.*

### B. Providing the employee plaintiffs an exemption to the contraceptive coverage requirement would undermine the government's compelling interests in a workable insurance system

Even if the employee plaintiffs were able to demonstrate a substantial burden on their religious exercise, they would not prevail on their RFRA claim because the contraceptive coverage requirement serves the government's compelling interest in promoting public health and, as further discussed below, *see supra* Section IV(C), is the least restrictive means to achieve that interest. Having a workable insurance system that covers a wide range of preventive health services is undoubtedly a compelling governmental interest. *See, e.g.*, *United States v. Lee*, 455 U.S. 252, 258 (1982) (affirming the government's compelling interest in the social security system, which provides "a comprehensive insurance system with a variety of benefits available to all participants, with costs shared by employers and employees"); *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011) ("[T]he Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets."); *see also* 75 Fed. Reg. 41,726, 41,731-36 (July 19, 2010) (explaining that Congress sought to make

recommended preventive services more accessible and affordable by requiring coverage of such services and eliminating cost-sharing requirements), AR at 231-36.[21]

Although dozens of courts have considered challenges to the contraceptive coverage requirement, no court has permitted an individual participant to demand a health plan tailored to his or her particular religious beliefs. And for good reason: in contrast to the system of mandatory coverage for recommended preventive services in all non-grandfathered health plans that Congress has established, the employee plaintiffs want a system where individual plan participants and beneficiaries can opt out of paying for coverage for any particular service to which they object on religious grounds. The employee plaintiffs' proposal, however, is incompatible with a functioning health insurance market.

Health insurance, by design, covers a wide array of services. No one is required to use a particular service that is covered by a comprehensive plan. Indeed, health insurance plans routinely cover services that a particular participant or beneficiary may not want or may never use. Most health plans, for example, cover prostate cancer screening even though women do not have a prostate. And most plans cover children's immunizations even though some plan participants do not have children or do not plan to immunize their children. Insurance markets could not function—either administratively or financially—if insurers had to tailor each health plan to the specific needs and desires of each individual plan participant and beneficiary.

Limiting "opt outs" only to objections based on his religious beliefs would not eliminate this feasibility problem. "[C]ontraceptive care is by no means the sole form of health care that implicates religious concerns." *Grote v. Sebelius*, 708 F.3d 850, 866 (7th Cir. 2013) (Rovner, J., dissenting). "To cite a few examples: artificial insemination and other reproductive technologies;

---

[21] Plaintiffs' reliance on the D.C. Circuit's decision in *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208 (D.C. Cir. 2013), *vacated*, 134 S. Ct. 2902 (2014), is misplaced. The Supreme Court's decision "vacat[ing]" the D.C. Circuit's "judgment" in *Gilardi* and remanding "for further consideration in light of [*Hobby Lobby*]," 134 S. Ct. at 2902, has "deprive[d] [the D.C. Circuit's] opinion of precedential effect," *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 634 n.6 (1979) (quotation omitted).

genetic screening, counseling, and gene therapy; preventative and remedial treatment for sexually-transmitted diseases; sex reassignment; vaccination; organ transplantation from deceased donors; blood transfusions; stem cell therapies; [and] end-of-life care[.]" *Id.*[22] Many of these are preventive services required by the statutory provision at issue in this suit. *See* 42 U.S.C. § 300gg-13(a). Permitting individual plan participants and beneficiaries to pick and choose what preventive services they would like their plans to cover based on their individual religious beliefs would be an impossible administrative undertaking. It would all but lead to the end of group health coverage, which relies on common coverage for a set of insured individuals.

These are not the kind of "slippery-slope concerns that could be invoked in response to any RFRA claim for an exception to a generally applicable law." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 435-36 (2006). The government's compelling interest in denying the employee plaintiffs an exemption to the contraceptive coverage requirement does not boil down to, "If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Id.* at 436. Rather, defendants have a "compelling interest in uniform application of" the ACA's preventive services coverage provision because "granting the requested religious accommodations would seriously compromise" the insurance market. *Id.* at 435.

Indeed, the "opt out" system the employee plaintiffs seek here is similar to that which courts have uniformly rejected, particularly in the tax context but elsewhere as well. *See id.* (citing *Lee*, 455 U.S. at 258; *Hernandez v. Commissioner*, 490 U.S. 680, 700 (1989); and *Braunfeld*, 366 U.S. at 608-09 (plurality opinion)); *see also Jenkins v. Comm'r*, 483 F.3d 90, 92 (2d Cir. 2007) (recognizing that it is "well settled that the collection of tax revenues for

---

[22] While Judge Rovner made these observations in dissent, it cannot be disputed that different individuals object on religious grounds to different health care services. *See*, *e.g.*, Liberty Counsel, *Compulsory Vaccinations Threaten Religious Freedom*, http://goo.gl/ZYFZcV (last visited Sept. 23, 2014) (raising religious objections to the vaccines for varicella, hepatitis A, and rubella).

expenditures that offend the religious beliefs of individual taxpayers does not violate the Free

Exercise Clause"). The plaintiff in *Lee*, for example, sought an exemption from paying social

security taxes based on religious objection. 455 U.S. at 255. The Court rejected the plaintiff's

claim, explaining:

> The design of the [social security] system requires support by mandatory
> contributions from covered employers and employees. This mandatory
> participation is indispensable to the fiscal vitality of the social security system.
> [W]idespread individual voluntary coverage under social security . . . would
> undermine the soundness of the social security program. Moreover, a
> comprehensive national social security system providing for voluntary
> participation would be almost a contradiction in terms and difficult, if not
> impossible, to administer.

*Id.* at 258 (quotations omitted). More broadly, the Court acknowledged the difficulty of

accommodating religious belief in the area of taxation—a difficulty that also exists in the context

of mandatory health coverage. "[W]e are a cosmopolitan nation made up of people of almost

every conceivable religious preference." *Id*. at 259. "To maintain an organized society that

guarantees religious freedom to a great variety of faiths requires that some religious practices

yield to the common good. Religious beliefs can be accommodated, but there is a point at which

accommodation would radically restrict the operating latitude of the legislature." *Id*. (quotations

omitted).

   The same reasoning applies here, as other courts have recognized. The Ninth Circuit, for

example, relied on the rationale of the tax cases to reject a RFRA challenge to a mandatory

health insurance requirement. *Goehring v. Brophy*, 94 F.3d 1294, 1298 (9th Cir. 1996), *overruled

on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997). In *Goehring*, several students

at the University of California alleged that their Free Exercise rights were violated by a

mandatory health insurance fee collected by the University for a health insurance program that

covered certain services to which the plaintiffs objected on religious grounds. 94 F.3d at 1297.

"[G]uided by cases involving [F]ree [E]xercise challenges to the government's use of tax

dollars," the Ninth Circuit rejected the challenges. *Id.* at 1301. The court explained that "the

fiscal vitality of the University's fee system would be undermined if the plaintiffs in the present case were exempted from paying a portion of their student registration fee on [F]ree [E]xercise grounds. Mandatory uniform participation by every student is essential to the insurance system's survival." *Id.*

Like the Social Security program in *Lee* and the mandatory health insurance program in *Goehring*, the preventive services coverage provision could not function if individuals could opt out of coverage for particular preventive services by asserting a religious objection to those services. If the employee plaintiffs were granted such an exemption, the number of people who could "potentially claim the exemption," and the variety of preventive services for which they could claim the exemption, would be limitless. *Olsen v. Comm'r*, 709 F.2d 278, 281 (4th Cir. 1983) (it would be impossible "to limit in number the class of persons who might potentially claim the exemption or the scope of the exemption" if the appellant's exemption request were granted). Congress determined that mandatory, uniform coverage of recommended preventive services in all non-grandfathered health plans was necessary to make such services more accessible and more affordable and thereby improve public health. Because the soundness of the system Congress created "depends on the government's ability to apply the . . . law in a uniform and even-handed fashion, and the exemption of one presages the exemption of a great many others," *Graham v. Comm'r*, 822 F.2d 844, 853 (9th Cir. 1987), the preventive services coverage provision satisfies strict scrutiny.

The employee plaintiffs contend that the government's interests cannot be compelling because not *every* health plan sold today must cover the enumerated preventive services. Pls.' Mot. at 15. Plaintiffs point to the grandfathering of certain health plans with respect to certain provisions of the ACA, Compl. ¶¶ 104-05, 133, 146; Pls.' Mot. at 2, 7-8, 15, 17-18, but grandfathering is not specifically limited to the preventive services coverage regulations, *see* 42 U.S.C. § 18011; 45 C.F.R. § 147.140, and the effect of grandfathering is not a permanent "exemption" but rather, over the long term, a transition in the marketplace with respect to several provisions of the ACA, *see* 78 Fed. Reg. at 39,887 n.49, AR at 9. This incremental transition

34

does not call into question the compelling interests furthered by the preventive services coverage provision. The employee plaintiffs would have this Court believe that an interest cannot truly be "compelling" unless Congress is willing to impose it on everyone, all at once and even in the face of competing concerns, but they offer no support for such an untenable proposition. *See Legatus v. Sebelius*, 901 F. Supp. 2d 980, 994 (E.D. Mich. 2012) ("[T]he grandfathering rule seems to be a reasonable plan for instituting an incredibly complex health care law while balancing competing interests.").

More importantly, the grandfathering provision applies at the *plan* level and thus does not raise the administrative and financial feasibility problems that would result if individual plan participants and beneficiaries were allowed to determine which services they would like their premiums to cover based on their individual religious beliefs. Likewise, the religious employer exemption, *see* 45 C.F.R. § 147.131(a), and the accommodations for religious nonprofits, *see id.* § 147.131(b), operate on a plan-wide basis and do not permit individual plan participants and beneficiaries to opt out of contraceptive coverage. Furthermore, these provisions reflect the government's attempts to balance the compelling interests underlying the challenged regulations against other significant interests supporting the complex scheme created by the ACA. 78 Fed. Reg. at 39,887, AR at 9; *see Lee*, 455 U.S. at 259 ("The Court has long recognized that balance must be struck between the values of the comprehensive social security system . . . and the consequences of allowing religiously based exemptions."); *S. Ridge Baptist Church v. Indus. Comm'n of Ohio*, 911 F.2d 1203, 1208-09 (6th Cir. 1990) (rejecting the plaintiff's argument that the existence of exemptions indicates that a law is not the least restrictive means of achieving a compelling interest where the exemptions do not undermine that interest).

Plaintiffs also refer to the treatment of self-insured "church plans" under the accommodations available to certain religious nonprofits, *see* Pls.' Mot. at 5 (citing 79 Fed. Reg. at 51,095 n.8), but the fact that ERISA provides no authority to regulate church plans, *see* 29 U.S.C. § 1003(b)(2), and consequently that defendants lack enforcement authority against the third-party administrators of self-insured church plans, clearly does not constitute an exemption

from the contraceptive coverage requirement for such plans. The Departments are constrained by preexisting limits on their statutory authority to regulate third-party administrators in this circumstance, and have offered to pay third-party administrators to make or arrange separate payments for contraception in those situations. *See* 29 C.F.R. § 2590.715-2713A(b)(3); 45 C.F.R. § 156.50(d). It is because the interests at stake are so compelling that the government is working to provide contraceptive coverage in this manner.

Ultimately, no provision of the ACA or its implementing regulations authorizes the type of selective individual opt outs that the employee plaintiffs demand here, which are fundamentally incompatible with the system of group health coverage that Congress sought to promote. Simply put, this is not a case where underinclusive enforcement of a law suggests that the government's "supposedly vital interest" is not really compelling. *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993).

   **C.     The contraceptive coverage requirement is the least restrictive means of furthering the government's compelling interests**

When determining whether a particular regulatory scheme is the "least restrictive," the appropriate inquiry is whether the individual or organization with religious objections, and those similarly situated, can be exempted from the scheme—or whether the scheme can otherwise be modified—without undermining the government's compelling interests. *See, e.g.*, *United States v. Schmucker*, 815 F.2d 413, 417 (6th Cir. 1987) (describing the least restrictive means test as "the extent to which accommodation of [the objector] would impede the state's objectives"); *United States v. Wilgus*, 638 F.3d 1274, 1289-95 (10th Cir. 2011). The government is not required "to do the impossible—refute each and every conceivable alternative regulation scheme." *Id.* at 1289. Instead, the government need only "refute the alternative schemes offered by the challenger." *Id.*

Instead of explaining how the government could create an administratively and financially feasible system that allows the employee plaintiffs and other individuals with religious objections to opt out of coverage for certain preventive services, plaintiffs offer only

one unsatisfactory alternative: having the government itself provide coverage for contraceptives. Pls.' Mot. at 16. But RFRA does not require the government to create entirely new programs to accommodate religious objections. *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring) ("[T]he Court does not address whether the proper response to a legitimate claim for freedom in the health care arena is for the Government to create an additional program. The Court properly does not resolve whether one freedom should be protected by creating incentives for additional government constraints."). An employer with a religious objection to paying the minimum wage to female employees, for example, cannot simply demand that the government make up the difference with tax credits or direct provision of financial aid.

Moreover, the employee plaintiffs' preferred scheme would not "equally further[] the [g]overnment's interest," *id.*, by ensuring that women can seamlessly obtain contraceptive coverage without additional burden—the very point of requiring that health coverage include coverage of contraceptives without cost-sharing. *See* 78 Fed. Reg. at 39,888, AR at 20; IOM REP. at 18-19, AR at 317-18. *See generally Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (question under free speech strict scrutiny is whether "less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve"). Congress determined that the best way to achieve the goals of the ACA, including expanding coverage for preventive services, was to build on the existing employer-based system rather than adopting a single-payer system financed through taxes. *See* H.R. Rep. No. 111-443, pt. II, at 984-86 (2010). The anticipated benefits of the regulations are attributable not only to the fact that recommended contraceptive services will be available to women with no cost-sharing, but also to the fact that these services will be available through the existing employer-based system of health coverage, such that women will face minimal logistical and administrative obstacles to receiving coverage.

For these reasons, the employee plaintiffs' RFRA claim fails on the merits.

## V.    THE EMPLOYEE PLAINTIFFS' FREE EXERCISE CLAIM FAILS

### A.    The contraceptive coverage requirement is a neutral law of general applicability

Nearly every court to have addressed a Free Exercise challenge to the contraceptive coverage requirement, including two courts in this district and the only court of appeals to have considered the issue, has rejected it.[23] Should this Court determine, contrary to defendants' arguments (*see supra* Section III), that it has subject matter jurisdiction over the employee plaintiffs' Free Exercise claim, this Court should also conclude that it fails on the merits.

The Supreme Court has made clear that a law that is neutral and generally applicable does not run afoul of the Free Exercise Clause even if it prescribes conduct that an individual's religion proscribes or has the incidental effect of burdening a particular religious practice. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990); *see Lukumi*, 508 U.S. at 531-32. "Neutrality and general applicability are interrelated." *Id.* at 531. A law is neutral if it does not target religiously motivated conduct either on its face or as applied, *id.* at 533, and has as its purpose something other than the disapproval of a particular religion, or of religion in general, *id.* at 545. A law is generally applicable so long as it does not selectively impose burdens only on conduct motivated by religious belief. *Id.* Unlike such selective laws, the contraceptive coverage requirement is neutral and generally applicable.

---

[23] *See, e.g.*, *Mich. Catholic Conf.*, 755 F.3d at 393-94; *Priests for Life v. U.S. Dep't of Health & Human Servs.*, -- F. Supp. 2d --, 2013 WL 6672400, at *10-12 (D.D.C. 2013); *Roman Catholic Archbishop of Wash. v. Sebelius*, -- F. Supp. 2d --, 2013 WL 6729515, at *27-31 (D.D.C. 2013); *Eternal World Television Network, Inc. v. Burwell*, -- F. Supp. 2d --, 2014 WL 2739347, at *5-6 (S.D. Ala. 2014); *Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-3489, 2014 WL 1256373, at *23-26 (N.D. Ga., May 30, 2014); *Univ. of Notre Dame v. Sebelius*, 988 F. Supp. 2d 912, 927-30 (N.D. Ind. 2013), *aff'd*, 743 F.3d 547 (7th Cir. 2014); *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-cv-01303, 2013 WL 6834375, at *5-7 (M.D. Tenn. 2013), and *Mich. Catholic Conf. v. Sebelius*, 989 F. Supp. 2d at 588-89, *aff'd sub nom. Mich. Catholic Conf.*, 755 F.3d 372 (6th Cir. 2014). *But see Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 437 (W.D. Penn., Mar. 6, 2013); *Sharpe Holdings v. HHS*, No. 2:12-cv-92, 2012 WL 6738489, at *5 (E.D. Mo., Dec. 31, 2012).

The Sixth Circuit's decision in *Michigan Catholic Conference* is illustrative. 755 F.3d at 393-94. There, the court concluded that the contraceptive coverage requirement "is a neutral law":

> Neither the text nor the history of the statute and regulations promulgated pursuant to the statute demonstrate that the requirement was targeted at a particular religious practice. There is no evidence that Congress and the executive branch agencies "had as their object the suppression of religion." [*Lukumi*, 508 U.S. at 542]. The record does not "disclose [] animosity" towards the [religious] practice of refusing to support access to contraception, the framework does not "by [its] own terms target this religious exercise," the program was not "gerrymandered with care to proscribe" [this] exercise of religion with respect to contraception but not secular opposition to contraception; and the arrangement does not "suppress much more religious conduct than is necessary in order to achieve the legitimate ends asserted in their defense." *Id.* . . . .

*Mich. Catholic Conf.*, 755 F.3d at 393-94 (some alterations in the original); *see also, e.g.*, *Roman Catholic Archbishop of Wash.*, 2013 WL 6729515, at *28 ("because the [contraceptive coverage requirement] does not operate to single out religion in general, or any religions specifically, for unfavorable treatment, it is neutral for purposes of the First Amendment").

Rejecting the precise argument that the employee plaintiffs press here,[24] the Sixth Circuit also concluded that the contraceptive coverage requirement is "generally applicable":

> [Plaintiffs] argue that the requirement is not generally applicable because grandfathered plans . . . and religious employers that obtain an exemption need not comply with [it]. This argument misunderstands the meaning of general applicability under our Free Exercise jurisprudence. "General applicability does not mean absolute universality." *See Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008). A law need not apply to every person or business in America to be generally applicable. A law is generally applicable if it does not make distinctions based on religion. To determine this, we consider whether the "legislature decide[d] that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." [*Lukumi*, 508 U.S. at 542-43.] The requirement at issue here does not pursue the governmental interest

---

[24] Plaintiffs' allegation that "[t]he ACA creates a vast system of categorical exemptions," Pls.' Mot. at 17, cannot be squared with the statute and regulations. As defendants have explained, *see supra* pp. 34-36, the ACA's grandfathering provisions and the regulations' exemption for religious employers and accommodations for religious nonprofits do not undermine the government's compelling interests.

39

in contraceptive coverage only against entities with a religiously motivated objection to providing such coverage; that interest is pursued uniformly against all [employers] that are not grandfathered . . . . This includes entities that have no objection to the requirement, entities that object for non-religious reasons such as general opposition to government dictating healthcare requirements, and entities that object to the requirement for religious reasons. . . . Accordingly, the program is generally applicable.

*Mich. Catholic Conf.*, 755 F.3d at 394; *see also, e.g.*, *Priests for Life*, 2013 WL 6672400, at *11 ("The regulations in this case do not impose burdens selectively; they apply to all non-exempt employers, regardless of their religious beliefs.").

The contraceptive coverage requirement reflects expert medical recommendations about the medical necessity of contraceptive services, without regard to any religious motivations for or against such services. It applies to all non-grandfathered health plans that do not qualify for the religious employer exemption or the accommodations for eligible organizations. Thus, "it is just not true . . . that the burdens of the [regulations] fall on religious organizations 'but almost no others.'" *Am. Family Ass'n v. FCC*, 365 F.3d 1156, 1171 (D.C. Cir. 2004) (quoting *Lukumi*, 508 U.S. at 536). Indeed, the exemption and the accommodations "present[] a strong argument in favor of neutrality, demonstrating that the object of the law was not to infringe upon or restrict practices because of their religious motivation." *Priests for Life*, 2013 WL 6672400, at *10 (quotation omitted). "To hold that any religious exemption that is not all-inclusive renders a statute non-neutral would be to discourage the enactment of any such exemptions—and thus to restrict, rather than promote, freedom of religion." *Id.* (quotation omitted).

> **B.    In any event, the contraceptive coverage requirement serves compelling governmental interests in public health and gender equality**

Defendants have already explained why "the compelling interest test is satisfied 'to the person'" by describing the "harm of granting" the employee plaintiffs "specific exemptions" to the contraceptive coverage requirement. *O Centro*, 546 U.S. at 430 (quoting 42 U.S.C. § 2000bb-1(b)); *see supra* Section IV(B); *see also supra* Section IV(C) (explaining why the contraceptive coverage requirement is the least restrictive means of furthering the government's compelling interests). But were the Court to conclude, contrary to defendants' arguments above, that the

requirement is not a neutral law of general applicability, in applying strict scrutiny under the Free Exercise Clause the Court would also need to consider the interrelated compelling interests that justify the requirement more generally. In *Hobby Lobby*, the majority opinion assumed without deciding that the contraceptive coverage requirement furthers compelling interests. 134 S. Ct. at 2780. And five members of the Court endorsed the position that providing contraceptive coverage to employees "serves the [g]overnment's compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." *Id.* at 2785-86 (Kennedy, J., concurring); *accord id.* at 2799-800 & n.23 (Ginsburg, J., dissenting). This Court should do the same.

First, the contraceptive coverage requirement furthers compelling interests by directly and substantially reducing the incidence of unintended pregnancies, improving birth spacing, protecting women with certain health conditions for whom pregnancy is contraindicated, and otherwise preventing adverse health conditions. The promotion of public health is unquestionably a compelling governmental interest. *Mead*, 766 F. Supp. 2d at 43; *see also, e.g.*, *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998). The regulations further this interest by "expanding access to and utilization of recommended preventive services for women." 78 Fed. Reg. at 39,887, AR at 9; *see id.* at 39,872, AR at 4; IOM REP. at 103-07, AR at 401-05; *see also Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring) ("There are many medical conditions for which pregnancy is contraindicated," and "[i]t is important to confirm that a premise of the Court's opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees.").

The contraceptive coverage requirement also advances the government's related compelling interest in assuring that women have equal access to recommended health care services. 78 Fed. Reg. at 39,872, 39,887, AR at 4, 9. As the Supreme Court has explained, there is a fundamental "importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984).

Thus, "[a]ssuring women equal access to . . . goods, privileges, and advantages clearly furthers compelling . . . interests." *Id.*

Congress enacted the women's preventive-services coverage provision because "women have different health needs than men, and these needs often generate additional costs." 155 Cong. Rec. 29,070 (2009) (statement of Sen. Feinstein); *see* IOM REP. at 18, AR at 316. Prior to the ACA, "[w]omen of childbearing age spen[t] 68 percent more in out-of-pocket health care costs than men." 155 Cong. Rec. at 29,070 (statement of Sen. Feinstein). These disproportionately high costs had a tangible impact: Women often found that copayments and other cost-sharing for important preventive services "[were] so high that they avoid[ed] getting [the services] in the first place." *Id.* at 29,302 (statement of Sen. Mikulski). Studies have demonstrated that "even moderate copayments for preventive services" can "deter patients from receiving those services." IOM REP. at 19, AR at 317. These costs thus  placed women in the workforce at a disadvantage compared to their male coworkers. *See, e.g.*, *id.* at 20, AR at 318; 78 Fed. Reg. at 39,887, AR at 9; 155 Cong. Rec. S12265-02, S12274 (daily ed. Dec. 3, 2009) (statement of Sen. Murray).

The government's efforts to equalize access to preventive health care services, and therefore to enable women to contribute to the same degree as men as healthy and productive members of society, further compelling governmental interests. *Cf. Catholic Charities of Sacramento v. Superior Court*, 85 P.3d 67, 92-93 (Cal. 2004).[25]

## VI.  PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM, AND AN INJUNCTION WOULD INJURE THE GOVERNMENT AND THE PUBLIC

The 2013 final rules were issued on July 2, 2013. Yet plaintiffs waited more than a year—until September 2, 2014—to seek preliminary injunctive relief. Such a substantial and

---

[25] Plaintiffs have identified no sound reason to doubt that these interests are compelling. Plaintiffs' allegation that the contraceptive coverage requirement is "underinclusive," Pls.' Mot. at 15 (quotation omitted), because of its treatment of religious employers, grandfathered plans, and self-insured church plans, is unavailing for the reasons described above, *see supra* pp. 34-36.

unexplained delay seriously undermines plaintiffs' claim of irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (denying preliminary injunctive relief and noting that a delay of forty-four days after final regulations were issued was "inexcusable"); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (noting that an over two-month delay "further militates against a finding of irreparable harm"). This delay alone demonstrates that plaintiffs have not met their burden to establish irreparable harm, for plaintiffs' "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995).

Indeed, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quotation and alterations omitted). And because plaintiffs' health plan currently covers the contraceptives to which they object, their burden is "somewhat higher." *Paleteria La Michoacana*, 901 F. Supp. 2d 54 at 56 (quotation omitted). Yet plaintiffs are conspicuously silent when it comes to describing the present or impending emergency circumstances that they face.

Although "the loss of constitutional freedoms . . . constitutes irreparable injury," *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (emphasis added, quotation omitted), in this case, plaintiffs have not shown that the contraceptive coverage requirement infringes their constitutional rights. In this respect, the merits and irreparable injury prongs of the preliminary injunction analysis merge together, and plaintiffs cannot show irreparable injury without also showing a likelihood of success on the merits, which they cannot do. *See, e.g.*, *Mich. Catholic Conf.*, 755 F.3d at 398. Moreover, contrary to plaintiffs' assertion, Pls.' Mot. at 20, any showing of a likelihood of success on the merits of plaintiffs' RFRA and Administrative Procedure Act claims—which plaintiffs in any event have not made—would not automatically establish irreparable injury; D.C. Circuit authority establishes only that the loss of *constitutional* rights is tantamount to irreparable injury, *Mills*, 571 F.3d at 1312.

As to the balance of equities and the public interest, "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *see Richenberg v. Perry*, 73 F.3d 172, 173 (8th Cir. 1995) (indicating that granting an injunction against the implementation of a likely constitutional statute would harm the government). Enjoining defendants from enforcing, as to plaintiffs,[26] the contraceptive coverage requirement would inflict a very real harm on the public.

## CONCLUSION

The Court should deny plaintiffs' motion for preliminary injunction and grant defendants' motion to dismiss or, in the alternative, for summary judgment.[27]

Dated: September 23, 2014                    Respectfully Submitted,

                                             JOYCE R. BRANDA
                                             Acting Assistant Attorney General

                                             RONALD C. MACHEN, JR.
                                             United States Attorney

                                             JENNIFER RICKETTS
                                             Director

---

[26] Plaintiffs purport to seek relief on behalf of themselves "and other pro-life groups similarly situated but not before the Court." Compl. at 28-29. Yet, even were the Court to agree that *plaintiffs* are entitled to an injunction, plaintiffs have provided no basis for extending injunctive relief to entities that are not before the Court. To the contrary, a "district court should not . . . enjoin[] [an] agency from applying [a] challenged regulation to any party when '[a]n injunction covering [plaintiff] alone adequately protects it from the feared [enforcement].'" *Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (some alterations in the original) (quoting *Va. Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2011)); *see, e.g.*, *Jean-Baptiste v. Dist. of Columbia*, 958 F. Supp. 2d 37, 50 (D.D.C. 2013) (collecting cases) ("If granted, injunctions should be narrowly tailored and should generally apply only to the plaintiff where a class has not been certified.").

[27] Defendants respectfully request that they be permitted to express their position regarding any need for an evidentiary hearing in their subsequent brief, upon consideration of plaintiffs' responses to defendants' challenges to the sufficiency of the evidence that plaintiffs have put forward with regard to all plaintiffs' standing to sue. *See supra* Section III.

SHEILA M. LIEBER
Deputy Director

/s/ *Adam Grogg*

ADAM GROGG (N.Y. Bar)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20001
phone: (202) 514-2395
fax:  (202) 616-8470
email: adam.a.grogg@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2014, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Adam Grogg*

ADAM GROGG