**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
MARCH FOR LIFE; JEANNE F. MONAHAN;     )
and BETHANY A. GOODMAN,                         )
                                                    )
          Plaintiffs,                               )
                                                    )
v.                                                  )          Case No. 1:14-cv-1149
                                                    )
KATHLEEN SEBELIUS, in her official capacity         )
as Secretary of the United States Department of     )
Health and Human Services; THOMAS E. PEREZ, )
in his official capacity as Secretary of the United )
States Department of Labor; JACOB J. LEW, in        )
his official capacity as Secretary of the United    )
States Department of the Treasury; UNITED           )
STATES DEPARTMENT OF HEALTH AND                     )
HUMAN SERVICES; UNITED STATES                       )
DEPARTMENT OF LABOR; and UNITED                     )
STATES DEPARTMENT OF THE                            )
TREASURY,                                           )
                                                    )
          Defendants.                               )
_____ )


**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND CONSOLIDATED TRIALON THE MERITS, AND IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR,
<u>IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iv

ARGUMENT ...................................................................................................................1

I.  The Government Explains No Purpose for Imposing the Mandate on People
    who Don't Want It, Rendering It Arbitrary and Capricious under the APA ........1

    A.  The Mandate itself violates the APA, as distinct from its church
        exception ...................................................................................................1

    B.  The church exception illuminates the Mandate's inherent
        capriciousness with respect to March for Life ................................................2

    C.  The government capriciously ignored comments on this precise issue ..........3

II.  The Mandate Violates Equal Protection because It Is a Coverage Benefit,
     not a Restriction of Hiring. ...................................................................................4

    A.  The government is treating March for Life unequally in light of its own
        description and operation of the Mandate......................................................4

    B.  The government is misapplying Establishment Clause cases ........................6

III.  The Employee Plaintiffs Have Standing .................................................................9

IV.  The Mandate Violates RFRA................................................................................15

    A.  The Mandate substantially burdens the employee Plaintiffs' religious
        exercise. ....................................................................................................15

    B.  The Mandate cannot satisfy strict scrutiny. .................................................16

        1.  The Mandate does not serve any compelling interest. .........................16

            a.  The Mandate's vast scheme of exemptions negates any
                alleged government interest. .......................................................17

            b.  The government's alleged interests in public health and
                gender equality are too broadly formulated and unsupported
                by insufficient evidence ...........................................................20

            c.  The government's alleged interest in a workable insurance
                system is fatally undermined by the massive exemptions to
                the Mandate and the ACA in general...........................................26

        2.  The Mandate is not the least restrictive means of furthering the
            government's alleged compelling interests ...........................................27

V.    The Mandate Violates the Free Exercise Clause. ...................................................29

VI.   The Mandate Is Contrary to Law under the APA. ..................................................31

VII.  Plaintiffs Satisfy the Remaining Injunction Factors. .............................................33

CONCLUSION.................................................................................................................34

STATEMENT REGARDING HEARING ........................................................................34

# TABLE OF AUTHORITIES

*Cases*

*Annex Medical, Inc. v. Burwell*,
    No. 13-1118 (8th Cir. Oct. 6, 2014)..........................................................................14

*Beckwith Elec. Co., Inc. v. Sebelius*,
    960 F. Supp. 2d. 1328 (M.D. Fla. 2013)....................................................................28

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011).......................................................................17, 21–24, 26

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S. Ct. 2751 (2014)....................................................................19, 21, 27–29

*CC Distributors, Inc. v. United States*,
    883 F.2d 146 (D.C. Cir. 1989).................................................................................13

*Center for Inquiry v. Marion Cnty. Clerk*,
    758 F.3d 869 (7th Cir. 2014) .........................................................................5-6, 9

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993)........................................................................16–17, 26, 30–31

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)................................................................................................31

*Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)..................................................................................................4

*Clinton v. City of New York*,
    524 U.S. 417 (1998)................................................................................................12

*Consumer Data Indus. Ass'n v. King*,
    678 F.3d 898 (10th Cir. 2012) ...............................................................................10

*Corp. of Presiding Bishop v. Amos*,
    483 U.S. 327 (1987)..............................................................................................6–9

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005)..................................................................................................7

*Employment Div. Dep't of Human Res. of Or. v. Smith*,
    494 U.S. 872 (1990)..........................................................................................29–30

iv

*Fisher v. Univ. of Tex. at Austin*,
    133 S. Ct. 2411(2013) ...................................................................................27

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ....................................................................................11

*Fraternal Order of Police v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999) .......................................................................30

*Geneva Coll. v. Sebelius*,
    2013 WL 838238 (W.D. Pa. Mar. 6, 2013). ..............................................19

*Gilardi v. U.S. Dept. of Health and Human Servs.*,
    733 F.3d 1208 (D.C. Cir. 2013) ...................................................21, 26, 29

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ........................................................................17, 20–21

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .............................................................19, 21

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ................................................................21, 27

*Larson v. Valente*,
    456 U.S. 228 (1982) ....................................................................................10

*Lepelletier v. FDIC*,
    164 F.3d 37 (D.C. Cir. 1999) .....................................................................13

*Lepelletier v. FDIC*,
    977 F. Supp. 456 (D.D.C. 1997) ................................................................13

*Little Sisters of the Poor v. Burwell*,
    No. 1:13-cv-02611 (D. Colo.) .....................................................................20

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) ................................................................................27

*Midrash Sephardi, Inc. v. Town of Surfside*,
    366 F.3d 1214 (11th Cir. 2004) .................................................................30

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009). ................................................................33

v

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)......................................................................................2

*Muwekma Ohlone Tribe v. Salazar*,
    708 F.3d 209 (D.C. Cir. 2013)...................................................................2

*Nat'l Motor Freight Traffic Ass'n, Inc. v. ICC*,
    590 F.2d 1180 (D.C. Cir. 1978)................................................................1

*Newland v. Sebelius*,
    881 F. Supp. 2d 1287 (D. Colo. 2012)....................................................19

*Noble v. U.S. Parole Comm'n*,
    194 F.3d 152 (D.C. Cir. 1999) .................................................................4

*O Centro Espirita v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) ...............................................................33

*Reaching Souls Int'l., Inc., v. Burwell*,
    No. 5:13-cv-01092-D (W.D. Okla.)........................................................20

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)..................................................................................2

*Sherbert v. Verner*,
    374 U.S. 398 (1963)...........................................................................15–16

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
    309 F.3d 144 (3d Cir. 2002)...................................................................30

*The Catholic Benefits Association LCA v. Sebelius*,
    No. CIV-14-240-R (W.D. Okla. June 6, 2014)......................................10

*Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981)...........................................................................15–16

*Tyndale House Publishers Inc. v. Sebelius*,
    904 F. Supp. 2d 106 (D.D.C. 2012)........................................................33

*United States v. Lee*,
    455 U.S. 252 (1982)................................................................................27

*Utah v. Evans*,
    536 U.S. 452 (2002)...........................................................................11–12

*Wieland v. U.S. Dep't of Health & Human Servs.*,
    978 F. Supp. 2d 1008 (E.D. Mo. 2013)...................................................................13

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)............................................................................................17

*Statutes*

Consolidated Appropriations Act of 2012, Public Law 112-74, § 507
    (Dec. 23, 2011) ..................................................................................................32

Teenage Pregnancy Prevention Program,
    Public Law 112-74 (125 Stat 786, 1080).........................................................24–25

5 U.S.C. § 706.................................................................................................1, 31

8 U.S.C. § 1232....................................................................................................25

25 U.S.C. § 13.......................................................................................................25

25 U.S.C. § 1601, *et seq*....................................................................................25

42 U.S.C. § 247b-12.............................................................................................25

42 U.S.C. § 248.....................................................................................................25

42 U.S.C. § 254b...................................................................................................25

42 U.S.C. § 254c-8................................................................................................25

42 U.S.C. § 300.....................................................................................................24

42 U.S.C. § 300a-7................................................................................................33

42 U.S.C. § 300gg-13............................................................................................21

42 U.S.C. § 703.....................................................................................................25

42 U.S.C. § 711.....................................................................................................25

42 U.S.C. § 713.....................................................................................................25

42 U.S.C. § 1396, *et seq*....................................................................................25

42 U.S.C. § 2000bb-1. ....................................................................................16, 27

vii

42 U.S.C. § 2001 ...................................................................................................25

42 U.S.C. § 18023 .................................................................................................31


*Regulations*

45 C.F.R. § 147.140 ..............................................................................................19

45 C.F.R. § 147.131 ..............................................................................................10

45 C.F.R. § 156.50 ................................................................................................28

75 Fed. Reg. 34,538 (June 17, 2010) ...................................................................19

77 Fed. Reg. 8,725 (Feb. 15, 2012) .............................................................1, 4, 18

78 Fed. Reg. 8,456 (Feb. 6, 2013) ...............................................................2, 4, 7

78 Fed. Reg. 39,870 (July 2, 2013) ..........................................................4, 10, 18

79 Fed. Reg. 51,092 (Aug. 27, 2014) ......................................................5, 20, 28


*Other Authorities*

Helen M. Alvare, *No Compelling Interest: The 'Birth Control' Mandate &
    Religious Freedom*, 58 VILLANOVA L. REV. 379 (2013) ....................................22–23

AUL Comment on CMA-9992-IFC2 (Nov. 1, 2011),
    *available at* http://www.regulations.gov/#!documentDetail;D=HHS-OS-2011-0023-
    59496 (last visited Oct. 3, 2014) ................................................................3

AUL Comment on CMS-9968-P (Apr. 8, 2013),
    *available at* http://www.regulations.gov/#!documentDetail;D=CMS-2012-0031-79115
    (last visited Oct. 3, 2014) ..........................................................................3

J. Darroch and S.K. Henshaw, *Contraceptive Use Among U.S. Women Having Abortions*,"
    PERSP. ON SEXUAL & REPROD. HEALTH 34 (Nov/Dec 2002)....................................25

3 K. Davis & R. Pierce,
    ADMINISTRATIVE LAW TREATISE 13–14 (3d ed. 1994).............................................13

Dorland's Illustrated Medical Dictionary 31st Ed. (2007) ....................................32

*Facts on Contraceptive Use in the United States* (June 2014),
  *available at* http://www.guttmacher.org/pubs/ fb_contr_use.html
  (last visited Sept. 20, 2014) ............................................................21, 25

*Facts on Publicly Funded Contraceptive Services in the United States*
  (Guttmacher Inst. May 2012) *available at* http://www.guttmacher.org/pubs/
  fb_contraceptive_serv.html (last visited September 30, 2014).................25

Jessica D. Gipson et al., *The Effects of Unintended Pregnancy on Infant, Child,*
  *and Parental Health: A Review of the Literature,*
  39 STUD. FAM. PLAN. 18 (2008) ............................................................24

Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* (2011),
  *available at* http://www.nap.edu/catalog.php?record_id=13181 (last visited
  Sept. 11, 2014) ...................................................................................22–25

Inst. of Med., *The Best Intentions: Unintended Pregnancy and the Well-Being of Children*
  *and Families* (1995),*available at* http://www.iom.edu/Reports/1995/The-Best-Intentions-
  Unintended-Pregnancy-and-the-Well-Being-of-Children-and-Families.aspx
  (last visited Oct. 3, 2014).................................................................23–24

Mosby's Medical Dictionary 7th Ed. (2006) ......................................................32

R. Robertson and S. Collins, *Realizing Health Reform's Potential* 8–9 (2011),
  *available at* http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20
  Brief/2011/May/1502_Robertson_women_at_risk_reform_brief_v3.pdf (last visited Sept.
  12, 2014) ...........................................................................................22

Stedman's Medical Dictionary 28th Ed. (2006).................................................32

**ARGUMENT**

I.     **The Government Explains No Purpose for Imposing the Mandate on People who Don't Want It, Rendering It Arbitrary and Capricious under the APA.**

The government has failed to identify any interest in imposing its abortifacient coverage Mandate on March for Life.  The Mandate is admittedly and inherently a benefit for people "who want it," to prevent pregnancies that are "unintended." 77 Fed. Reg. 8,725, 8,727 (Feb. 15, 2012). But by definition neither March for Life's employees or families, nor the entity itself, want the coverage. This renders the compulsion arbitrary and capricious under 5 U.S.C. § 706(2)(A).

**A.  The Mandate itself violates the APA, as distinct from its church exception.**

The government devotes a total of one short paragraph to this claim (Defs. Br. at 18), in which it fails to address this substantive issue. It merely refers back to its arguments about why the church exemption is rational. But that overlooks the need to explain how the Mandate itself is rational with respect to March for Life: an entity and people who are gathered together personally and professionally to oppose abortifacients.

March for Life's APA claim needs to be considered in light of the church exemption, but does not rest on the exemption as such. The government cannot explain how the Mandate itself is rational imposed on March for Life, when its own regulations admit the Mandate's sole purpose is to provide coverage of items to people who want them, to such an extent that the Mandate is not offended by exempting people merely because they are likely to oppose contraception.

In this respect Mandate does not "ha[ve] a rational basis" in and of itself as applied to March for Life. *Nat'l Motor Freight Traffic Ass'n, Inc. v. ICC*, 590 F.2d 1180, 1184 (D.C. Cir. 1978). Within and without the church exemption, the government admits the Mandate exists for people who want it, not for people likely to oppose the items. Thus the government does not

1

"articulate a satisfactory explanation for" imposing a mandate of desire on people who do not desire it. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The court may not accept the government's invitation to ignore regulatory admissions about what the Mandate is. "We may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

**B. The church exception illuminates the Mandate's inherent capriciousness with respect to March for Life.**

While the APA claim concerns the Mandate itself as applied to the plaintiffs, the government does dig itself into a deeper hole by means of its church exemption.  In that exemption the government explains that it is appropriate not merely because churches are churches, but specifically because church employees "likely" oppose contraception. 78 Fed. Reg. 8,456, 8,461 (Feb. 6, 2013). This candid recognition reinforces the plain reality of what the Mandate is—a benefit for people who want it, which serves no purpose when imposed on an inherently anti-abortifacient group of people like March for Life and its employees.

Consequently, the government violates the APA by refusing to exempt March for Life, which has an even stronger factual claim to its employees sharing its views on abortifacient contraception. "Agency action is arbitrary and capricious [because] 'the agency offers insufficient reasons for treating similar situations differently.'" *Muwekma Ohlone Tribe v. Salazar,* 708 F.3d 209, 216 (D.C. Cir. 2013).

Rather than explaining this admission of the limits of the Mandate's purpose—that it need not apply where employees likely oppose it—the government devotes a single footnote asking the Court to ignore the concession. Defs. Br. at 14. That footnote insists the concession is "irrelevant" to the Equal Protection claim (which, as described below, it is not). But the government does not bother to explain how a Mandate admittedly aimed at people who "want

2

it," which is not offended by exempting entities whose employees "likely" oppose contraception, serves any purpose when imposed on entities like March for Life whose employees are associated to oppose these items.[1]

The church exemption also demonstrates the Mandate's arbitrary and capricious character because the government cannot identify even a bureaucratic rationale for coercing March for Life. Its church exemption operates merely by means of regulatory fiat: the rule declares those entities are exempt, and no further monitoring or verification of their exempt status occurs. Nothing prevents a similar raw declaration exempting non-profit groups that require employees to oppose contraception.

### C.  The government capriciously ignored comments on this precise issue.

The government is incorrect that no comments were submitted asking for an exemption for secular pro-life groups. For example, Americans United for Life submitted repeated comments asking that exemptions encompass non-religious pro-life organizations. *See* AUL Comment on CMA-9992-IFC2 at 10 (Nov. 1, 2011), *available at* http://www.regulations.gov/#!documentDetail;D=HHS-OS-2011-0023-59496 (last visited Oct. 3, 2014); AUL Comment on CMS-9968-P at 5 (Apr. 8, 2013), *available at* http://www.regulations.gov/#!documentDetail;D=CMS-2012-0031-79115 (last visited Oct. 3, 2014). The government cannot hide behind the generic proposition that it need not respond to each and every comment. The government has offered no "satisfactory explanation" for

---

[1] Nor could the government claim, contrary to its own regulations, that the Mandate somehow serves the interest of promoting women's health by reducing *intended* pregnancies among people who oppose contraception. Not only would that interest be improper and unconnected to any of the government's evidence (all of which references only "unintended" pregnancy), but this Mandate could not possibly advance such an interest. The Mandate does not force women to use contraception, so such an interest is not rationally advanced when March for Life's plan participants simply choose not to use the covered items. This again leaves the Mandate as achieving no rational purpose with respect to March for Life.

imposing this Mandate on groups like March for Life when the Mandate is geared only towards recipients who want it and it admittedly need not apply to people who likely oppose it.

## II.     The Mandate Violates Equal Protection because It Is a Coverage Benefit, not a Restriction on Hiring.

March for Life is entitled to judgment under the Equal Protection Clause because the nature of this Mandate is to provide a benefit only to employees who want it. Thus March for Life is indistinguishable from exempted churches, and the government violates March for Life's rights by refusing them a similar exemption.

### A. The government is treating March for Life unequally in light of its own description and operation of the Mandate.

Equal Protection requires that the "government not treat similarly situated individuals differently without a rational basis." *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (emphasis omitted) (*citing Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

In applying the Mandate's requirement of coverage for contraceptives, which includes abortifacients, the government has continually asserted that its purpose is to offer contraceptive coverage to women who desire such coverage, so as to prevent "unintended" pregnancies. 77 Fed. Reg. at 8,727. The government has repeatedly asserted that it chose to exempt churches and the like because it concluded that the employees of these entities are "likely" or "more likely" than other groups to oppose contraception, and therefore likely to use the coverage. *Id.* at 8,728; 78 Fed. Reg. at 8,461; 78 Fed. Reg. 39,870, 39,874 (July 2, 2013). When the government says that the reason for its exemption is to respect churches generally, Defs. Br. at 14 n.10, it seeks to ignore the more specific reasoning behind the Mandate's exemption on the basis of church employees' "likely opposition" to contraceptives. March for Life employs individuals who are entirely opposed to contraceptives they consider abortifacient. Verified Complaint ¶ 103. The

government also ignores the fact that it has chose not to impose Mandate penalties on non-churches, mere religious non-profits in non-ERISA "church plans." 79 Fed. Reg. at 51,095 & n.8.  Yet the government penalizes March for Life, for reasons unrelated to respect for churches.

Focusing on the nature of the requirement at issue reveals the government's failure to distinguish the Seventh Circuit's decision in *Center for Inquiry v. Marion Cnty. Clerk*, 758 F.3d 869 (7th Cir. 2014). That case did not say, as the government strangely contends, that atheists had to be allowed to solemnize marriages because the state had discriminated between Quakers and Buddhists. *Center for Inquiry* instead recognized that the underlying purpose of marriage solemnization placed atheist group leaders and religious clergy in indistinguishable positions, because the state of Indiana would have been glad to let the atheists to solemnize marriage if only they would categorize themselves as religious. *Id.* at 873–75. Here, the government likewise has not offered any rational explanation about *why* the Mandate needs to be imposed on March for Life or its employees, who by definition oppose contraceptives they consider abortifacient, when the government has declared that since church employees "likely" oppose contraception it is appropriate to exempt churches.

Defendants are wrong to assert that *Center for Inquiry* ruled in favor of the plaintiffs' Equal Protection claim only because the statute also discriminated among religions. Defs. Br. at 14 n.9. The Seventh Circuit struck down Indiana's marriage solemnization statute in this respect specifically because it granted marriage solemnization rights to religious groups for a particular reason related to solemnizations, but denied secular groups the same rights without a rational basis to do so, given the underlying purpose of solemnization. *Center for Inquiry*, 758 F.3d at 875. The Seventh Circuit concluded that "[a]n accommodation cannot treat religions favorably when secular groups are identical with respect to the attribute selected for that accommodation."

*Id*. at 872. It further declared that the "attribute selected" for accommodation cannot be the mere distinction that some groups are religious while others are secular. "It is irrational to allow humanists to solemnize marriages if, and only if, they falsely declare that they are a "religion." *Id.* at 875.

Discrimination among religions existed in *Center for Inquiry*, but for Equal Protection purposes it was simply illustrative of the purpose of the statute. Marriage solemnization did not require religious sincerity as such, and the state was even "willing[] to recognize marriages performed by hypocrites." *Id.* Given the mere purpose of allowing private groups to solemnize marriages, there was no rational ground for discriminating between religious and non-religious moral views. Likewise here, given the Mandate's goal of delivering items to people who want them, the exemption's recognition that the Mandate need not be served for people who "likely" oppose it, and the government's patent discrimination among religious groups in not offering the Mandate to non-churches, there is no rational grounds for distinguishing March for Life from the church exemption to the Mandate.

**B.  The government is misapplying Establishment Clause cases.**

March for Life's equal protection rights are violated here in a way that secular entities' rights were violated in the series of Establishment Clause cases the government cites, such as *Corp. of Presiding Bishop v. Amos,* 483 U.S. 327 (1987). The requirements in those cases directly interfered with religious group hiring, and thus implicated government interference in the autonomy of religious groups. Thus there was a rationale between the nature of the requirement and the First Amendment purpose of exempting churches, which did not exist in the same aspect for secular entities that requested exemptions.

Here, however, the government has admitted that its church exemption is not generically related to church autonomy, but it seeks to respect churches precisely because their employees "likely" oppose contraception and so the Mandate does not serve its purposes for such employees anyway. 78 Fed. Reg. at 8,461. This rationale recognizes that the Mandate exists, as explained above, only to give this coverage to employees who want it. Thus March for Life occupies a stance similar to churches *with respect to this Mandate*, which is not analogous to the disparate stance that churches and secular groups occupied with respect to hiring mandates.

Defendants misplace their reliance on *Amos* and similar cases. First, the Supreme Court's decision in *Amos* does not apply here because it regarded an attempt to negate the religious group exemption, brought by employees who wanted to force exempted groups not to fire them. 483 U.S. at 329–30. March for Life's challenge is the opposite. It does not seek to repeal the exemption for religious employers, but to reverse the government's decision *not* to include March for Life in that exemption. *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005), similarly involved an attempt to strike down existing religious exemptions as violating the Establishment Clause. That is not the nature of the claim here, and thus the court's observation regarding the need under the Establishment Clause to provide secular entities with parallel benefits is inapposite in opposing March for Life.

Second, *Amos* involved a prohibition on religious discrimination against employees, and it exempted all religious organizations (not just churches) and their "secular non-profit activities." *Amos,* 483 U.S. at 330. The court explained that religious exemptions from that kind of requirement protected religious groups by "minimize[ing] governmental interference with the decision-making process in religions," because a religious group's decision to hire based on adherence to religious beliefs is a core component of its mission. *Id.* at 336. Here, however, the

Mandate is not aimed at who an entity can hire, and thus the mechanism of its decision-making process. Moreover, it does not seek to protect the religious activity of non-profit groups in choosing not to cover contraception. On the contrary, the government has *refused* to exempt most non-profit religious groups. The "religious employer" exemption only applies to churches and the like, not to religious non-profits, whereas the exception in *Amos* applied to both. Therefore the government cannot claim the religious exercise protection purpose that existed for the exception in *Amos*, because if it really were interested in protecting the "decision-making process" and the religious exercise of groups, it could not give its exemption only to churches and not to independent religious charities and schools.

In this light, the government makes an additionally ironic argument. It contends that Equal Protection rights would only be violated if a privilege was granted in a way that discriminated between religious groups. Defs. Br. at 13 n.9. The Mandate exemption explicitly discriminates among religious groups by applying to churches but not non-profit religious entities, unlike the exemption considered in *Amos* which encompassed all such groups. The Mandate's church exemption cannot be said to respect religious exercise as such as in *Amos*, since if it did it would not discriminate against some religious groups in its narrow scope. The purpose of the Mandate and its exemption are clear on the face of the regulations: not to generically respect religious rights, but to give contraception coverage to employees who want it, and not to those who likely oppose it.

The discussion about equal protection in *Amos* is also inapplicable here. The court determined that "Congress acted with a legitimate purpose in expanding the § 702 exemption to cover all activities of religious employers," in order to let all religious organizations "define and carry out their religious missions." *Amos*, 483 U.S. at 339. The Mandate exemption here does no

such thing, because it leaves most religious organizations outside the exemption (since they are not churches or integrated auxiliaries). In *Amos*, the challengers' Equal Protection argument was that secular employees of secular entities could not be fired, but "secular" employees of religious entities could be fired.  March for Life is not asking that any exemption be taken away. It argues, instead, that when an exemption is given to religious entities in specific recognition that the underlying requirement's purpose is not "likely" advanced within those entities in the first place, then the exemption must also be extended to groups similarly situated with respect to that purpose: namely, non-religious non-profit groups whose employees object to contraception.

As the Seventh Circuit explained about *Amos*, its general approval of religious exemptions "cannot be a complete answer to plaintiffs' contention that humanists are situated similarly to religions in everything except belief in a deity." *Center for Inquiry*, 758 F.3d at 872. The question the court must explore is not just whether churches and non-profit groups are different in general, but whether they are different regarding the "attribute selected for accommodation" given the nature of the underlying requirement. *Id.* Here the government has failed to articulate any purpose advanced by imposing this Mandate on the March for Life plaintiffs at all, especially in light of the government's willingness to exempt "likely" opponents.

## III.     The Employee Plaintiffs Have Standing.

The government argues that the employee plaintiffs do not have standing because they have not sufficiently alleged they could access morally acceptable health insurance coverage if they obtained an injunction. Defs. Br. at 24–26. This is incorrect for three reasons.

First, as the government concedes, *see id.* at 25, the plaintiffs specifically testified that their insurer would offer them morally acceptable insurance coverage if doing so was legal. *See* VC ¶ 25. This resolves the question definitively. The government claims that the plaintiffs must

provide some kind of additional proof of this fact, Defs. Br. at 25 n.16, but precedent nowhere requires such hyper-verifications. The plaintiffs' existing sworn statement is not generic, it is based on their personal knowledge of what their insurer would offer them, an insurer with whom they have an existing relationship and a history of contractual negotiations.

Moreover, the reliability of this fact is reinforced by the knowledge, contained on the face of federal regulations, that the government allows many plans to exist without the Mandated coverage, in particular when it fully exempts tens of thousands of churches. 45 C.F.R. § 147.131(a); 78 Fed. Reg. at 39,874. If the government really believed that health plans without contraception are not available, it would not have created explicit exemptions for churches to obtain such plans. The government tries to rehabilitate its standing challenge by making a hairline distinction between whether Plaintiffs' insurer is willing to offer such a plan, and whether it actually will. This distinction is difficult to comprehend, and in any event it is irrelevant for standing purposes. An injunction would give Plaintiffs freedom to buy what the law says they cannot, from a vendor they work with and would deal with them if they received relief. It is the government that has failed to rebut Plaintiffs' evidence of redressability.

Second, the government is wrong to argue that the Plaintiffs have no standing even if they did not have an insurer waiting in the wings to offer them morally acceptable insurance. As the district court recently ruled in a related case, "[s]tanding doctrine does not require 'complete redressability.'" *The Catholic Benefits Association LCA v. Sebelius*, No. CIV-14-240-R, slip op. at 7 (W.D. Okla. June 6, 2014) (quoting *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (citation omitted)). "In other words, 'a plaintiff need show only that a favorable decision would redress 'an injury,' not 'every injury.'" *Id.* (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

Judgment and an injunction for Plaintiffs would change the legal relationship between the Plaintiffs and the government, so Plaintiffs could buy what the government currently makes it illegal for vendors to sell them. The legality of that exchange after an injunction would itself constitute legal relief to the Plaintiffs independent of whether fluctuations might exist in the market Plaintiffs would then be free to enter.  The Supreme Court heard and rejected an analogous standing argument in *Utah v. Evans*, 536 U.S. 452 (2002). There Utah challenged census reporting methods in an attempt to obtain another congressional representative by apportionment. *Id.* at 469–61. Opposing intervenor North Carolina argued that Utah had no standing because it sought and could not obtain proper redress: Utah asked for an injunction ordering change in census data, *but not* for an order apportioning another Representative, which would only be a hoped-for consequence. *Id.* at 461. The latter result could happen from a changed census, but the executive branch "would not be directly bound" to reapportion the representatives at all, or in Utah's favor. *Id.* at 460 (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 803 (1992)). But the Supreme Court rejected North Carolina's argument and affirmed Utah indeed had standing. Even though correcting the census data would not require reapportionment, but would merely "permit" it, reapportionment might happen because the executive might think doing so "makes good sense." *Id.* at 462. Consequently, the court concluded, if it ruled in Utah's favor on census calculations, the consequent relief Utah hoped to obtain on its own would be legally permitted (despite several arguments by North Carolina to the contrary), even if reapportionment would not be required or certain. *Id.* at 462–63. This was enough to establish Utah's standing. Under "our 'standing' precedent," if the courts "order[] a change in legal status," and that change "would amount to a significant increase in the likelihood that the plaintiff would obtain relief," standing exists. *Id.* at 464 (citing several cases).

The a similarly clear "change in legal status" would occur here providing all the plaintiffs with standing. The parties agree that the injunction that March for Life and its employees request would make it *legal* for insurance companies to sell them a health plan that is currently *illegal* for them to sell under the ACA: a plan that does not cover contraceptives that the employees consider abortifacient. That change in legal status, and the undisputed fact that health insurance companies already sell such plans to exempt organizations like churches, constitute objective evidence of a "significant increase in the likelihood" that the plaintiffs here can go and actually buy the plans they are looking for. The additional fact that March for Life was told, by its own insurer, that it would indeed sell March for Life such a plan, reinforces that likelihood even more. Under *Evans* Article III does not require that the plaintiff show that she will certainly obtain her ultimate relief, as the government insists here by saying the plaintiffs need a declaration from their insurance company before they can seek redress. The Supreme Court rejected a similar contention by North Carolina, saying that since its ruling would permit Utah to later seek relief, it had standing based merely on a "significant increase in the likelihood" that it could go on to obtain more "direct" redress. *Id.* at 464. Here, the plaintiffs' desired plans would go from being illegal to being legal. No "increase in the likelihood" or relief could be more "significant," especially in a market that already sells such legal plans.

The Supreme Court has likewise held that when the executive branch makes it harder for a party to make a purchase, an injunction lifting that legal obstacle relieves the party's Article III injury, even if he is uncertain to actually make the purchase. In *Clinton v. City of New York*, 524 U.S. 417 (1998), the executive branch cancelled a tax benefit that farmers' cooperatives received to acquire processing plants. *Id.* at 432.  Even without proof that the cooperatives would certainly make a purchase if the tax benefits were restored, taking away the tax benefit "deprived them of

a statutory bargaining chip" to make the purchase. *Id.* at 432. Such an injury alone confers standing based on a merely "sufficient likelihood" of ultimate harm. *Id.* at 432–33 (citing and quoting 3 K. Davis & R. Pierce, ADMINISTRATIVE LAW TREATISE 13–14 (3d ed. 1994) (standing exists to reverse "[governmental action] that changes market conditions")).

The D.C. Circuit has similarly recognized standing to challenge governmental "denial of the opportunity to develop a business relationship," rejecting the contention that the claimant must additionally prove that "existing contracts" would be injured. *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) (quoting *Lepelletier v. FDIC*, 977 F. Supp. 456, 462 (D.D.C. 1997)). A plaintiff's mere "loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive the benefit" suffices to establish standing. *Id.* (quoting *CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)). By definition the Mandate has caused the March for Life plaintiffs to lose the opportunity to obtain morally acceptable health insurance, and an injunction would remove that lost opportunity.

For these reasons the government misplaces its reliance on *Wieland v. U.S. Dep't of Health & Human Servs.*, 978 F. Supp. 2d 1008 (E.D. Mo. 2013). The court in that case found redressability absent because it credited undisputed evidence showing that the injunction only asked to cover a single government vendor of an insurance plan, and that vendor had definitively declared state law made it illegal to sell those plaintiffs an acceptable plan even if they received an injunction against federal law. *Id.* at 1015. Here the government points to no such evidence. The Plaintiffs have testified from their personal knowledge to the opposite, saying their existing

insurer would sell them an acceptable plan, and the government cites no non-federal law that would prohibit any other insurer from selling the employee Plaintiffs the same sort of plan.[2]

The government further errs in this regard by asserting that if March for Life were to lose its claim, the individual employee Plaintiffs could not obtain redress. The government overlooks two facts in this regard. If March for Life's claims failed, but the employee Plaintiffs' claims succeeded, the employee Plaintiffs could in fact join together to get March for Life's insurer to sell them a morally acceptable plan. By definition, the injunction could and would protect that plan and thus also protect its sponsor and insurer. Moreover, if the employee plaintiffs obtained an injunction protecting any plan they buy, that injunction would open them to a market that they could present to insurance vendors beyond March for Life's issuer.

Third, the government is wrong to call Plaintiffs' evidence inadmissible hearsay. *See* Defs. Br. at 25 n.16. Plaintiffs' personal testimony that their insurer would sell them a morally acceptable health plan need not be considered as having been offered for the truth of the matter asserted, but to demonstrate that its current issuer has expressed a willingness to do so. No standing doctrine or rule of evidence requires the Court to disbelieve Plaintiffs based on the government's mere assertion that they must submit a declaration from their insurer. Plaintiffs' testimony is especially reliable and unrebutted here based on the fact that the government's own rules acknowledge that non-contraception plans exist for an entire category of groups like churches, so that the government exempted them as "religious employers." The government has

---

[2] Similarly inapposite is *Annex Medical, Inc. v. Burwell*, No. 13-1118 (8th Cir. Oct. 6, 2014), in which the plaintiffs' insurance company affirmatively "refused" to offer a plan without contraception, three additional insurers did the same, and the claimants themselves contended that all Minnesota insurers were "unwilling" to sell them a morally acceptable plan. *Id.* slip. op at 4, 6 (available at http://media.ca8.uscourts.gov/opndir/14/10/131118P.pdf ). No such hostile or definitive evidence against redressability exists here, and the only record evidence suggests the opposite.

itself admitted that plans which do not cover abortifacients or contraceptives in general exist, by virtue of the complex scheme of exemptions, non-enforcement, and grandfathering provisions.

The individual employee plaintiffs therefore have standing to pursue their claims, and this Court should therefore deny Defendants' motion to dismiss.

## IV.   The Mandate Violates RFRA.

### A.  The Mandate substantially burdens the employee Plaintiffs' religious exercise.

The employee Plaintiffs are substantially burdened by the Mandate's application to March for Life, because the Mandate's coercion of coverage for abortifacient contraceptives directly implicates the religious beliefs of the employee Plaintiffs. The individual employees' sincere religious beliefs oppose participating in a health plan, in any way, that provides coverage for abortifacients. Defendants argue that the Mandate does not substantially burden these religious beliefs because the Mandate does not apply to the employee plaintiffs. Defs. Br. at 28. Though the employees need not comply with the Mandate in that they are not providers of the employee health plan, the Mandate conditions the important benefit of health insurance on the violation of Plaintiffs' sincere religious beliefs, directly in violation of RFRA. *See Thomas v. Review Bd. of the Ind. Emp't Sec. Div.,* 450 U.S. 707, 717–18 (1981); *see also Sherbert v. Verner,* 374 U.S. 398, 404 (1963) (deeming it "unmistakable" substantial pressure to violate religious beliefs where a law "force[d] [plaintiff] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. . .").

It is a substantial burden to be required to carry health insurance which has coverage of abortifacient services for several reasons. Defendants attempt to minimize these burdens, arguing that "[n]o one is required to use her health coverage for services she does not want, and it is not a burden on a person's religion to participate in a group health plan that covers services she will

not use." Defs. Br. at 29. The individual employees' sincere religious beliefs against participating in a health insurance plan that covers abortifacients is burdened by requiring their employer, March for Life, to cover such abortifacients. If the employee plaintiffs were to forego coverage through their employer, such an option would substantially pressure them to violate their beliefs because health insurance is an important component of family health, as the ACA itself recognizes, and the employee plaintiffs believe that it is part of God's command to take care of their health, as well as the health of their dependents, which includes maintaining health care coverage. *See* VC ¶ 125. Furthermore, the Mandate fundamentally changes the compensation package available to the individual employees, which would otherwise omit coverage for abortifacients. The Mandate undeniably pressures the individual employees to forfeit benefits otherwise available, or to violate their religious beliefs. This is the definitional substantial burden in *Thomas* and *Sherbert*. The Mandate is therefore subject to strict scrutiny.

### B. The Mandate cannot satisfy strict scrutiny.

The Mandate must face strict scrutiny under RFRA. 42 U.S.C. § 2000bb-1(b). The Mandate "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quotations omitted).

### 1. The Mandate does not serve any compelling interest.

As discussed above and in Plaintiffs' opening memorandum, application of the Mandate to the individual employees cannot serve even a rational government interest where the employees will not utilize such coverage. For a government interest to be compelling, it must combat "the gravest abuses, endangering paramount interest[s]." *Sherbert*, 374 U.S. at 406. No

possible interest can be served by requiring the employees to maintain coverage for items they will not use.

However, Defendants proffer interests in public health, gender equality, and maintaining a workable insurance system in support of their argument that the Mandate satisfies strict scrutiny, each addressed in turn below.  Three principles define the compelling quality of an interest under the strict scrutiny test. First, for an interest to be compelling the government must focus its "application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006). The government must show with "particularity how [even] admittedly strong interest[s]" "would be adversely affected by granting an exemption." *Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972); *see also O Centro*, 546 U.S. at 431. Second, compelling interests cannot be amorphous, and "broadly formulated" interests are not legally sufficient. *See O Centro*, 546 U.S. at 433. Finally, the government must show that its interest is actually served to a compelling degree by its chosen method of coercion. It must "specifically identify an 'actual problem' in need of solving" and demonstrate that its coercion is "actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011) (internal citations omitted). As demonstrated below, the government cannot demonstrate that any of its proffered interests withstand this exacting standard. The Mandate therefore violates RFRA.

      a. *The Mandate's vast scheme of exemptions negates any alleged government interest.*

The government's many exceptions to this Mandate show that it "leaves appreciable damage" to its same alleged interests "unprohibited" in many similar circumstances, and therefore that its interests are not "adversely affected by granting an exemption" to this

"particular claimant."  *See Lukumi*, 508 U.S. at 547; *O Centro*, 546 U.S. at 430–31; *Yoder*, 406 U.S. at 236.

The first exemption that negates the government's interests here is the exemption letting churches and similar groups out of the Mandate and its "accommodation." *See, e.g.*, 78 Fed. Reg. at 39,896 (defining the "religious employer" exemption, and applying the accommodation only to non-exempt "eligible organizations"). This exemption is most notable for the particular rationale that the government offered for why it gave the church exemption, because that rationale should include March for Life. The government explained that it was exempting churches and related groups because, in its speculative view, their employees are "more likely than other employers to employ people of the same faith who share the same objection." 78 Fed. Reg. at 39,887. In other words, if an employer's employees are "likely" to object to contraception, according to the government's best guess, then the Mandate need not be applied— since the purpose of the Mandate is to advance "health" and "equality" in women who "want it" and will use it. 77 Fed. Reg. at 8,727.  But March for Life is an expressive organization which has associated for the purpose of opposing abortion (including abortifacient contraceptives), and the individual employees oppose abortifacient coverage, so will not utilize any such coverage. The government cannot claim a compelling interest in imposing a Mandate on an employer whose employees demonstrably "share the same objection" to contraception, while exempting other religious groups based on pure speculation about what their employees believe. For all the government knows, the Plaintiff employees are more likely than the employees of some churches to object to abortifacient coverage. There can be no compelling interest to impose the Mandate on these claimants.

A second exemption that destroys the government's alleged compelling interests is its decision to leave tens of millions of women without this mandated coverage, for purely secular and administrative reasons related to how the ACA is implemented. By the government's own choice, this Mandate does not apply to "grandfathered" plans that include tens of millions of women. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2764 (2014). "[T]he interest here cannot be compelling because the contraceptive-coverage requirement presently does not apply to tens of millions of people." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013); *see also Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012); *Geneva Coll. v. Sebelius*, 2013 WL 838238, at *25 (W.D. Pa. Mar. 6, 2013). In fact, Congress itself and the Defendants deemed this Mandate not "particularly significant," which is why they didn't consider it sufficiently important to ensure that women in grandfathered plans receive it. *Hobby Lobby*, 134 S. Ct. at 2780 (quoting 75 Fed. Reg. 34,538, 34,540 (June 17, 2010)). It is not possible for a requirement to be an "interest of the highest order" and not "particularly significant" at the same time.

In response, Defendants allege that the grandfathering provisions of the Mandate are not a permanent exemption, but are rather a long term "transition in the marketplace . . . ." Defs. Br. at 34. However, the government's own data project that grandfathered plans, even as they reduce in number, will cover tens of millions of women. 75 Fed. Reg. at 34,540–53 & tbl. 3. It also indicates that approximately 55% of large employers will have healthcare plans that are grandfathered. *Id.* And employers have a "right" to keep their grandfathered plans indefinitely, *Hobby Lobby*, 723 F.3d at 1124; *see generally* 75 Fed. Reg. 34,538, even if they make certain changes that raise employees' costs. *See, e.g.*, 45 C.F.R. § 147.140(g) (2010). The Mandate exempts a wide array of conduct, thereby leaving millions without the coverage that the

government has deemed essential to the operation of its health insurance system. The Mandate cannot therefore serve the government's asserted interests.

The third element of the government's huge exemption regime is its decision not to impose a penalty when non-exempt groups like religious universities enroll in a "church plan" exempt from ERISA, and their plan omits contraception. *See* 79 Fed. Reg. 51,092, 51,095 & n.8 (Aug. 27, 2014) (explaining that imposing the Mandate coercively will not happen on a third party administrator of a "church plan," since it is exempt from ERISA). The government has decided that delivering the Mandate's items to the women in those plans is simply not important enough to cause the government to attack the plans' third party administrators with penalties.[3] Universities and colleges and other institutions are enrolled in those same plans. *Little Sisters of the Poor v. Burwell*, No. 1:13-cv-02611 (D. Colo.), Complaint ¶ 18, doc. # 1 (filed Sept. 24, 2013) (church plan covers "more than 200 non-exempt Catholic employers"); *Reaching Souls Int'l., Inc., v. Burwell*, No. 5:13-cv-01092-D (W.D. Okla.), Complaint ¶ 39, doc. # 1 (filed Oct. 11, 2013) (church plan covers "hundreds" of employers).

In *O Centro*, the government's ban on hallucinogenic tea had no exemption, but a single exemption for another drug, peyote, showed that the government could not deny an exemption to that petitioner. 546 U.S. at 433. Here, the exemptions are far more vast and varied. Therefore the government cannot show that "granting the requested religious accommodations would seriously compromise its ability to administer the program." *Id.* at 435. The government has voluntarily compromised the Mandate's universality already, and it must accordingly fail strict scrutiny.

---

[3] The government cannot excuse itself for this non-penalty by pointing out that ERISA does not allow Defendant agencies to coerce church plan TPAs. *See* Defs. Br. 35. Defendants are not "the government." Congress and the executive branch together are the government. Congress' choice not to give Defendants a coercive mechanism against church plan TPAs negates the compelling interest in the Mandate.

        b.  *The government's alleged interests in public health and gender equality are too broadly formulated and unsupported by sufficient evidence.*

Defendants generally allege an interest in public health and gender equality. *See* Defs. Br. 30. Such "broadly formulated" interests are not legally compelling. *O Centro*, 546 U.S. at 431; *see also Gilardi v. U.S. Dept. of Health and Human Servs.,* 733 F.3d 1208, 1220 (D.C. Cir. 2013) (finding the government's interests here too broadly formulated); *Hobby Lobby,* 723 F.3d at 1143 (same); *Korte v. Sebelius*, 735 F.3d 654, 685 (7th Cir. 2013) (same). RFRA's inquiry is "more focused." *Hobby Lobby*, 134 S. Ct. at 2779 (quoting *O Centro*, 546 U.S. at 430–31). Defendants claim that the Mandate "directly and substantially impacts its compelling interests in public health and gender equality." Defs. Br. at 40–42. However, Defendants cannot justify the Mandate by relying on generic studies about contraception. According to the government's sources, about 90% of women who are at risk of unintended pregnancy are already using contraception, and an even higher percentage of healthcare plans already cover it. *See* Guttmacher Inst., *Facts on Contraceptive Use in the United States* (June 2014), *available at* http://www.guttmacher.org/pubs/ fb_contr_use.html (last visited Sept. 20, 2014) [hereinafter "*Facts on Contraceptive Use*"]. The Mandate only advances its interest by giving contraception to women who want it but do not already have access. The employee Plaintiffs hold religious views against the use of abortifacient contraceptives, and therefore do not want the coverage, nor will they use it. Therefore imposing the Mandate here would not advance a specific compelling interest. It is not clear that even a "marginal percentage point" is advanced by the Mandate here. *Brown*, 131 S. Ct. at 2741.

Likewise, the mere fact that women pay more for preventive services than men is too generic in this particular circumstance. The ACA erases most of this gap by requiring preventive services unrelated to contraception. *See* 42 U.S.C. § 300gg-13(a) (listing other mandated

preventive services). The government's evidence fails to specify how much of the preventive services cost gap for women is attributable to contraception. To the extent the evidence claims the existence of such a gap, it almost exclusively refers to a gap caused by items other than contraception. *See* Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* at 19 (2011), *available at* http://www.nap.edu/catalog.php?record_id=13181 (last visited Sept. 11, 2014) (link to Read Free OpenBook) (hereinafter "IOM 2011"); R. Robertson and S. Collins, *Realizing Health Reform's Potential* 8–9 (2011), *available at* http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2011/May/1502_Robertson_women_at_risk_reform_brief_v3.pdf (last visited Sept. 12, 2014). Thus the evidence fails to "specifically identify" how the Mandate serves a compelling need *after* non-contraceptive preventive services are covered. *See Brown*, 131 S. Ct. at 2738. Therefore, the government's proffered interests in public health and gender equality are inadequate to satisfy its burden.

Furthermore, the government's evidence is admittedly flawed and fails to show that greater public health or equality will result from imposition of the Mandate. To yield the government's alleged health and equality benefits, it must affect women who experience "unintended pregnancy," cause in them an increased use of birth control, reduce the number of unintended pregnancies among them, and reduce the negative consequences that arise from those pregnancies, all to a compelling degree.

At each step of this evidentiary chain, the government's "evidence is not compelling." *Brown*, 131 S. Ct. at 2739. Nearly all of the research the government cites "is based on correlation, not evidence of causation, and most of the studies suffer from significant … flaws in methodology." *See id.* (citation and quotation marks omitted); *see generally* Helen M. Alvare, *No Compelling Interest: The 'Birth Control' Mandate & Religious Freedom*, 58 VILLANOVA L.

REV. 379 (2013). Each evidentiary failure yields a smaller "marginal percentage point" in alleged results, amounting to no final interest that is advanced to any degree that could be called compelling. *Brown*, 131 S. Ct. at 2741 n.9. The government's evidentiary case rests on eleven pages of a report it commissioned from the Institute of Medicine in 2011 (IOM 2011). The report is not a scientific study; it merely cites other studies (and therefore is apparently inadmissible as qualified expert testimony). But walking through those citations shows that the government does not "specifically identify an 'actual problem' in need of solving," or that coercing religious objectors is "actually necessary to the solution." *Brown*, 131 S. Ct. at 2738.

First, the government alleges that health and equality will be achieved by reducing unintended pregnancy. But amazingly, the government's own evidence admits that it *does not know how to define* "unintended pregnancy." The IOM discusses this failure by citing to its own 1995 study. Inst. of Med., *The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families* 21–25 (1995) ("1995 IOM"), *available at* http://www.iom.edu/Reports/1995/The-Best-Intentions-Unintended-Pregnancy-and-the-Well-Being-of-Children-and-Families.aspx (last visited Oct. 3, 2014) (hereinafter "IOM 1995"). The IOM admits the "many limitations and ambiguities" that exist in explaining "the concept of intended versus unintended," making that category "more [of] a continuum" than a known quantity. *Id.* Available data on what women "intend" with respect to pregnancy includes significant reporting flaws, and extrapolates from sources that do not claim to show intent, such as whether women get abortions. *Id.*; *see also* Alvare, 58 VILLANOVA L. REV. at 396–97. "Unintended pregnancy" can even include a pregnancy that was initially unwelcomed but later desired—for which it is not clear that any harm follows.

Second, the government claims that by reducing "unintended pregnancy," it will achieve

compelling health and equality results. But its own evidence admits that "research is limited" about whether and to what extent those results actually flow. IOM 2011 at 103. The evidence admits that researchers do not know whether the alleged negative effects of unintended pregnancy are actually *caused by* it or are "merely associated" with it. IOM 1995 at 65. "[C]ausality is difficult if not impossible to show." Jessica D. Gipson et al., *The Effects of Unintended Pregnancy on Infant, Child, and Parental Health: A Review of the Literature,* 39 STUD. FAM. PLAN. 18, 19–20, 29 (2008) (cited in App. 50). For instance, the IOM concedes that merely associative links between unintended pregnancy and delay in prenatal care, IOM 1995 at 68, increases in smoking and drinking, *id.* at 69, 73, 75, and premature birth and low birth weight, *id.* at 70–71. But the Supreme Court has forcefully declared that evidence of mere correlation between an event and a negative consequence is "not compelling" to show a government interest; "a direct causal link" is needed between the harm and what the government is regulating. *Brown*, 131 S. Ct. at 2738–39. The government "bear[s] the risk of uncertainty" on all of these questions and "ambiguous proof will not suffice." *Id.* at 2739. The government's "studies suffer from significant, admitted flaws in methodology." *Id.* Overall, the Mandate was adopted "without high quality, systematic evidence" based on the personal "preferences of the [IOM] committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy." App. 64 (dissent by Dr. Anthony Lo Sasso).

Third, even if unintended pregnancy was known and its reduction was known to cause compelling benefits, the IOM report says that woman at risk of this problem are predominantly young, unmarried, undereducated, and low income. IOM 2011 at 102. Women who are in the at-risk category already have access to contraception in large part through existing federal

programs.[4] But the individual employee plaintiffs are religious people opposed to abortifacients who work for plaintiff March for Life and have health insurance. They are the wrong target population. It is not likely that they want to use contraception or that they can't access it. The government has no evidence to show its interest is advanced here.

Fourth, the government has failed to show that unintended pregnancies are caused by a lack of contraceptives or by their cost. The Guttmacher Institute ("Guttmacher"), which the IOM cites extensively, reports that around 90% of women at risk of unintended pregnancy already use contraception. *Facts on Contraceptive Use*. Guttmacher has also reported that, even among at-risk populations, only 12% of women cite cost as a reason for not using contraceptives. R. Jones, J. Darroch and S.K. Henshaw, *Contraceptive Use Among U.S. Women Having Abortions*," PERSP. ON SEXUAL & REPROD. HEALTH 34 (Nov/Dec 2002) 294–303.

Fifth, the government has provided no evidence that the Mandate itself—not mere contraceptives—will *cause* the government's health or equality interests to be advanced, or will do so to any compelling degree. Twenty-eight states have passed similar measures. IOM 2011 at 108. Yet the government has not cited one single study showing that any state Mandate caused, or is even correlated with, a compelling increase in health or equality due to a reduction in unintended pregnancies. This evidentiary gap is startling. Twenty-eight state mandates, but not one statewide survey shows health or equality increasing as a result.

---

[4] The government has admitted that it provides or subsidizes contraception in the following programs: Family Planning grants in 42 U.S.C. § 300, *et seq.*; the Teenage Pregnancy Prevention Program, Public Law 112-74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. § 254c-8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. § 711; Maternal and Child Health Block Grants, 42 U.S.C. § 703; 42 U.S.C. § 247b-12; Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*; the Indian Health Service, 25 U.S.C. § 13, 42 U.S.C. § 2001(a), & 25 U.S.C. § 1601, *et seq.*; Health center grants, 42 U.S.C. § 254b(e), (g), (h), & (i); the NIH Clinical Center, 42 U.S.C. § 248; the Personal Responsibility Education Program, 42 U.S.C. § 713; and the Unaccompanied Alien Children Program, 8 U.S.C. § 1232(b)(1). *See also Facts on Publicly Funded Contraceptive Services in the United States* (Guttmacher Inst. May 2012) (citations omitted), *available at* http://www.guttmacher.org/pubs/fb_contraceptive_serv.html (last visited September 30, 2014).

This Mandate's "causal" relationship to compelling health and equality benefits cannot be shown by relying on one or two localized studies that merely suggest low income women use contraception more if given it for free, or that some women who are already using contraception will use some methods instead of others. Evidence must be proffered to show that this Mandate, on employer-provided coverage, at a devoutly religious educational institution, will cause not merely increased contraception use but compelling health and equality benefits by reduction in quantifiable unintended pregnancies. The government has no such evidence. It chose to pursue its interests by a coercive measure far upstream and many contingencies removed from its alleged compelling benefits. It therefore has the burden to connect all the dots in its evidentiary chain, or else it has failed strict scrutiny. *See Brown*, 131 S. Ct. at 2738–41.

        *c.  The government's alleged interest in a workable insurance system is fatally undermined by the massive exemptions to the Mandate and the ACA in general.*

The government raises an additional compelling interest in a workable insurance system, arguing that it is essential to the operation of the Mandate's scheme that Plaintiffs not be exempt from its terms. Defs. Br. at 30–36. However, the Mandate's vast scheme of categorical exemptions, grandfathering provisions, and selective nonenforcement, discussed in detail above, directly contradicts the government's claim that the Mandate furthers any of its proffered interests. This is especially true in light of the government's claim that exemptions for Plaintiffs would undermine the government's interest in a workable insurance system, where exemptions already exempt millions of people. The Mandate is "self-defeating" because "the government has 'fail[ed] to prohibit nonreligious conduct that endangers [its asserted] interests in a similar or greater degree' than the regulated conduct, it is underinclusive by design." *Gilardi*, 733 F.3d at 1222 (citing *Lukumi*, 508 U.S. at 543). It is well-established in the Supreme Court's "strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order

when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (internal citations omitted). Where the government has voluntarily exempted millions of employees, it cannot allege that exempting the two employee Plaintiffs here at issue will undermine its health care system. In this regard, Defendants' reliance on *United States v. Lee*, 455 U.S. 252 (1982), is misplaced. *Lee* rejected a religious exemption to social security taxes. *Id.* at 261. There, the Social Security Act did not contain such widespread exemptions, and was instead a law which applied generally. These mass exemptions fatally undermine the government claim that the ACA "could not function if individuals could opt out of coverage for particular preventive service" for religious reasons, and therefore forecloses the government's argument that it has a compelling interest in maintaining a workable insurance system.

   **2.   The Mandate is not the least restrictive means of furthering the government's alleged compelling interests.**

   Under RFRA, the government must also show that the regulation "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. "[T]he government must demonstrate that alternative measures . . . would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014); *see also Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2420 (2013) (stating that strict scrutiny requires a "serious, good faith consideration of workable . . . alternatives" to achieve the government's goal) (internal quotation marks and citation omitted).

   The Government has a myriad of other means to "promote public health and gender equality, almost all of them less burdensome on religious liberty." *Korte*, 735 F.3d at 686. Due to their religious views, Plaintiffs are not recommending that the government actually pursue these methods as a policy matter. But still the following options remain available to the government,

and consequently they show that the Mandate cannot survive RFRA's narrow-tailoring requirement. "The most straightforward way of doing this would be for the Government to assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health insurance policies due to the employers' religious objections." *Hobby Lobby*, 134 S. Ct. at 2780. "This would certainly be less restrictive of the plaintiffs' religious liberty, and HHS has not shown . . . that this is not a viable alternative." *Id*.

In fact, in the government's new "accommodation," not available to March for Life, it has demonstrated it *is* willing to pay for objectionable contraceptives. When an entity is self-insured, the government proposes that its third party administrator will provide payments for these items and the government will reimburse that TPA at least 110% for doing so. 79 Fed. Reg. at 51,099 (referencing the reimbursement mechanism in 45 C.F.R. § 156.50 & (d)). This money comes out of the government's own pocket, demonstrating that the government cannot object to a means solely on the basis that it will cost the government money for the objectionable items. The new rules illustrate that the government is perfectly willing to pay for some entities' objectionable items. Thus the government has essentially waived any objection to other less restrictive means simply because they involve government payments.

The government could expand some or all of the existing federal family planning programs referenced above to include people who work at entities exempted under RFRA. *See supra* n.2. The government gives no reason why it could not, for example, simply eliminate the federal poverty level multiplier for program eligibility for Title X and Title XIX Medicaid family planning, to let in participants regardless of their income level if they work for religious employers objecting to contraception. Title X alone is "certainly" a less restrictive means, because amending it would merely "increase the efficacy of an already established [government-

run] program that has a reported revenue stream of $1.3 billion". *Beckwith Elec. Co., Inc. v. Sebelius*, 960 F. Supp. 2d. 1328, 1349 n.16 (M.D. Fla. 2013). Alternatively, the government could allow employees at objecting religious entities to enroll in state exchange plans (covering contraception) and receive a federal subsidy for that plan. The exchanges are the mechanism by which the government is content to deliver the mandated items to tens of millions of people; it should be good enough for employees of March for Life.

*Hobby Lobby* roundly rejected the government's argument that the least restrictive means analysis cannot require it to engage in "the modification of an existing program" like one of these family planning provision methods. 134 S. Ct. at 2781. In fact the court said the government could even be required to create new programs. *Id.* Thus the government must show it cannot provide tax credits to persons who buy contraceptives if their plan does not cover them. And that it cannot fund providers like Planned Parenthood to give contraceptives to those people.

The D.C. Circuit in *Gilardi* noted that the government "has made no such case" to defeat the viability of these alternatives; "for all we know, a broader religious exemption would have so little impact on so small a group of employees that the argument cannot be made." 733 F.3d at 1222. Likewise, the Defendants have not attempted to defeat the viability of these alternatives in their argument that the Mandate is the least restrictive means of achieving their alleged interests. *See* Defs. Br. at 36–37. The Mandate therefore fails strict scrutiny, in violation of RFRA.

**V.      The Mandate Violates the Free Exercise Clause.**

The Mandate violates the Free Exercise Clause of the First Amendment because it is neither religiously neutral nor generally applicable, and fails strict scrutiny. As detailed above and in Plaintiffs' initial memorandum, the employee plaintiffs exercise religion in their objection to the Mandate's compulsion of coverage for abortifacients. Burdens on such conduct are subject

to strict scrutiny under the Free Exercise Clause when a regulation lacks neutrality or general applicability. *Employment Div. Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990).

Defendants argue that the Mandate is both neutral and generally applicable, and therefore complies with the Free Exercise Clause. Defs. Br. at 38–40. The Mandate is neither. Unlike *Smith*, which involved an "across-the-board criminal prohibition on a particular form of conduct," *id.* at 884, the vast exemptions discussed above fail to apply this Mandate to tens of millions of women. This scheme of exemptions, grandfathering provisions, and non-enforcement precludes general applicability. The Supreme Court has "confirmed that the government violates Free Exercise rights when it selectively imposes burdens on religious conduct." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232 (11th Cir. 2004) (citing *Lukumi*, 508 U.S. 520). Indeed, "categorical" exclusions exacerbate the harm caused by discrimination against certain religious views. *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 364–65 (3d Cir. 1999) (Opinion of Alito, J.); *see also Lukumi*, 508 U.S. at 543 (noting a lack of general applicability when a regulation "fail[s] to prohibit nonreligious conduct that endangers [the government's] interests in a similar or greater degree"). The government cannot refuse to extend a system of exemptions "to cases of 'religious hardship' without compelling reason." *Lukumi*, 508 at 537 (quotation omitted); *Smith*, 494 U.S. at 884 (quotation omitted). The First Amendment "protects religious observers against [such] unequal treatment." *Lukumi*, 508 U.S. at 542 (quotation and alteration omitted).

The mandate is not neutral where it distinguishes among religious objectors, treating exemptions on a scale of religiosity, and also distinguishes between secular and religious objectors. It is well established that the "government cannot discriminate between religiously motivated conduct and comparable secularly motivated conduct in a manner than devalues

religious reasons for acting." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 169 (3d Cir. 2002) (Opinion of Alito, J.). By failing to exempt March for Life, and therefore its employees, from the Mandate while exempting millions of others "devalues" the employees' "religious reasons" for objecting to assisting in the government scheme to provide abortifacient contraceptives. *See Lukumi*, 508 U.S. at 537. Furthermore, the government exempted some religious employees on the basis that they work for churches and are therefore more "likely" to agree with the church's opposition to contraception. But it then refused to exempt the employees of March for Life, who work at March for Life for the purpose of opposing abortion, including abortifacient contraceptives. The rule is therefore not neutral towards religion.

Because the Mandate is neither neutral nor generally applicable, it is subject to strict scrutiny. As discussed above, *supra* Section IV(b), the government cannot meet its tremendous burden, and the Mandate accordingly violates the Free Exercise Clause.

## VI. The Mandate Is Contrary to Law under the APA.

The APA forbids agency action from being contrary to law and constitutional right. 5 U.S.C. § 706(2)(A) & (B). *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–17 (1971). As discussed herein, the Mandate violates RFRA and the Equal Protection doctrine of the Fifth Amendment. Defendants fail to acknowledge this aspect of Plaintiffs' claims, alleging only that the regulations do not violate federal restrictions regarding abortion, including the ACA, the Weldon Amendment, and the Church Amendment. *See* Defs. Br. 18–22.

The Mandate is contrary to the provision of the ACA that states that nothing in Title I of the ACA, which includes the provision governing "preventive services," "shall be construed to require a qualified health plan to provide coverage of [abortion] services…as part of its essential health benefits for any plan year." Section 1303(b)(1)(A) (codified at 42 U.S.C. § 18023). Defendants contend that the Mandate does not require coverage of "abortion." *See* Defs. Br. 20–

21. However, the Mandate requires coverage of certain "FDA-approved contraceptives" which act as abortifacients, in that they cause the demise of human embryos after conception and before and/or after implantation in the uterus. Destroying a human embryo that is in a woman's body constitutes an action that is abortifacient, that destroys a new human life, and that terminates a pregnancy. [5] Accordingly, the Mandate contradicts the requirements of the ACA itself, in violation of the APA.

The Mandate is contrary to the provisions of the Weldon Amendment to the Consolidated Appropriations Act of 2012, Public Law 112-74, § 507(d)(1), 125 Stat 786, 1111 (Dec. 23, 2011), which provides that none of the funds made available in the Act for appropriations for Defendants Department of Labor and Health and Human Services "may be made available to a Federal agency or program…if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

The Mandate was enacted and enforced by the Defendant Labor and HHS Departments. Those Defendants are using funds appropriated under the 2012 and previous Appropriations Acts to subject March for Life to discrimination due to its refusal to cover abortifacient drugs and devices. The Mandate is therefore contrary to the Weldon Amendment.

The Mandate also violates the provisions of the Church Amendment, which provides that "[n]o individual shall be required to perform or assist in the performance of any part of a health

---

[5] *See* Dorland's Illustrated Medical Dictionary 31st Ed. (2007) ("Pregnancy" is "The condition of having a developing embryo or fetus in the body, after union of an ovum and spermatozoon.); Mosby's Medical Dictionary 7th Ed. (2006) ("Pregnancy" is "The gestational process, comprising the growth and development within a woman of a new individual from conception through the embryonic and fetal periods to birth."; "Conception" is "1. the beginning of pregnancy, usually taken to be the instant that a spermatozoon enters an ovum and forms a viable zygote 2. the act or process of fertilization."); Stedman's Medical Dictionary 28th Ed. (2006) ("Pregnancy" is "The state of a female after conception and until the termination of the gestation."; "Conception" is "Fertilization of oocyte by a sperm").

service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d). The Mandate unquestionably requires individuals to participate in and fund activity which they find objectionable on the basis of sincerely-held religious beliefs, in violation of the Church Amendment.

## VII.    Plaintiffs Satisfy the Remaining Injunction Factors.

March for Life and the individual employee plaintiffs have demonstrated irreparable harm, a balance of equities, and that relief serves the public interest.

Absent an injunction, March for Life and the employee plaintiffs will be irreparably harmed. "[T]he loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). The same is true for rights guaranteed by RFRA. *See Tyndale House Publishers Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012) (internal citations omitted).

The balance of equities unquestionably tips in favor of March for Life if the injunction is granted. The Defendants are unlikely to suffer any appreciable harm if the injunction is issued where Plaintiffs will not utilize any abortifacient coverage, therefore failing to advance a single government interest in application of the Mandate. On the other hand, March for Life and the individual employees will suffer irreparable harm to their constitutional and statutory rights. The balance of equities favors granting the requested injunction.

Finally, "there is a strong public interest in the free exercise of religion [under RFRA] even where that interest may conflict with" another statutory scheme. *O Centro Espirita v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) (en banc), *aff'd* 546 U.S. 418 (2006). And since RFRA was enacted by Congress, Defendant agencies cannot claim any interest in trumping that

statute by means of a Mandate that Congress did not even require in the ACA, while Congress left the ACA subject to RFRA overall.

## CONCLUSION

For the foregoing reasons, Plaintiffs March for Life, Jeanne Monahan, and Bethany Goodman respectfully request that the Court grant its motion for preliminary injunction and judgment on the merits, and deny Defendants' motion to dismiss or, in the alternative, for summary judgment.

## STATEMENT REGARDING HEARING

The parties indicated they would state in their briefing whether the hearing on the pending motions that the Court had planned to schedule at the end of October or the beginning of November needs to be evidentiary or can consist merely of oral argument. Plaintiffs do not plan to present evidence beyond what they have already submitted, and therefore they believe that the hearing can be oral argument. As referenced above, the parties dispute the legal significance of the evidence. But the government has not asked plaintiffs' counsel for an opportunity to engage in cross-examination. The government indicated in its motion that it may signal in its reply brief some need for evidentiary review at the hearing, but it did not specify what the nature or purpose of that review might be, and Plaintiffs do not believe it would be appropriate for the government to do so in a reply brief. If the Court finds that an evidentiary hearing is appropriate, or if the government asks to submit evidence and the Court agrees, Plaintiffs will be prepared to proceed with an evidentiary hearing in the same timeframe that the Court already indicated it was considering. Counsel for Plaintiffs is still available October 23 through November 7, excluding October 30 and 31. An out-of-town trip has arisen for Plaintiffs' counsel from November 10–21, but counsel can make those dates available if necessary to accommodate the Court.

Respectfully submitted this 7th day of October, 2014.

*Attorneys for Plaintiffs*:

   s/ Matthew S. Bowman _ _ _ _ _

David A. Cortman                              Steven H. Aden
 (DC Bar No. 478748)                        (DC Bar No. 46777)
Alliance Defending Freedom                     Matthew S. Bowman
1000 Hurricane Shoals Road NE                    (DC Bar No. 993261)
Suite D-1100                                   Alliance Defending Freedom
Lawrenceville, GA 30043                        801 G Street, NW, Suite 509
(770) 339-0774                                 Washington, D.C.  20001
(770) 339-6744 (facsimile)                     (202) 393-8690
dcortman@alliancedefendingfreedom.org          (202) 347-3622 (facsimile)
Elissa Graves                                  saden@alliancedefendingfreedom.org
 (*Pro Hac Vice*; AZ Bar No. 030670)       mbowman@alliancedefendingfreedom.org
Alliance Defending Freedom
15100 N 90th Street
Scottsdale, AZ 85260-2901
(480) 444-0020
(480) 444-0028 (facsimile)
egraves@alliancedefendingfreedom.org