**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MARCH FOR LIFE; JEANNE F. MONAHAN; and BETHANY A. GOODMAN, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:14-cv-1149-RJL |
| SYLVIA M. BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services; THOMAS E. PEREZ, in his official capacity as Secretary of the United States Department of Labor; JACOB J. LEW, in his official capacity as Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES DEPARTMENT OF THE TREASURY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF ON *PRIESTS FOR LIFE***

Plaintiffs file this supplemental brief concerning the D.C. Circuit's decision in *Priests for Life v. Burwell*, No. 13-5368, slip op. (D.C. Cir. Nov. 17, 2014), attached as Exh. 1 to Gov. Notice of Supp. Authority (doc. # 25). Although the government's previously-filed notice implied that *Priests for Life* supports the government's position in the present case, instead *Priests for Life* reinforces Plaintiffs' entitlement to relief on all their claims, for four reasons.

First, *Priests for Life* did not rule on the Mandate that applies to March for Life and applied to Hobby Lobby. Instead *Priests for Life* makes clear that it was considering the "accommodation," not the Mandate itself. The plaintiffs in *Priests for Life* were either subject to

1

that accommodation or were entirely exempt—they were not subject to the Mandate as such, according to the D.C. Circuit. March for Life and the plaintiffs here, in contrast, are not subject to the accommodation. The March for Life are instead like the plaintiffs in *Hobby Lobby*, subject the same Mandate that applied to them.

The Supreme Court struck down the Mandate as applied to the RFRA objectors in *Hobby Lobby*. And the D.C. Circuit did not purport to contradict that decision. Instead it went out of its way to distinguish it on the specific theory that the accommodation is legally different than the Mandate for the purposes of plaintiffs' claims against it. "Plaintiffs' case is significantly different from the recent, successful Supreme Court challenge brought by for-profit, closely-held corporations in *Burwell v. Hobby Lobby Stores*" because unlike the plaintiffs in *Priests for Life*, *Hobby Lobby* involved "*the absence of any accommodation*" on its plaintiffs. *Id.* slip op. at 22 (emphasis in original). The distinction between the Mandate and the accommodation was extremely important to the D.C. Circuit in *Priests for Life*. It is the overarching premise of the entire case. It allowed the court to issue a ruling that was the opposite of the outcome in *Hobby Lobby*, while still adhering to its duty to follow Supreme Court precedent. The *Priests for Life* opinion is riddled with contextual assertions indicating that the accommodation is different than the Mandate in the eyes of the court, to explain and justify denying relief to those plaintiffs even after the plaintiffs in *Hobby Lobby* had received judgment in their favor.

Consequently, *Priests for Life* did not rule that the Mandate survives RFRA, the Free Exercise Clause, or any of the plaintiffs claims in that case. *Priests for Life* did not rule on the unadorned Mandate at all. *Priests for Life* even goes out of its way to specify what its "holding" is, specifically, as distinct from its discussion of its rationale. In that statement the court specifies that its "hold[ing]" on the government's interest under RFRA pertains only to "the

*accommodation.*" *Id.* slip op. at 60 (emphasis added). The court issued no holding on the Mandate itself. Rather it signaled that such a holding was governed by *Hobby Lobby*. March for Life and its employees are subject to the same full Mandate to which the plaintiffs in *Hobby Lobby* were subject: their health plan must cover contraception, full stop. They are not subject to the accommodation.

In this context, any dicta that the government wishes to attribute to *Priests for Life* as being applicable against the March for Life plaintiffs' claims is severely misplaced. *Priests for Life* 's holdings foreswear application to the bare Mandate that is at issue here, and its dicta is all geared towards the emphatic point that it is ruling on the accommodation specifically. Any government quotation of *Priests for Life* as if it proves the government has an interest *here*, or the plaintiffs *here* failed to satisfy their claims, is necessarily wrenched out of context. *Priests for Life* affirms that when a litigant faces the non-accommodated Mandate, *Hobby Lobby* controls.

The second reason that *Priests for Life* supports the March for Life plaintiffs' claims is that the governmental interest sustained in *Priests for Life* is not an interest supporting the Mandate challenged here. It pertains only to the accommodation, not to the bare Mandate. As a result no inference in favor of the government's interest in the present case can be drawn from *Priests for Life*. The opposite is true: *Priests for Life* specifies that the government interest it was recognizing was only an interest to give contraception coverage to women who "want it," and who are "not fairly presumed to share the organizations' opposition to contraception*." See, e.g., id*. at 10, 46.  These are exactly the narrow contours that March for Life says actually define any interest the government has in the Mandate, and that utterly fail to be rationally advanced in the context of the March for Life plaintiffs. By defining the government's interests in this specific way, *Priests for Life* demonstrates why March for Life's claims should succeed here.

*Priests for Life* did not describe a generic government interest to provide contraception coverage. Over and over again it specified that the interest it was recognizing was an interest to provide contraceptive items "to women who want them, for whom they are medically appropriate, *and* who personally have no objection to using them." *Id.* at 5 (emphasis added). *Priests for Life* could not be more emphatic about this point: the government interest that the court recognizes is specifically one of providing coverage for women who "want them," "want them," "use them," "want it," and "want them," to help avoid "unwanted" pregnancy, and so attain "personal autonomy without unwanted pregnancy." *Id.* slip op. at 5, 7, 11, 46, 51, 60, & 62. Nothing in *Priests for Life* recognizes a government interest in providing contraceptive coverage for women who do not want contraceptive coverage, refuse to use it, and work at organizations where all employees by definition oppose the items in question.

*Priests for Life* went so far as to openly reject the notion that the court should deem "compelling *every* subsidiary governmental action that advances" via the Mandate. *Id.* at 51 (emphasis added). Rather, the ruling concerns only promoting the interest "for women who want them and whose doctors prescribe them." *Id.* And again, the governmental interest is only advanced if it causes "use" of the items to be more "widespread," "because appropriate and consistent use of contraceptives furthers women and children's health," and so can be undermined if an exemption "would dissuade women from obtaining contraceptives." *Id.* slip op. at 49, 55, 62. None of these factors are implicated by women who refuse to use the items, and neither the court in *Priests for Life* nor the government here identifies any interest in imposing the Mandate in the context raised here.

A word about medical appropriateness of contraceptive items when "doctors prescribe them" may also be in order. That language is referenced in *Priests for Life* because the Mandate

4

itself, as voluntarily defined by Defendants, does not cover all contraceptives women want to buy. It only covers them "[a]s prescribed" by a physician. http://www.hrsa.gov/womensguidelines/ . A woman who is covered by a health plan that does comply with the contraceptive Mandate, and who goes to a pharmacy to buy some, will still not have those items covered if she does not have a doctor's prescription for them. This point reinforces the inapplicability of the Mandate here, and of the government's alleged health interest. Because March for Life's employees ideologically oppose contraceptives they consider abortifacient, it follows that they would never let a doctor prescribe the items for them, nor would they present such a prescription to a pharmacist. Therefore by the Mandate's own parameters the government has no interest in their plan covering those items—the coverage Mandate does not even include those items. This is why *Priests for Life* conjoins its references to women's health and to women's desires. The Mandate requires both. In a free society, if a woman who does not want contraception she will not be required to use it even if a doctor thinks she needs it. But in the case of this Mandate, if a woman does not want it will not even be covered, because she will refuse any prescription for it. Yet Defendants still insist that March for Life's health plan cover these items as prescribed. That is utterly irrational. The Mandate advances no interest here.

  Third, *Priests for Life* does not justify the government's decision to grant a Mandate exemption to churches but not to the plaintiffs here. Despite any government quotation of the case out of context, *Priests for Life* simply does not give a carte blanche approval to the decision to exempt churches but not others. Instead *Priests for Life* asks whether the distinction between *those plaintiffs* and exempt churches makes sense *in light of the nature of the Mandate*. That is the question the government does not want this court to ask. The government wants the court to focus on some abstract notion about whether churches deserve exemptions, not the specific issue

about whether it is rational to take a Mandate designed only for women who want it and exempt some entities whose employees "likely" don't want it, but not exempt other entities whose employees by definition don't want it. *Priests for Life* asks this kind of question, and in the process it implies that the plaintiffs here should win their case.

*Priests for Life* asks the right kind of question about the church exemption when it drills down into the actual facts of the plaintiffs in that case—facts that are markedly different than the facts here. The court in *Priests for Life* asserts that, based on its record, the non-profit, non-church plaintiffs in that case "employ both Catholics and non-Catholics," "including individuals who do not share their beliefs." *Id.* slip op. at 11, 63. Because those plaintiffs employ people who do not share their beliefs, the court said that its record reflects "no reason to believe" that people in the *Priests for Life* plaintiffs' health plans "are materially different" from women in the general public who want or use contraception, and who therefore may benefit from the Mandate. *Id.* slip op. at 63. But as shown by the undisputed record here, the opposite is true: March for Life by definition limits its employees to those who oppose abortifacients and abortifacient coverage in their health plan.

*Priests for Life* goes on to examine the church exemption in light of these factual characteristics of the plaintiffs, and of the nature of the Mandate. *Priests for Life* does not rule based on an abstract question of whether churches deserve exemptions. While it recognizes "longstanding and familiar" exemptions for houses of worship, *id.* at 10, the court does not consider that generic characterization sufficient. It goes on to specifically explain that with respect to this Mandate, the distinction can be justified when employers like the plaintiffs in *Priests for Life* "employ both Catholics and non-Catholics," "including individuals who do not share their beliefs," because those employees are "people not fairly presumed to share the

6

organizations' opposition to contraception or to be co-religionists." *Id.* slip op. at 10–11, 63. In contrast, *Priests for Life* emphasizes that Defendants themselves created the exemption because they consider noncompliance appropriate for "[e]mployers that do not primarily employ employees who share the religious tenets of the organization," since those employers "are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives." *Id.* slip op. at 63–64. This "categorical exemption" is acceptable not in the abstract, but based on the "assumption" that employees of churches "share that view, or at least have knowingly joined a pervasively sectarian institution that expects them to." *Id.* slip op. at 77.

Thus we see that far from approving the church exemption in the abstract, *Priests for Life* approved of it because (1) the Mandate is for women who want the items; (2) exempt entities are fairly presumed to share their employers' opposition to contraception; and (3) the plaintiffs *in that case* were known, by the record, *not* to share the entity's religious beliefs. This analysis applied here shows why the Mandate is irrational for the March for Life plaintiffs. The undisputed evidence demonstrates that March for Life is "pervasively" anti-abortifacient in actual practice, like exempt churches are presumed to be in the exemption. March for Life requires its employee to agree with its opposition to abortifacients, and its employees do in fact share that view or else they would no longer maintain their jobs. Under *Priests for Life*, the church exemption is deemed appropriate because the Mandate is for women who want it and there is "no reason to believe" that *Priests for Life* plaintiffs' employees "are materially different" from women in the general population, many of whom want contraception. Since the opposite is true of the plaintiffs here, denying them an exemption is irrational. The logic of *Priests for Life* fully supports this conclusion.

Fourth, the Administrative Procedure Act claim rejected in *Priests for Life* was not an arbitrary and capricious claim, nor was it like the APA claims brought here. Its failure has no bearing on the present case.

Finally, some discussion occurred at the last status conference indicating that the government wishes to use the brief it files today to discuss undisclosed issues that it feels it unsatisfactorily addressed at the hearing, although this Court indicated that the brief could only be used narrowly to respond to specific questions and not to reopen the briefing on the issues already addressed in the case. Nevertheless, Plaintiffs offer the following case citations in response to questions the court asked the government about whether the Mandate could survive rational basis review.

The D.C. Circuit has continually struck down agency action which it found arbitrary and capricious under rational basis review. In particular, the D.C. Circuit has repeatedly held that an agency cannot "arbitrarily treat similar situations dissimilarly," and that such agency action violates the APA. *Local 777, Democratic Union Org. Comm. V. NLRB,* 603 F.2d 862, 872 (D.C. Cir. 1978) (striking down a decision of the NLRB concerning taxi leasing programs which was inconsistent with previous Board precedent). In *Airmark Corp. v. FAA*, the D.C. Circuit struck down as arbitrary and capricious the FAA's refusal to exempt various air carriers from airplane noise regulations where it had provided exemptions for some carriers for reasons similar to the exempted carriers' alleged need for an exemption due to the agency's "complete failure to apply consistent criteria in granting or denying exemptions." 758 F.2d 685, 687 (1985). In the 1970s, the FAA promulgated rules requiring all aircraft to be fitted with certain noise-reducing technology, but crafted exemptions for smaller carriers which would suffer financial hardship if required to meet the FAA's compliance date. *Id*. at 687-88. The D.C. Circuit held that the FAA

"arbitrarily applied different decisional criteria to similarly situated carriers," and therefore violated the APA. *Id*. at 692. The court further noted that the "FAA has offered no coherent explanation for this disparate treatment" of different carriers. *Id*. at 695.

Finding a decision by the Federal Communications Commission concerning cellular licenses arbitrary and capricious, the D.C. Circuit recognized that "an agency must provide adequate explanation before it treats similarly situated parties differently," and that an agency must also "justify its failure to take account of circumstances that appear to warrant different treatment for different parties." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994). There, water-based cellular licensees, composed largely of the oil industry in the Gulf of Mexico, challenged a rule essentially treating water-based licenses the same as land-based licenses, despite the FCC's "longstanding recognition of [the oil companies'] unique plight" in this area of regulation. *Id*. at 1173. The D.C. Circuit concluded that such a decision was arbitrary and capricious where the FCC had failed to adequately explain its failure to take into account the differences between water- and land-based licenses in the Gulf of Mexico. *Id*.

Here, the government is arbitrarily treating March for Life differently from similarly situated organizations, without adequate explanation, in violation of the APA. The government has repeatedly explained that the church exemption is appropriate because church employees are "likely" to oppose contraception. 78 Fed. Reg. at 8,461. March for Life exists for the purpose of opposing abortion in all forms, including abortifacient contraceptives. The failure to exempt March for Life, whose employees are opposed to abortifacient contraceptives, "arbitrarily treat[s] similar situations dissimilarly." *Local 777*, 603 F.2d at 872. The Mandate is therefore arbitrary and capricious under the APA.

Respectfully submitted this 10th day of December, 2014.

                                            ***Attorneys for Plaintiffs*:**

                                             *s/ Matthew S. Bowman*
                                            Matthew S. Bowman
                                              (DC Bar No. 993261)
                                            Alliance Defending Freedom
                                            801 G Street, NW, Suite 509
                                            Washington, D.C.  20001
                                            (202) 393-8690
                                            (202) 347-3622 (facsimile)
                                            saden@alliancedefendingfreedom.org
                                            mbowman@alliancedefendingfreedom.org