### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARCH FOR LIFE, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 14-cv-1149 (RJL)** |
| | ) | |
| **SYLVIA M. BURWELL, *et al.*,** | ) | **FILED** |
| | ) | |
| **Defendants.** | ) | **AUG 3 1 2015** |

**MEMORANDUM OPINION**
(August **31**, 2015) [Dkts. ##11, 16]

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Plaintiffs, the March for Life Education and Defense Fund ("March for Life"),

Jeanne F. Monahan, and Bethany A. Goodman (together, "employee plaintiffs"), bring

this action seeking injunctive relief from what is commonly referred to as the

"Contraceptive Mandate" embodied in the regulations implementing the Patient

Protection and Affordable Care Act. Defendants are three federal agencies and their

respective Secretaries: the United States Department of Health and Human Services

("HHS") and Secretary of HHS Sylvia M. Burwell; the United States Department of

Labor and Secretary of Labor Thomas E. Perez; and the United States Department of the

Treasury and Secretary of the Treasury Jacob Lew (together "defendants" or "the

government"). Secretaries Burwell, Perez, and Lew are named in their official capacities

only. *See generally* Verified Compl. ("Compl.") [Dkt. #1].[1]

---

[1] A verified complaint is treated as an affidavit to the extent it is based on personal knowledge and sets
out facts admissible in evidence. *See Neal v. Kelly*, 963 F.2d 453, 457-58 (D.C. Cir. 1992).

Plaintiffs move for a preliminary injunction and consolidated trial on the merits, requesting permanent declaratory and injunctive relief.  Mot. for Prelim. Inj. & Consolidated Trial on the Merits & Mem. of Law in Supp. ("Pls.' Mot.") [Dkt. #11]. Defendants oppose and move to dismiss plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for summary judgment.  Defs.' Mot. to Dismiss or for Summ. J. [Dkt. #16]; Mem. of P. &. A. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. & Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp'n") [Dkt. #16].

After reviewing the pleadings, record, and applicable law, the trial on the merits is consolidated with the preliminary injunction and, as the disputes are purely legal, plaintiffs' motion is construed as a motion for summary judgment.  For the reasons discussed herein, Plaintiffs' Motion for Summary Judgment is GRANTED as to their First Claim for Relief, under the equal protection clause of the Fifth Amendment; GRANTED as to their Second Claim for Relief, under the Religious Freedom Restoration Act; GRANTED as to their Fourth Claim for Relief under the Administrative Procedure Act; and DENIED as to their Third Claim for Relief, under the free exercise clause of the First Amendment.  Defendants' Motion for Summary Judgment is GRANTED as to plaintiffs' Third Claim for Relief, and DENIED as to plaintiffs' First, Second, and Fourth Claims for Relief.

## BACKGROUND

### I.    Statutory and Regulatory Background

In March 2010, President Obama signed into law The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 ("ACA").  One of its many

2

provisions mandates that group health plans and insurers offering group or individual

health insurance coverage must cover certain preventive health services without imposing

cost sharing requirements on plan participants or beneficiaries.  42 U.S.C. § 300gg-13(a).

The required preventive services include items or services rated an "A" or "B" by the

United States Preventive Services Task Force; immunizations recommended by the

Centers for Disease Control and Prevention's Advisory Committee on Immunization

Practices; and preventive care and screenings for women as "provided for in

comprehensive guidelines supported by the Health Resources and Services

Administration" ("HRSA"), a section within HHS.  42 U.S.C. § 300gg-13(a)(1)-(4).

In keeping with the ACA's provisions, HHS directed a third party, the Institute of

Medicine ("IOM"), to recommend which services and care should be included under the

aegis of women's preventive services.  IOM, *Clinical Preventive Services for Women:*

*Closing the Gaps* (2011) ("IOM Report"), AR[2] at 285-534.  IOM did so, and the ensuing

HRSA Guidelines, published in August 2011, adopted IOM's recommendations.  HRSA,

*Women's Preventive Services Guidelines* (Aug. 1, 2011),

http://www.hrsa.gov/womensguidelines/.  The HRSA Guidelines provide that, among

other things, "[a]ll Food and Drug Administration approved contraceptive methods,

sterilization procedures, and patient education and counseling for all women with

reproductive capacity" will be covered by the ACA without cost sharing.  *Id.*  FDA-

approved contraceptive methods include hormonal contraceptives, such as birth control

pills, intrauterine devices, and emergency contraception.  IOM Report at 105, AR 403.

---

[2] Parallel citations to the administrative record [Dkt. #23] are denoted "AR."

Together, the ACA preventive services coverage provision, the HRSA Guidelines, and the HHS, Labor, and Treasury implementing regulations, form what is colloquially referred to as the "Contraceptive Mandate," or, here, simply the "Mandate."

The Mandate is not without its opponents. In the wake of its issuance, HHS was deluged with concerns about "imposing on certain religious employers through binding guidelines the requirement to cover contraceptive services that would be in conflict with the religious tenets of the employer." 76 Fed. Reg. 46,621, 46,625 (Aug. 3, 2011). To preserve the "unique relationship between a house of worship and its employees in ministerial positions," and to prevent the Mandate from "imping[ing]" upon religious employees' faith-based objections to contraceptives, HHS promulgated an interim regulation granting HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. at 46,623. The interim regulation was adopted, without change, as a final rule in February 2012. *See* 77 Fed. Reg. 8,725 (Feb. 15, 2012). The story, however, does not end there. Besieged by concerns that this safe harbor did not fully resolve fears about imposing the Mandate on classes of individuals that object to the use of contraceptives, HHS initiated a notice-and-comment rulemaking procedure. *See* 77 Fed. Reg. 16,501, 16,503 (Mar. 21, 2012).

At the conclusion of this rulemaking process in 2013, HHS arrived at the rule in place at the time the Complaint in this case was filed.[3] Under this final rule, HRSA was given authority to exempt from the Mandate health plans "established or maintained by

---

[3] The government issued another set of interim final regulations in August 2014, but they did not change the religious exemption described herein. *See* 79 Fed. Reg. 51,092 (Aug. 27, 2014); 79 Fed. Reg. 51,118 (Aug. 27, 2014).

religious employers." 78 Fed. Reg. 39,870, 39,873 (July 2, 2013). As defined in the regulation, "religious employers" are confined to "churches, their integrated auxiliaries, and conventions or associations of churches as well as to the exclusively religious activities of any religious order." 78 Fed. Reg. at 39,874. Secular non-profit organizations, regardless of their employees' views on contraceptives, are thus excluded from this exemption. HHS reasoned that a narrow religious employer exemption was necessary to accomplish two objectives. First, it addressed HHS's desire to "respect the religious interests of houses of worship and their integrated auxiliaries." 78 Fed. Reg. at 39,874. Second, it accommodated these religious interests without undermining "the governmental interests furthered by the contraceptive coverage requirement," *i.e.*—the provision of contraceptive coverage to women who "want it." 78 Fed. Reg. at 39,874; *see* 77 Fed. Reg. at 8,727. As to the latter objective, HHS opined that the Mandate's central purpose would remain undisturbed because employees of religious organizations would be less likely than employees of secular organizations to want contraceptive coverage in the first instance. Specifically, "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are *more likely* than other employers to employ people of the same faith who share the same objection, and who would therefore be *less likely* than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39,874 (emphasis added).[4]

---

[4] HHS also devised another mechanism to address the concerns of certain religious non-profit organizations that do not qualify for the exemption. Under its "religious accommodation," an eligible organization can opt out of providing contraceptive coverage through its employer-sponsored plan, in which case the third-party administrator separately provides employees coverage. *See* 78 Fed. Reg. at 39,874-82. This accommodation applies only to employers claiming a religious objection to providing

HHS did not, however, supply a rationale for subjecting to the Mandate secular non-profit groups whose employees share an analogous objection to the use of certain contraceptives.[5]

## II.    Parties

March for Life is a non-profit, non-religious pro-life organization founded in 1973 following the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973).  Compl. ¶¶ 5, 16.  March for Life holds as a foundational tenet the idea that life begins at conception.  *Id.* at ¶ 1.  March for Life defines conception as fertilization of an egg by a sperm, and thus considers a human embryo to be an unborn human life.  *Id.* at ¶¶ 1, 19. March for Life will not support abortion in any way, and, as such, opposes coverage in its health insurance plan for contraceptive methods it deems "abortifacients."  *Id.* at ¶ 20. March for Life believes that hormonal contraceptives, IUDs, and emergency contraception can, and in some cases do, prevent the implantation into the uterus of a fertilized human embryo, and making them abortifacients.  *See id.* at ¶ 49.

---

contraceptive coverage, though it now looks to be extended beyond the original non-profit scope by the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).  March for Life does not qualify for an accommodation because it is not religious.  Compl. at ¶ 91.  March for Life focuses on the fact that it is not included within the scope of the religious employer exemption, and does not argue that it should be, or wants to be, included within the scope of the accommodation regulation.  In addition to those plans offered by exempt religious employers, certain other plans need not provide contraception coverage.  Plans that were created prior to March 23, 2010, and have not made specified changes ("grandfathered plans"), are not required to comply with, among other things, the preventive services mandate.  42 U.S.C. § 18011.  This allows certain plans that did not previously offer contraceptive coverage to continue declining to do so.  In addition, religious health plans not governed by ERISA ("church plans") need not cover contraceptives.  *See* 79 Fed. Reg. at 51,095 n.8.

[5] HHS made passing reference to the fact that "[s]ome commenters requested that the definition of eligible organization be broadened to include nonprofit secular employers and for-profit employers with religious objections to contraceptive coverage."  78 Fed. Reg. at 38,874.  HHS, however, "decline[d] to adopt these suggestions."  78 Fed. Reg. at 39,875.

March for Life offers health insurance to its employees. *See id.* at ¶¶ 6-7, 22. March for Life does not qualify for the religious exemption because it is not religious, much less a house of worship or integrated auxiliary. *Id.* at ¶ 63. Nor is its health insurance plan a "grandfathered plan," because it did not exist prior to the passage of the ACA in 2010. *Id.* at ¶ 23. March for Life's insurance carrier has indicated that it would be willing to offer March for Life a health insurance plan that does not include coverage for abortifacients if it were legally permissible to do so. *Id.* at ¶ 25; CareFirst Letter, Ex. A to Affidavit of Pl. Jeanne F. Monahan ("Monahan Affidavit") [Dkt. #27].

March for Life only hires individuals who oppose all forms of abortion, including contraceptives that the organization believes are abortifacients. Compl. ¶ 21. This includes the two individual employee plaintiffs here: Jeanne Monahan, a Catholic, is President of March for Life, and Bethany Goodman, an Evangelical Protestant, is one of the organization's employees. *Id.* at ¶¶ 6-7, 27. Both employee plaintiffs participate in the insurance plan currently offered by March for Life. *Id.* at ¶¶ 6-7.

The employee plaintiffs state that their religious faiths prohibit them from using or supporting the use of abortifacient drugs and devices. *Id.* at ¶ 32. They, like the organization they work for, believe that certain of the FDA-approved contraceptives are abortifacients. *Id.* at ¶ 49. On the basis of these "sincere and deeply held religious and moral beliefs against abortion and abortifacients," employee plaintiffs oppose having insurance coverage for contraceptives they deem abortifacients and object to participating in a health insurance plan that provides them such coverage. *Id.* at ¶¶ 33-34.

### III.   Procedural History

Plaintiffs filed the instant suit in July 2014.  Compl.  Not all claims are alleged by all plaintiffs.  March for Life alone claims that the Contraceptive Mandate and the attendant religious employer exemption violate its right to equal protection under the Fifth Amendment.  Compl. ¶¶ 113-123 (First Claim for Relief).  All plaintiffs claim that the Mandate is unlawful and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706, ("APA") for two separate reasons: (1) it is arbitrary and capricious because it does not serve a rational government interest as applied to an organization employing only people who are opposed to contraceptive coverage, while exempting churches; and (2) it violates the Constitution and federal laws.  Compl. ¶¶ 152-161 (Fourth Claim for Relief).

The employee plaintiffs also bring challenges based on their religious beliefs. They claim that that applying the Mandate to their health insurance plans violates their rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, Compl. ¶¶ 124-136 (Second Claim for Relief), as well as under the First Amendment's Free Exercise clause, *id.* ¶¶ 137-151 (Third Claim for Relief).[6]

---

[6] The government initially challenged employee plaintiffs' standing on the grounds that they needed to submit evidence that their alleged injury here would be redressed by a favorable decision by this Court, because a third party (an insurer) would have to make the decision to offer employee plaintiffs insurance without contraception coverage. *See* Defs.' Opp'n at 22-28. At the request of the Court, plaintiffs submitted a letter received from March for Life's insurance carrier, CareFirst BlueCross BlueShield. The letter states that "CareFirst would be willing to offer March for Life or its employees a plan omitting the contraceptive coverage that they are objecting to" "[i]f a legal exemption from [the Mandate] is obtained." CareFirst Letter, Ex. A to Monahan Affidavit. This addresses the government's concerns, and the employee plaintiffs, as such, have standing to bring their claims.

Plaintiffs request that the Court declare the Mandate unconstitutional and contrary to federal law, and enjoin defendants from continuing to apply the Mandate to plaintiffs and their insurers, such that March for Life can provide, and its employees can participate in, health insurance plans that do not provide coverage for the opposed contraceptives. Compl. at 28-29.

In September 2014, plaintiffs moved for a preliminary injunction and consolidated trial on the merits on all of their claims. Pls.' Mot. Defendants opposed and moved to dismiss, or, in the alternative, for summary judgment. Defs.' Opp'n. I heard oral argument on November 6, 2014, *see* November 6, 2014 Minute Entry, and received supplemental briefing from both sides on December 10, 2014, *see* Defendants' Supplemental Brief [Dkt. #28]; Plaintiffs' Supplemental Brief [Dkt. #29].

## LEGAL STANDARD

The questions raised by the parties are matters of law, and they have been fully briefed. There are no material factual disputes regarding the administrative record or the allegations in plaintiffs' Verified Complaint.[7] Accordingly, the record is sufficient for a determination on the merits under the summary judgment standard, or, where reliance on the record is unnecessary, under the motion to dismiss standard. I consolidate the preliminary injunction with trial on the merits on all claims pursuant to Federal Rule of Civil Procedure 65(a)(2), and, therefore, do not need to analyze the typical preliminary injunction factors.

---

[7] As described above, plaintiffs also have supplemented the record with one additional affidavit and an attached exhibit for the purposes of establishing standing. *See* Monahan Affidavit.

## I.      Rule 12(b)(6) Dismissal

The Court may dismiss a complaint or any portion thereof for failure to state a

claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). At the motion to

dismiss stage, the Court "may consider only the facts alleged in the complaint, any

documents either attached to or incorporated in the complaint and matters of which [the

court] may take judicial notice." *EEOC. v. St. Francis Xavier Parochial Sch.*, 117 F.3d

621, 624 (D.C. Cir. 1997). To survive a motion to dismiss, a plaintiff must plead "factual

content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court

must "accept as true all of the allegations contained in a complaint." *Id.* However, the

Court need not "accept legal conclusions cast in the form of factual allegations," nor

"inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in

the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## II.     Rule 56(a) Summary Judgment

Where a plaintiff's complaint properly states a claim, summary judgment is the

appropriate method by which to resolve the merits of a dispute regarding federal agency

action "because the . . . regulation's validity is a question of law." *See Lederman v.*

*United States*, 89 F. Supp. 2d 29, 33 (D.D.C. 2000), *on reconsideration in part*, 131 F.

Supp. 2d 46 (D.D.C. 2001). Summary judgment is warranted when the evidence in the

record demonstrates that "there is no genuine dispute as to any material fact and the

10

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.,*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ANALYSIS

### I.   Governing Principles

Plaintiffs advance several statutory and constitutional challenges to the Mandate,

averring that it violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the

equal protection clause of the Fifth Amendment, the Religious Freedom and Restoration

Act, 42 U.S.C. § 2000bb *et seq*. ("RFRA"), and the free exercise clause of the First

Amendment. *See generally* Compl. The APA permits a reviewing court to set aside an

agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" or, alternatively, that is "(B) contrary to constitutional right, power,

privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B). Stated differently, the APA allows

courts to right two types of agency wrongs: procedural missteps and substantive

transgressions. While procedural correctness is, to be sure, an important facet of any

judicial inquiry, compliance with the law is the true touchstone of legality. Thus, in a

context such as this, where plaintiffs have alleged serious constitutional and statutory

infirmities, the appropriate starting point for the Court's analysis is not the integrity of the

agency's decision-making process, but rather the lawfulness of the Mandate itself. I will

therefore begin by addressing plaintiffs' Fifth Amendment, RFRA, and First Amendment

arguments and, because I find the first two challenges meritorious, I will refrain from

delving into the thicket of an APA review.

## II.   Equal Protection Clause

March for Life first argues that the Mandate violates the Fifth Amendment's guarantee of equal protection because it treats March for Life differently than it treats similarly situated employers. Pls.' Mot. at 8-10.  I agree.

The equal protection clause of the Fifth Amendment prohibits lawmakers from "treating differently [entities that] are in all relevant respects alike." *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citation omitted).   The practical reality is that regulatory regimes may, and in some cases must, classify persons for one purpose or another. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979).  Thus, to preserve the regulatory balance, equal protection prevents only classifications motivated by discriminatory animus. *See id.*  In the ordinary course, laws that neither burden a fundamental right, nor target a suspect class, must satisfy so-called rational basis review—meaning that to survive an equal protection challenge, they must rationally relate to a legitimate governmental purpose. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see Steffan v. Perry*, 41 F.3d 677, 684-85 (D.C. Cir. 1994) (en banc) (applying rational basis review to an agency regulation).

Were defendants to have their way here, rational basis review would have all the bite of a rubber stamp!  The *sin quo non* of equal protection is that the government must "not treat *similarly situated* individuals differently without a rational basis" for doing so. *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (per curiam) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  The Court is, of course, mindful that the equal protection clause does not impose on lawmakers a requirement of

12

perfect parity. *See Heller v. Doe*, 509 U.S. 312, 321 (1993). But the elusiveness of perfection will not excuse regulatory animus. Rational basis review, if it is to have any meaning in the constellation of judicial scrutiny, demands that agency line drawing, however inartful, rationally relate to its purported objective. Even under this "most deferential of standards," it is incumbent on the Court to find "the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Were the Court to abdicate this search, it would disregard basic principles of equal protection, which secure not only the rights of domestic persons, but also the limits of regulatory authority. *See id.* Unfortunately for defendants, the Mandate here defies this conventional inquiry.

Defendants contend that March for Life is not "similarly situated" to the exempted organizations because it "is not religious and is not a church." Defs.' Opp'n at 18 (internal quotation marks omitted). Rational basis review is met, they argue, because the purpose served, "accommodating religious exercise by religious institutions," is "'permissible and legitimate.'" *See* Defs.' Opp'n at 15. This not only oversimplifies the issue—it misses the point entirely! The threshold question is *not* whether March for Life is "generally" similar to churches and their integrated auxiliaries. It is whether March for Life is similarly *situated* with regard to the precise attribute selected for accommodation. *See Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 872 (7th Cir. 2014). For the following reasons, I conclude that it most assuredly is.

The clear, and undisputed, purpose of the Mandate is to provide accessible contraceptive coverage for women who "want it" in order to avoid "unintended

pregnancies." *See* 77 Fed. Reg. at 8,727.  Religious employers are exempt from the

Mandate because of the "unique relationship between a house of worship and its

employees in ministerial positions." 76 Fed. Reg. at 46,623.  What, then, makes *that*

particular employment relationship "unique" in *this* particular context?  The answer,

according to HHS, is simple: employees of religiously exempt organizations are "less

likely" than other groups to want contraceptives because of their moral beliefs.  In HHS's

own words, "[h]ouses of worship and their integrated auxiliaries that object to

contraceptive coverage on religious grounds are *more likely* than other employers to

employ people of the same faith who share the same objection, and who would therefore

be *less likely* than other people to use contraceptive services even if such services were

covered under their plan." 78 Fed. Reg. at 39,874 (emphasis added); *see* 77 Fed. Reg. at

8,728 ("A group health plan . . . qualifies for the exemption if . . . the plan is established

and maintained by an employer that primarily employs persons who share the religious

tenets of the organization.  As such, the employees of employers availing themselves of

the exemption would be *less likely* to use contraceptives even if contraceptives were

covered under their health plans.") (emphasis added).  What emerges is a curious

rationale indeed.  HHS has chosen to protect a class of individuals that, it believes, are

less likely than other individuals to avail themselves of contraceptives.  It has

consequently moored this accommodation not in the language of conscientious objection,

but in the vernacular of religious protection.  This, of course, is puzzling.  In HHS's own

view, it is not the belief or non-belief in God that warrants safe harbor from the Mandate.

The characteristic that warrants protection—an employment relationship based in part on

14

a shared objection to abortifacients—is altogether separate from theism.  Stated

differently, what HHS *claims* to be protecting is religious beliefs, when it *actually* is

protecting a moral philosophy about the sanctity of human life.  HHS may be correct that

this objection is common among religiously-affiliated employers.  Where HHS has erred,

however, is in assuming that this trait is *unique* to such organizations.  It is not.

March for Life and its employees are evidence of this fact.  Anti-abortion

advocacy is March for Life's sole and central tenet.  Compl. ¶ 1.  It is an entity founded

exclusively on pro-life principles, and its governing ethos—indeed its corporate dogma—

is staunchly anti-abortifacient.  *Id.*  This philosophy is shared, moreover, by March for

Life's employees, who "not only agree with its anti-abortifacient views, but [who] work

there precisely to advocate those views."  Pls.' Mem. at 9; *see* Compl. ¶¶ 21, 26-35, 119,

156.  To say that its employees oppose contraceptives understates the vehemence of their

objection.  According to plaintiffs, March for Life's employees not only reject

abortifacients in principle, but they "*don't want* them, *don't want* coverage for them, and

*will not* use" them in practice.  Pls.' Mem. at 9 (emphasis added).  On the spectrum of

"likelihood" that undergirds HHS's policy decisions, March's for Life's employees are,

to put it mildly, "unlikely" to use contraceptives.  In this respect, March for Life and

exempted religious organizations are not just "similarly situated," they are *identically*

situated.  Their employees share, as a function of their belief system, the "unique" tenets

of an employment relationship that HHS seeks to protect.  It is difficult to imagine a more

textbook example of the trait HHS purports to accommodate.  And yet, March for Life

has been excised from the fold because it is not "religious." This is nothing short of regulatory favoritism.

While it is true, as defendants assert, that religious employers have long enjoyed advantages over their secular counterparts, "religion" is not a talisman that sweeps aside all constitutional concerns.[8] *See* Defs.' Opp'n at 12. As the Seventh Circuit recently cautioned, the special solicitude given to religions "does not imply an ability to favor religions over non-theistic groups that have moral stances that are equivalent to theistic ones" with regard to the regulated attribute. *See Ctr. for Inquiry*, 758 F.3d at 873. Our jurisprudence has long recognized that "[i]f an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content . . . those beliefs certainly occupy in the life of that individual a place parallel to that filled by God in traditionally religious persons." *See Welsh v. United States*, 398 U.S. 333, 340 (1970) (internal quotation marks omitted).[9] Recognizing the role morality plays in the lives of citizens, courts prohibit regulatory "distinctions between religious and secular beliefs that hold the same place in adherents' lives." *See Ctr. for Inquiry*, 758 F.3d at 873 (citations omitted). Yet, here, HHS has made a distinction of this very ilk. March for Life is an avowedly pro-life organization whose employees share in, and advocate for, a particular moral

---

[8] The Court is, of course, cognizant that ordinarily, when the government lifts a regulation that "might interfere with religious organizations' 'exercise of religion,'" there is "no reason to require that the exemption comes packaged with benefits to secular entities." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338 (1987). However, as the Seventh Circuit recently pointed out, religiosity "cannot be a complete answer" where, as here, two groups with a shared attribute are similarly situated "in everything except a belief in deity." *See Ctr. for Inquiry*, 758 F.3d at 872.

[9] Although *Welsh* was decided under statute, rather than under the Constitution, the Court nonetheless finds its reasoning persuasive here.

philosophy. HHS has chosen, however, to accommodate this moral philosophy only when it is overtly tied to religious values. HHS provides no principled basis, other than the semantics of religious tolerance, for its distinction. If the purpose of the religious employer exemption is, as HHS states, to respect the anti-abortifacient tenets of an employment relationship, then it makes no rational sense—indeed, no sense whatsoever—to deny March Life that same respect. By singling out a specific trait for accommodation, and then excising from its protection an organization with that precise trait, it sweeps in arbitrary and irrational strokes that simply cannot be countenanced, even under the most deferential of lenses. As such, the Mandate violates the equal protection clause of the Fifth Amendment and must be struck down as unconstitutional.

## III.    Religious Freedom Restoration Act

Although March for Life is avowedly non-religious, the employee plaintiffs do oppose the Mandate on religious grounds. *See* Compl. ¶¶ 34, 124-51. They contend as an initial matter that the Mandate violates the Religious Freedom Restoration Act, or "RFRA," codified at 42 U.S.C. § 2000bb *et seq*. Compl. ¶¶ 124-36. I agree.

Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), which held that, as a matter of constitutional law, "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997). RFRA raises the bar via statute, requiring that such laws must be narrowly-tailored if they substantially burden religious exercise. "Under RFRA, the federal government may not 'substantially burden'

a person's religious exercise—even where the burden results from a religiously neutral, generally applicable law that is constitutionally valid under *Smith*—unless the imposition of such a burden is the least restrictive means to serve a compelling governmental interest." *Priests For Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 236-37 (D.C. Cir. 2014); *see* 42 U.S.C. § 2000bb-1(b).  Congress found that this test allows courts to "strik[e] sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5).

The threshold question, thus, is whether the employee plaintiffs have demonstrated that the Mandate substantially burdens their sincere exercise of religion.  *See Sample v. Lappin*, 424 F. Supp. 2d 187, 192 (D.D.C. 2006) (explaining burden-shifting analysis under RFRA).  The employee plaintiffs affirm that they "sincerely hold religious beliefs against using, supporting, or otherwise advocating the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families," Compl. ¶ 125, and defendants assert that they "do not dispute that the employee plaintiffs' desire not to participate in a health insurance plan that covers contraceptives is a sincere religious belief," Defs.' Opp'n at 30.

However, elsewhere in their brief, defendants argue that "[n]o one is required to use her health coverage for services that she does not want, and it is not a burden on a person's religion to participate in a group health plan that covers services that she will not use." Defs.' Opp'n at 29.  Despite defendants' proclamation that they do not dispute the sincerity of plaintiffs' religious beliefs, this argument is a thinly veiled attack on those beliefs.  Employee plaintiffs swear that participation in a plan covering contraceptives

violates their beliefs. Compl. ¶ 125. Defendants' argument that such participation "is not a burden" at all is, in essence, a dispute about what plaintiffs' religious beliefs *are*.

It is not, of course, this Court's role to "determine what religious observance [plaintiffs'] faith commands," and I do not do so here. *See Priests For Life*, 772 F.3d at 247; *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014) (explaining that the Court's "narrow function . . . in this context is to determine whether the line drawn reflects an honest conviction, and there is no dispute that it does" (citation and internal quotation marks omitted)). The situation presented in this case is unlike the one presented in *Priests for Life*, where our Circuit Court held that the Mandate did not substantially burden accommodated organizations' beliefs against providing, paying for, or facilitating access to contraception because it found the Mandate did not, in fact, require them to do that which they opposed. *Priests For Life*, 772 F.3d at 246-47; *see also id.* at 252-54. Here, employee plaintiffs assert that they hold religious beliefs against participating in a health insurance plan that covers contraceptives, and there is no dispute that the existence of the Mandate requires them either to so participate, or to forego health insurance coverage and pay a penalty.

Defendants argue that the Mandate acts on employers and health plans, not individual employees, and therefore does not substantially burden employee plaintiffs' exercise of religion. Defs.' Opp'n at 30; *see Priests For Life*, 772 F.3d at 247 ("Whether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact."). I disagree. While it is true that "[a]n asserted burden is also not an actionable substantial burden when it falls on a third party, not the religious

adherent," *Priests For Life*, 772 F.3d at 246, health insurance does not exist independently of the people who purchase it. Indeed, we commonly refer to such purchasers as health plan "participants." A participant pays premiums into a plan in exchange for coverage for his or her future health needs. Given the nature of health insurance, employee plaintiffs *do* play a role in the health care plans that provide contraceptive coverage. *Cf. Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) (noting that burdens arise from the affirmative exercise of a particular act). Even though employee plaintiffs are not the direct objects of the Mandate, they are thus very much burdened by it.

"A substantial burden exists when government action puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 678 (citations and internal quotation marks omitted). Such pressure exists here. The Mandate, in its current form, makes it impossible for employee plaintiffs to purchase a health insurance plan that does not include coverage of contraceptives to which they object. If their employer, March for Life, continues to provide a health insurance plan, it must include contraceptive coverage, as must any plan available for individual purchase on a state health exchange. Employee plaintiffs are thus caught between the proverbial rock and a hard place: they can either buy into and participate in a health insurance plan that includes the coverage they find objectionable and thereby violate their religious beliefs, or they can forgo health insurance altogether and thereby subject themselves to penalties for violating the ACA's individual mandate, codified at 26 U.S.C. § 5000A. Either way, employee plaintiffs must act, and may not maintain health insurance consistent with their

religious beliefs.  This is not a case of a government program with "incidental effects . . . which may make it more difficult to practice certain religions," but rather one which has a "tendency to coerce individuals into acting contrary to their religious beliefs." *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988).  Thus, the Mandate imposes a substantial burden on employee plaintiffs' exercise of religion.

In light of this substantial burden to employee plaintiffs' exercise of religion, defendants must demonstrate that the Mandate (1) furthers a compelling government interest, and (2) is the least restrictive means of doing so.  42 U.S.C. § 2000bb–1(b); *Hobby Lobby*, 134 S. Ct. at 2779.  Our Circuit Court has concluded that the Mandate, in general, does further compelling government interests.  "The government has overlapping and mutually reinforcing compelling interests in promoting public health and gender equality.  The contraceptive coverage requirement specifically advances those interests." *Priests For Life*, 772 F.3d at 263-64; *see also id.* at 259 ("[C]ompelling interests converge to support the government's decision, reflected in the challenged regulations, to provide cost-free contraceptive coverage and to remove administrative and logistical obstacles to accessing contraceptive care.").

The government's assertion of a compelling interest in the Mandate in general is not sufficient to satisfy the standard established by RFRA.  Instead, "the compelling interest test [must be] satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)).  The Court "must look beyond the

21

broadly formulated interests justifying the general applicability of the statute to examine the interests the government seeks to promote as applied to [the particular plaintiff] and the impediment to those objectives that would flow from granting [her] a specific exemption." *Kaemmerling*, 553 F.3d at 682 (internal quotation marks omitted).

"The challenged regulations seek to ensure timely and effective access to contraception for all women who want it and for whom it is medically appropriate." *Priests For Life*, 772 F.3d at 257. As employee plaintiffs repeatedly point out, they do *not* want such access. *See, e.g.*, Compl. ¶¶ 1, 32-35, 125. But our Circuit Court also recognized the government's compelling interest "in a sustainable system of taxes and subsidies under the ACA to advance public health." *Priests For Life*, 772 F.3d at 258. And as just noted, the Court held that the seamless provision of cost-free contraceptive coverage advances public health. *Id.* at 263-64. A program requiring broad participation—including some who do not wish to use certain aspects of the coverage—does serve the government's interest in a functional and sustainable insurance system.

Of course, that is not the end of the inquiry. The final question the Court must ask under RFRA is whether the current Mandate is the least restrictive means of serving this governmental interest. Assuredly, it is not! The inquiry at this stage "focus[es] on the context of the religious objectors, and consider[s] whether and how the government's compelling interest is harmed by granting specific exemptions to particular religious claimants. [A Court] must look to the marginal interest in enforcing the regulation to which the plaintiffs object." *Priests For Life*, 772 F.3d at 264 (citations and internal quotation marks omitted).

In arguing that the current set-up is the least restrictive means of ensuring a functioning health insurance system that covers contraceptives for those who want them, defendants rely heavily on *United States v. Lee*, 455 U.S. 252 (1982), a pre-*Smith* free exercise case.[10] *See* Defs.' Opp'n at 33.  In *Lee*, the Supreme Court held that an Amish man could not, in essence, "opt out" of the Social Security system even though it conflicted with his religious beliefs.  455 U.S. at 261.  The Court explained that "mandatory participation is indispensable to the fiscal vitality of the social security system" and "a comprehensive national social security system providing for voluntary participation would be almost a contradiction in terms and difficult, if not impossible, to administer."  *Id.* at 258.  Therefore "it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs."[11]  *Id.* at 259-60.

Defendants say the same is true here.  They contend that "[i]nsurance markets could not function—either administratively or financially—if insurers had to tailor each health plan to the specific needs and desires of each individual plan participant and beneficiary."  Defs.' Opp'n at 31.  They raise the specter of individuals "pick[ing] and

---

[10] Courts look to pre-*Smith* free exercise jurisprudence when analyzing RFRA claims. *See Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 120 (D.D.C. 2012).

[11] As defendants point out, this reasoning has been employed by other courts, primarily, but not exclusively, in the tax context. *See* Defs.' Opp'n at 32-33; *see also, e.g., Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699-700 (1989) (applying the reasoning in *Lee* in a case involving federal income taxes). In the health insurance context, the Ninth Circuit denied student plaintiffs' RFRA challenge to the mandatory fee for their public university's health insurance program, which covered certain services to which plaintiffs objected. *See Goehring v. Brophy*, 94 F.3d 1294 (9th Cir. 1996), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997). There, the Ninth Circuit explained that "the fiscal vitality of the University's fee system would be undermined if the plaintiffs in the present case were exempted from paying a portion of their student registration fee on free exercise grounds. Mandatory uniform participation by every student is essential to the insurance system's survival." *Id.* at 1301.

choos[ing]" from a long list of preventive services what their plans will and will not

cover, arguing that this "would be an impossible administrative undertaking. . . . [and]

would all but lead to the end of group health coverage." Defs.' Opp'n at 32.  Please!

Defendants overlook a critical distinction.  Unlike in *Lee*, the government does *not*

provide the insurance at issue here, and there is no single "comprehensive national

[health insurance] system."  *See Lee*, 455 U.S. at 258.  Instead, the government *regulates*

a host of third party insurers.  The Mandate burdens employee plaintiffs' religious

exercise by restricting the form in which those third parties can offer something that

plaintiffs, for all intents and purposes, *must* buy.

There is, of course, a simple solution: prohibit the government from enforcing the

Mandate against, and penalizing, a third-party insurer that offers individual employee

plaintiffs insurance plans consistent with their sincerely held religious beliefs.  This

removes the burden imposed on employee plaintiffs by the government by *allowing* an

insurance company to offer them plans in the individual market consistent with their

beliefs.  The government need not *require* an insurer offer such a plan at plaintiffs'

request in order to avoid burdening plaintiffs' religious exercise.

March for Life's insurer has represented that it will offer individual employee

plaintiffs the type of plan they desire.  CareFirst Letter, Ex. A to Monahan Affidavit.

However, if it declines to do so, now or at some point in the future, and plaintiffs are

unable to purchase a plan consistent with their beliefs, their inability would be a product

of market or other forces, not the government regulation, and would therefore not

implicate RFRA.

Defendants' parade of horribles necessarily looks beyond the employee plaintiffs in this particular case and purports to project what would happen if other individuals assert similar objections.[12] However, defendants seem to envisage a world in which the government would require third-party insurance companies to provide coverage in every possible form requested by an individual on religious grounds.[13] That, most assuredly, is not the action the Court is taking here.

Insurance companies have every incentive to maintain a sustainable and functioning market, and the government's interest in the same would not be undermined by simply making it legal for a third-party provider to offer, without penalty, a plan consistent with plaintiffs' religious beliefs. If, as defendants suggest, offering an insurance plan that does not include a service or services to which a potential purchaser objects on religious grounds would be "an impossible administrative undertaking," insurance companies will not do it. One particular religious accommodation may make actuarial sense, while another may not. A company may even choose not to entertain possible changes as a matter of policy if it deems the cost of analysis too high. Those decisions can, and should be, left to private actors.

---

[12] Note that here, as in *Hobby Lobby*, the defendants argue that ruling in favor of plaintiffs here "will lead to a flood of religious objections regarding a wide variety of medical procedures and drugs, such as vaccinations and blood transfusions, but [the government] has made no effort to substantiate this prediction." *See* 134 S. Ct. at 2783.

[13] At oral argument, however, the government does acknowledge the possibility of the approach taken by the Court: "[I]f this court ordered that, owing to RFRA, for example, an issuer needed to be permitted to sell the employee plaintiffs an individual plan that accorded with their religious beliefs, they could, indeed, take that to an insurer in the market for individual plans and receive that coverage." Nov. 6, 2014 Mot. Hr'g Tr. 29:20-25.

The remedy here is limited, and has no effect on the Mandate's application to employers or to individuals who do want contraceptive coverage included without cost sharing. Prohibiting the government from punishing a company that offers a modified plan to an employee plaintiff who certifies that she objects on religious grounds to otherwise-required contraceptive coverage does not enable that company to refuse to provide such coverage to others who do not share those religious objections. Thus, employee plaintiffs' RFRA claim is clearly independent of their employer, and has no impact on March for Life's obligations under the Mandate. As such, the Mandate is additionally in violation of RFRA and plaintiffs' Second Claim for Relief must also be granted.

## IV.    Free Exercise

Although the decision on employee plaintiffs' RFRA challenge grants them the individual relief they seek, I must still address their First Amendment free exercise claim briefly, because our Circuit Court has spoken to this issue recently.

Under the First Amendment's protection of the free exercise of religion, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Smith*, 494 U.S. 872); *see also Kaemmerling*, 553 F.3d at 677. If a law is not neutral or generally applicable, it is subject to strict scrutiny. *Lukumi*, 508 U.S. at 531-32 ("A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that

26

interest."). The employee plaintiffs contend that the Mandate is not neutral and generally applicable, and therefore their Free Exercise claim must be evaluated using strict scrutiny. *See* Pls.' Mot. at 17-19.

A neutral regulation does not "target[] religious conduct for distinctive treatment," *Lukumi*, 508 U.S. at 534. A regulation is *not* neutral if its "object . . . is to infringe upon or restrict practices because of their religious motivation" or if it "refers to a religious practice without a secular meaning discernable from the language or context." *Id*. at 533. "General applicability" in the free exercise context "does not mean absolute universality." *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008). To be generally applicable, a regulation "cannot in a selective manner impose burdens only on conduct motivated by religious belief," and the court looks to whether the enacting body decided "that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 542-43.

After the initial briefing in this case, our Circuit Court analyzed whether the Mandate violated a religious organization's free exercise rights in *Priests For Life*, 772 F.3d 229. Plaintiffs in *Priests for Life*, like the employee plaintiffs here, contended "that the exemptions provided to houses of worship and grandfathered plans render the contraceptive coverage requirement non-neutral and not generally applicable." *Id*. at 268; *see* Pls.' Mot. at 17-19. The *Priests for Life* Court found their arguments unavailing and concluded that "[t]hose exemptions, however, do not impugn the contraceptive coverage requirement's neutrality and generality: it is both, in the relevant sense of not selectively targeting religious conduct, whether facially or intentionally, and broadly

27

applying across religious and nonreligious groups alike." *Priests for Life*, 772 F.3d at

268. The exemptions "do not amount to the kind of pattern of exemptions from a facially

neutral law that demonstrate that the law was motivated by a discriminatory purpose,"

and the Mandate "applies across the board," rather than "target[ing] religious

organizations." *Id.*

The relevant questions regarding the Mandate's neutrality and general

applicability are no different in this case, even though plaintiffs are religious individuals

rather than religious non-profits. The underlying Mandate itself remains the same. Just

as the exemptions that do exist do not "render the law so under-inclusive as . . . to suggest

that disfavoring Catholic or other pro-life employers was its objective," *id.*, nor do they

suggest that disfavoring religious individuals—who are not even acted upon directly by

the Mandate—was its objective. "The exemptions in the ACA do not single out any

religion and are wholly consistent with the law's neutral purpose." *Id.*

Our Circuit's ruling that the Mandate is neutral and generally applicable, and thus

not subject to strict scrutiny under the free exercise clause, precludes employee plaintiffs'

claim here. "The right of free exercise protected by the First Amendment 'does not

relieve an individual of the obligation to comply with a valid and neutral law of general

applicability on the ground that the law proscribes (or prescribes) conduct that his

religion prescribes (or proscribes).'" *Kaemmerling*, 553 F.3d at 677 (quoting *Smith*, 494

U.S. at 879). The fact that the government requires via a neutral, generally-applicable

regulation that the employee plaintiffs participate in an insurance plan that covers

contraception does not violate their free exercise rights. Plaintiffs have therefore not

stated a free exercise claim upon which relief can be granted.  As such, their Third Claim for Relief must be dismissed.

## CONCLUSION

For all the foregoing reasons, the Court GRANTS in part plaintiffs' Motion for Summary Judgment.  Specifically, the Court GRANTS plaintiffs' Motion as to plaintiffs' First Claim for Relief under the equal protection clause of the Fifth Amendment, their Second Claim for Relief under the RFRA, and their Fourth Claim for Relief under the Administrative Procedure Act, but DENIES their Motion as to plaintiffs' Third Claim for Relief under the free exercise clause of the First Amendment.  The Court further GRANTS defendants' Motion to Dismiss as to plaintiffs' Third Claim for Relief, but DENIES the remainder of defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, as to plaintiffs' First, Second, and Fourth Claims for Relief. Defendants are hereby permanently ENJOINED from enforcing against plaintiff March for Life, its health insurance issuer, and the insurance issuer(s) of employee plaintiffs Jeanne Monahan and/or Bethany Goodman, the statutes and regulations requiring a health insurance issuer to include contraceptive coverage in plaintiffs' health insurance plans. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge